# Report of the Commission on Presidential Nomination Timing and Scheduling

# to Governor Howard Dean Chairman Democratic National Committee

*As adopted by the Commission at its December 10, 2005 meeting.*

Prepared by the DNC Office of Party Affairs and Delegate Selection
as Staff to the Commission on Presidential Nomination Timing and Scheduling

For more information contact:

Democratic National Committee
430 South Capitol Street, S.E.
Washington, D.C. 20003
www.democrats.org

**Report of the Commission on Presidential Nomination Timing and Scheduling**

# Contents

**1** Commission on Presidential Nomination Timing and Scheduling Membership . . . . . . . . . . . . . . . 5

**2** Letter of Transmittal from the Commission Co-Chairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**3** Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**4** Establishing Resolution by National Convention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**5** Schedule of Meetings and Persons Submitting Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**6** Introduction and Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     ! DNC Authority Over Delegate Selection Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     ! History of Democratic Party Timing Rule and Implementation . . . . . . . . . . . . . . . . . . . . . 20

         • 1972 & 1976 Cycles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

         • 1980 Cycle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

         • 1984 Cycle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

         • 1988 Cycle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

         • 1992 Cycle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

         • 1996 Cycle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

         • 2000 Cycle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

     ! 2004 Calendar and Current Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

     ! Creation of the Commission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

     ! Republican Rules on Timing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**7** Commission Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

     ! March 12, 2005 Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## Report of the Commission on Presidential Nomination Timing and Scheduling

!   May 14, 2005 Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

!   July 16, 2005 Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

!   October 1, 2005 Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

8   Findings and Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

!   Pre-Window Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

!   Window Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

!   Further Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

•   Presidential Candidate Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

•   Presidential Election Public Financing System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

•   Moving Back the Process in 2012 and Beyond . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

•   Election Reform . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

•   Party Building Efforts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

9   Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

!   Procedural Rules of the Commission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

!   Acknowledgements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

!   Charts Showing Allocation of Delegates Based on First Determining Step . . . . . . . . . . . . . . 51

**Report of the Commission on Presidential Nomination Timing and Scheduling**

# 1 Commission Membership

## Co-Chairs

Hon. Alexis Herman
*Fmr. U.S. Secretary of Labor*

Hon. David Price
*U.S. Representative, North Carolina*

## Members

Aida Alvarez
*Fmr. Administrator, U.S. Small Business Administration*

Vida Benavides

Donna Brazile
*DNC At-Large Member & Fmr. DNC Rules & Bylaws Cmte. Co-Chair*

Hon. Michael Coleman
*Mayor of Columbus, Ohio*

Roxanne Conlin
*Fmr. President, American Trial Lawyers Association*

Jerry Crawford
*Fmr. State Chair, Iowa State Party*

Hon. Lois DeBerry
*DNC At-Large Member & Tennessee House Speaker Pro Tempore*

Debbie Dingell
*Michigan Democratic National Committeewoman*

Maria Echaveste
*DNC At-Large Member*

Cuauhtemo "Temo" Figueroa
*Assistant Political Director, AFSCME*

Hartina Flournoy
*AFT & DNC At-Large Member & Fmr. DNC Rules & Bylaws Cmte. Co-Chair*

Donald Fowler
*DNC At-Large Member & Fmr. DNC Chair*

Jehmu Greene
*Fmr. President, Rock the Vote*

Linda Honold
*Fmr. Chair, Wisconsin State Party*

Harold Ickes
*DNC At-Large Member*

Carol Khare Fowler
*Vice Chair, South Carolina State Party & Fmr. Co-Chair, DNC Rules & Bylaws Cmte.*

Hon. Carl Levin
*U.S. Senator, Michigan*

Hon. Blanche Lincoln
*U.S. Senator, Arkansas*

Bill Lynch
*Fmr. DNC Vice Chair*

Hon. Kendrick Meek
*U.S. Representative, Florida*

Steve Murphy
*Murphy, Putnam, Shorr & Partners*

Spencer Overton
*Associate Professor of Law, The George Washington University Law School*

Jim Pederson
*Fmr. Chair, Arizona State Party*

Hon. Ed Rendell
*Governor of Pennsylvania*

James Roosevelt, Jr
*DNC At-Large Member & Co-Chair, DNC*

Rules and Bylaws Cmte.

Dolores Sibonga
*Fmr. Seattle City Council*

Hon. Jeanne Shaheen
*Fmr. Governor of New Hampshire*

Hon. Terry Shumaker
*Fmr. Ambassador to Trinidad & Exec. Dir., New Hampshire Education Association*

Hon. Kathleen Sebelius
*Governor of Kansas*

Michael J. Stratton

Hon. Hilda Solis
*U.S. Representative, California*

Susan Swecker
*Virginia Democratic National Committeewoman & Chair, DNC Southern Regional Caucus*

John Sweeney
*President, AFL-CIO*

Hon. Art Torres
*Chair, California State Party*

Ed Turlington
*Brooks, Pierce, McLendon, Humphrey & Leonard*

Hon. Jennifer Veiga
*Colorado State Senate*

Josh Wachs

## Report of the Commission on Presidential Nomination Timing and Scheduling

| | | |
|---|---|---|
| *Associate Dean, Milano The New School for Management and Urban Policy* | Hon. Harriet Smith Windsor | *Secretary of State of Delaware* |

## Staff

Philip A. McNamara
*DNC Director of Party Affairs & Delegate Selection*

Joseph E. Sandler
*DNC General Counsel*

Alecia Dyer
Marc Schloss
*Deputy Directors*

**Report of the Commission on Presidential Nomination Timing and Scheduling**

# 2      Letter of Transmittal

December 13, 2005

Governor Howard Dean, M.D.
Chair
Democratic National Committee
430 S. Capitol Street, SE
Washington, D.C. 20003

Dear Governor Dean:

We are pleased to report that the Commission on Presidential Nomination Timing and Scheduling has completed its work. The attached report was adopted by the Commission on December 10, 2005 and is transmitted to you for your review and consideration.

The Commission Members carried out the review of the 2008 presidential nominating calendar in the thorough manner contemplated by the 2004 Democratic National Convention resolution that established our Commission and issued our charge. We examined a wide variety of reform proposals and evaluated what kind of approach could best achieve the Democratic Party's goals and affirm its values, in structuring the nominating process.  We heard from Party leaders, elected officials, experienced campaign staff, academic experts, and Democratic grassroots activists about their thoughts and perspectives on the timing of the nominating process, and we benefited from their advice.

At the end of this thoughtful and deliberative process, we are pleased that the recommendations in this report received broad-based support from the Commission members.  Certainly every Commission member intended that whatever recommendations we made would help ensure that the nominating process produce the best and strongest possible nominee for President.

The Commission has attempted to devise a schedule that gives our presidential candidates an opportunity to present themselves and their views to a broad range of voters.  Our recommendations reflect both an appreciation for the traditional role of the Iowa and New Hampshire contests and the need to test our candidates in contests that more broadly reflect the rich and broad diversity of our Party and your commitment to build the Party in every region of the country.

Additionally, the Commission offers an incentive system based on bonus delegates for states that move their contests later in the nominating calendar. While we cannot know the effect they will have, we hope the inducements would be significant enough to encourage consideration and might actually serve as a positive force in avoiding the front-loading of the calendar.

Lastly, the Commission recommends some action on a number of matters that were addressed through testimony, including our strong recommendation that you begin discussions with our Republican counterparts on the 2012 nominating process in time for action by the GOP at their 2008 Convention. Our conviction is that the entire process should be moved a number of weeks later, but we realize that this will

# Report of the Commission on Presidential Nomination Timing and Scheduling

require bipartisan negoitation and action.

Over the years, Democrats have tried to make the nominating process more fair, more representative, and more effective as a proving ground for our own candidates. The changes recommended by the Commission continue that effort and further improve the nominating calendar for both our candidates and our voters.

On behalf of the Commission members, we thank you for the privilege of serving and for the support you and other members of the DNC and staff have provided throughout our work. We believe these recommendations will put us on the road to electing a Democratic president in 2008, once again restoring hope and promise for millions of Americans.

Sincerely,


Alexis M. Herman
David E. Price
Commission Co-Chairs

**Report of the Commission on Presidential Nomination Timing and Scheduling**

# 3      Executive Summary

The 2004 Democratic National Convention approved a resolution establishing a Commission on Presidential Nomination Timing and Scheduling. The Commission was charged with studying the timing of Democratic presidential primaries and caucuses and developing appropriate recommendations for the 2008 nominating cycle.

The Commission began its work in March 2005 and held a total of five public meetings, undertaking a thorough review of the current schedule.  The Commission received broad input and a variety of useful suggestions and ideas from Democratic elected officials, Party leaders, experienced campaign staff, academic experts, grassroots activists and interested voters.

In developing its recommendations for consideration by Governor Dean, the Commission has reaffirmed the Party's commitment to a nominating process that will produce the best and strongest possible candidate for President and is open, inclusive and fair to all Democratic candidates and voters.

The Party's reform efforts over the last three decades have been characterized by various attempts to broaden participation in the delegate selection process.

The Commission is mindful and respectful of the valuable roles the Iowa caucuses and New Hampshire primary have traditionally played and, in particular, the personal engagement and involvement of the voters who participate in these contests.  At the same time, the Commission heard serious concerns about the disproportionate influence of these traditionally early contests, and the need, early in process, to include states that would be more fully representative of the Party's rich diversity.

Accordingly, the Commission recommends:

‣ Preserving the first-in-the-nation status of Iowa and New Hampshire but adding other states in the pre-window period.

‣ Adding 1 or 2 new first-tier caucuses between Iowa and New Hampshire, and 1 or 2 new primaries between New Hampshire and the opening of the window for all other states on February 5, 2008.

‣ Having the DNC Rules and Bylaws Committee determine which states should be added, using the following criteria: racial and ethnic diversity; geographic diversity; and economic diversity including union density.

The front-loading of states at the beginning of the calendar has also limited broader participation in the process. The trend toward bunching up on the first day of the window, or in the first month, does not enhance the role of any state or group of states. To be effective and to receive attention from candidates and the press, states must spread out the dates of their contests and restore a more deliberate pacing to the process.

Accordingly, the Commission recommends that the DNC work with State Parties and political leaders to

## Report of the Commission on Presidential Nomination Timing and Scheduling

schedule no more than five contests in any one week. Additionally, the Commission has proposed, for consideration by the Rules and Bylaws Committee, a bonus delegate incentive system that would encourage states parties to schedule their events later in the process.

Finally, the Commission urges the DNC to engage at an early stage with the Republican Party with respect to the 2012 calendar so that the two parties can work together to move the entire process later in the presidential year and to harmonize their calendars.  In addition, the Commission urges the DNC to support reform of the presidential public financing system; to continue its advocacy of extending and strengthening the Voting Rights Act; to use the presidential nominating process as a party-building opportunity; and to ensure that the Rules and Bylaws Committee is cognizant of election reform issues in administering the delegate selection process.

**Report of the Commission on Presidential Nomination Timing and Scheduling**

# 4   Establishing Resolution by National Convention

The following Resolution was recommended by the 2004 Democratic National Convention Rules Committee at its July 25, 2004 meeting for consideration by the 2004 Democratic National Convention. The Resolution was subsequently adopted by the 2004 Democratic National Convention July 26, 2004.

Sponsored by

Senator Carl Levin, Michigan
DNC Chairman Terry McAuliffe, Virginia
Debbie Dingell, Democratic National Committeewoman, Michigan

*Resolution Establishing a Commission on Presidential Nomination Timing and Scheduling*

**WHEREAS,** the timing of the delegate selection process and the scheduling of presidential primaries and caucuses is a critical component in the nomination of a candidate for president by the Democratic Party; and

**WHEREAS,** in 1980, the Democratic Party established a "window" in which presidential primaries and caucuses must be scheduled, considering it important and in the public interest to contain the length of the primary season and believing that a longer primary period is divisive and expensive and could potentially weaken the Party's prospects for the general election in November; and

**WHEREAS,** over the last two decades individual states have moved their respective contests earlier and earlier in the calendar year; and

**WHEREAS,** in 2000, the Republican Party established its first "window" and set the opening a month ahead of the Democratic "window" which created an unfair, imbalanced and confusing 2000 nominating calendar; and

**WHEREAS,** for the 2004 presidential nominating process, in an effort to match the calendar used by the Republicans, the Democratic Party advanced by a month the opening of its "window" for when primaries and caucuses may begin; and

**WHEREAS,** some political pundits were initially skeptical about the Party's move to match the Republican calendar and allow the primaries and caucuses to begin a month earlier, but came to see the merit of having a presumptive nominee determined earlier among a cross-section of voters in a set of diverse and balanced states to compete with the Republican incumbent;

**WHEREAS,** for years, objections have been raised to a calendar that some believe gives a disproportionate influence to a few early states; and

**WHEREAS,** based on the abovementioned issues, some Party leaders have called for an examination of

## Report of the Commission on Presidential Nomination Timing and Scheduling

the scheduling of future Democratic presidential primaries and caucuses;

**THEREFORE BE IT RESOLVED,** that the 2004 Democratic National Convention shall create the Commission on Presidential Nomination Timing and Scheduling; and

**BE IT FURTHER RESOLVED,** that the Commission shall be charged with the responsibility of studying the timing of presidential primaries and caucuses and developing appropriate recommendations to the Democratic National Committee for the nominating process beginning in 2008; and

**BE IT FURTHER RESOLVED,** the Commission shall examine all substantive, systematic, and incremental reform proposals while evaluating how specific proposals would be implemented; outlining measures to ensure compliance; and bearing in mind the Party's commitment to a presidential nominating process that is open and fair to all Democratic candidates and voters and that produces the strongest possible nominee; and

**BE IT FURTHER RESOLVED,** the Commission shall consist of between 25 and 40 members, provided that no more than half are members of the Democratic National Committee; and

**BE IT FURTHER RESOLVED,** that the Commission members include a Democratic governor, two Democratic U.S. Senators, a Democratic Member of the U.S. House of Representatives, and other Democratic elected officials, Party leaders, scholars, organized labor officials, grassroots community activists to be appointed by the Chairman of the Democratic National Committee within 30 days following the 2004 general election, and

**BE IT FURTHER RESOLVED,** that the Commission shall hold a series of regional hearings/meetings throughout the country and shall hold its first meeting within 90 days following the 2004 general election; and

**BE IT FURTHER RESOLVED,** the Commission shall issue its report and recommendations to the Democratic National Committee by December 31, 2005 for consideration and action by the Democratic National Committee.

**Report of the Commission on Presidential Nomination Timing and Scheduling**

# 5  Schedule of Meetings and Persons Submitting Testimony

To carry out its charge to examine the timing of presidential primaries and caucuses and to develop a recommendation on the timing of the 2008 nominating cycle, the Commission held a series of three "informational fact-finding" meetings. At its March, May and July meetings, the Commission received testimony from a number of Democratic elected officials, Party leaders, national organizations, and scholars who offered a variety of helpful, insightful, thoughtful, perceptive, and useful suggestions and comments concerning the future primary/caucus schedule. The Commission's October meeting featured a discussion of issues related to the pre-window period and several key votes by the members.

## March 12, 2005 – Washington, D.C.

- Elaine C. Kamarck
  *Lecturer in Public Policy, John F. Kennedy School of Government, Harvard University*

- Thomas Mann
  *W. Averill Harriman Chair and Senior Fellow, The Brookings Instituion*

- Ronald Walters
  *Director African American Leadership Institute, Distinguished Leadership Scholar, James MacGregor Burns Academy of Leadership, University of Maryland*

- Lyn Utrecht
  *Partner, Ryan, Phillips, Utrecht and MacKinnon*

## May 14, 2005 – Chicago, Illinois

- Leslie Reynolds
  *Executive Director, National Association of Secretaries of State (NASS)*

- Broward "Beage" Atwater
  *Steering Committee Member, Democrats for the West*

- Brian Kuehl
  *Democrats for the West*

- Jerry Brady
  *Democrats for the West & 2002 Idaho Democratic Nominee for Governor*

- Hon. Carl Levin
  *U.S. Senator, Michigan*

- Debbie Dingell
  *Michigan Democratic National Committeewoman*

- Tina Abbott
  *Vice Chair, Michigan Democratic Party*

- Hon. Tom Harkin
  *U.S. Senator, Iowa*

- Hon. Wayne Ford
  *Iowa State Representative*

- Ako Abdul-Samad
  *Des Moines, Iowa School Board*

- Hon. John Lynch
  *Governor of New Hampshire*

- Hon. Bill Gardner
  *New Hampshire Secretary of State*

- Kathy Sullivan
  *Chair, New Hampshire State Party*

**Report of the Commission on Presidential Nomination Timing and Scheduling**

## May 14, 2005 Continued – Chicago, Illinois

- Paul Strauss
  *Shadow Senator, District of Columbia*

- Sean Tenner
  *DC Democracy Fund*

- Vince Powers
  *Nebraska Democratic National Committeeman*

- John Wertheim
  *Chair, New Mexico State Party*

- Joe Erwin
  *Chair, South Carolina State Party*

## July 16, 2005 – Washington, D.C.

- Hon. Bill Jefferson
  *U.S. Representative, Louisiana - Statement on behalf of the Congressional Black Caucus*

- Hon. Hilda Solis
  *U.S. Representative, California -- Statement on behalf of Hispanic Democratic Members of Congress*

- Andre Pineda
  *Pineda Consulting*

- Ginger Ehn Lew

- John Sweeney
  *President, AFL-CIO*

- Curtis Gans
  *Director, Center for the Study of the American Electorate*

- Diane Feldman
  *President, The Feldman Group*

- Bruce Caswell
  *Americans for Democratic Action & Associate Professor, Rowan University*

- Michael Malbin
  *Executive Director, Campaign Finance Institute*

## Written Testimony (only)

- Alabama Democratic Party
  Jim Spearman, Executive Director

- California Young Democrats
  David Phelps, Former President

- Colorado Democratic Party
  Pat Waak, State Chair

- DLC
  Al From, Founder and CEO

- District of Columbia State Party
  Wanda Lockridge, State Chair

- League of Women's Voters
  Kay Maxwell, President

- Montana Democratic Party
  Bob Ream, State Chair

- NDN (New Democrat Network)
  Simon Rosenberg, President

- Hon. Eleanor Holmes Norton
  Delegate, U.S. House of Representatives, District of Columbia

## Report of the Commission on Presidential Nomination Timing and Scheduling

## Written Testimony (only) Continued

- Pennsylvania Democratic Party
  TJ Rooney, State Chair

- SEIU
  Anna Burger, Secretary-Treasurer

- Utah Democratic Party
  Donald Dunn, State Chair

- West Virginia Democratic Party
  G. Nick Casey, State Chair

- Wyoming Democratic Party
  Mike Gierau, State Chair



**Report of the Commission on Presidential Nomination Timing and Scheduling**

(This Page Intentionally Blank)

**Report of the Commission on Presidential Nomination Timing and Scheduling**

# 6        Introduction and Background

In 1964, Fannie Lou Hamer[1] led the Mississippi Freedom Party's challenge to the credentials of the delegates selected to represent that state at the Democratic National Convention in Atlantic City. That challenge began the modern movement to reform the way in which the Democratic Party selects its nominee for President and has culminated in the issuance and implementation by the Democratic National Committee (DNC) of its Party rules governing the selection of delegates to each presidential nominating convention.  Beginning in 1976, and continuing in each presidential cycle since, the DNC has issued "Delegate Selection Rules" that govern the process by which each state and territorial Democratic Party selects its delegates to the National Convention.

The rules that govern this process are not abstractions unrelated to broader goals. Rather, they are designed, if somewhat imperfectly, to help ensure that the Democratic Party selects its nominees through a fair, open, inclusive and representative process. Ensuring that those broader goals are reached is not a stagnant process - indeed it is the reason why the Party has in the past and continues today to look at, examine, review and, when necessary, change its delegate selection rules.

The Commission on Presidential Nomination Timing and Scheduling ("Commission") is part of that continuing process. It was established by the 2004 Democratic National Convention pursuant to a resolution sponsored by then DNC Chairman Terry McAuliffe, Senator Carl Levin and DNC member Debbie Dingell. The Commission's charge was to "study the timing of presidential primaries and caucuses and develop appropriate recommendations to the DNC for the nominating process beginning in 2008." It is a mandate that the members of the Commission have taken seriously, committing themselves to a challenging, open, robust and rigorous process.

During the past year, the Commission has held four public meetings, heard testimony from a broad and diverse group of presenters and discussed, in detail, the differing points of view on the very important issues before it. And because neither its members nor this process exists in a bubble, the Commission has benefitted from the opinions of a number of others who are interested in the Democratic Party.

We would be remiss if we did not point out, at this early juncture, that Commission members are both mindful of and respectful of the traditions surrounding the Party's delegate selection process and of the

---

[1]   Fannie Lou Hamer was a Mississippi sharecropper who became involved in the civil rights movement when she volunteered to attempt to register to vote in 1963 as part of the Student Nonviolent Coordinating Committee (SNCC). She helped form, and became Vice Chairperson of, the Mississippi Freedom Democratic Party (MFDP) an alternative to the "regular" Mississippi State Democratic Party which at the time excluded African Americans. In 1964, the Mississippi Freedom Democratic Party elected its own delgation to the Convention that included Hamer and others. Hamer and the MFDP challenged the regular State Party's all-white delegation to the Convention on the grounds that the delegation did not fairly represent all the people of Mississippi, as most African Americans were denied the right to vote. Hamer testified before the 1964 Convention Credentials Committee about the injustices that allowed an all-white delegation to be certified from the state. Her live testimony before the Credentials Committee was pre-empted by a presidential press conference, national television networks aired Hamer's testimony in its entirety later that night. Ultimately, the Convention Credentials Committee offered a "compromise" that seated two MFDP delegates as at-large delegates to the Convention, a "compromise" rejected by the MFDP at the urging of Hamer. This historic episode led to the adoption of a resolution at the 1964 Convention which conditioned the seating of delegates at future Conventions on assurances that discrimination in any State Party affairs on the ground of race, color, creed, or national origin would not be permitted.

**Report of the Commission on Presidential Nomination Timing and Scheduling**

important and unique roles that the Iowa caucuses and the New Hampshire primary have played in that process. The particular type of candidate and citizen interaction that their processes have afforded has not been taken lightly. Many, if not all, of the Commission members have had the opportunity to spend time in these states and are personally familiar with the vigorously participatory democracy that takes place during the presidential caucuses and primary.

However, Commission members are similarly mindful of and respectful of the voices that urge that the Party's rich ethnic, racial, regional, economic, religious and philosophical diversity be more fully on display at every stage of the delegate selection process - including during any "pre-window" period.[2]

The Commission also heard widespread concerns about the negative impact of front-loading.[3] We attempt in this report to address those concerns.

The Commission believes that its recommendations recognize and respect these seemingly competing concerns and, more importantly, focus on what we all agree is and must be our ultimate goal: producing the best and strongest Democratic nominee for the office of President of the United States.

# DNC Authority Over Delegate Selection Process

Under the delegate selection rules, the DNC requires each State Party to develop a written plan for the selection of delegates to the national nominating Convention, and to submit that plan to the DNC Rules & Bylaws Committee (RBC), the Party's body charged with administering the delegate selection process.[4] The Committee reviews each plan for compliance with the Delegate Selection Rules.[5] As explained in detail below, since 1980, one of those rules has addressed the timing of presidential primaries and caucuses in each state.

If a State Party's delegate selection plan does not comply with the rules, the Rules & Bylaws Committee can declare it in "non-compliance."[6] Non-compliance with certain key provisions – including the rule on timing – results in an automatic, severe reduction in the number of delegates the state can send to the Convention.[7] Additionally, a plan in non-compliance for any reason also leaves the state's delegation open to a credentials challenge at the Convention.

---

[2]   The window is the period in time during which any state or territory is free to hold its first determining step, a presidential preference primary or first-tier caucus. In 2004, the window opened the first Tuesday of February (February 3, 2004) and closed the second Tuesday of June (June 8, 2004). The pre-window refers to the period of time before the opening of the window and is the time when Iowa and New Hampshire have been given specific exemptions in the Party's rules to hold their contests.

[3]   The term "front-loading" refers to the early bunching of contests at the beginning of the formal window period.

[4]   *The Delegate Selection Rules for the 2004 Democratic National Convention*, as adopted by the DNC January 19, 2002; Rule 1

[5]   Ibid; Rule 1.D & 1.E

[6]   Ibid; Rule 19.B

[7]   Ibid; Rule 19.C

## Report of the Commission on Presidential Nomination Timing and Scheduling

It is well established that the Party processes through which delegates are selected – caucuses and Party-run primaries – are subject to the rules of the National Party. As such, no state law can dictate to a State Party how, whether, or when to hold a Party-run event. Moreover, it is solely within the DNC's purview to determine if those Party-run events have been conducted in compliance with applicable rules, and if their results will be recognized by the National Party.

To be sure, with respect to primaries that are run and paid for by a state government, rulings of the Supreme Court and lower courts over the years have made clear that, ultimately, the DNC (and RNC) cannot force a state to hold or not hold a primary or tell the state when the event must be scheduled. However, the National Party and its Convention do have the constitutionally-protected right: to disregard the results of that primary, if it is held in violation of National Party rules; to refuse to seat, at the Convention, delegates chosen based on that primary; and/or to force a State Party to hold an alternative, Party-run process (caucus) to choose the delegates to attend the Convention.[8]

In the leading case of Democratic Party of the United States v. Wisconsin ex rel. LaFollette, Wisconsin state law provided for a Democratic presidential primary open to Republicans and independents, and required delegates to vote in accordance with the results of the primary.  The State Party submitted a delegate selection plan providing for such an open primary and the DNC's Compliance Review Commission (the predecessor to the DNC Rules and Bylaws Committee) disapproved the plan, indicating that delegates chosen under the plan would not be seated at the 1980 Convention.  The state sued in the state Supreme Court, which ordered that delegates be apportioned based on the open primary and that they be seated at the Convention.

The U.S. Supreme Court reversed, ruling that, while Wisconsin was free to run an open primary, it could not force the DNC to seat a delegation chosen in contravention of the Party's rules because such a requirement would violate the Party's associational rights protected by the First Amendment.  The Court rejected the state's argument that its open primary law placed only a minor burden on the National Party, holding that a "State . . . may not substitute its own judgment for that of the Party.  A political party's choice among the various ways of determining the makeup of a State's delegation to the party's national convention is protected by the Constitution."[9]  The Court found that the various interests asserted by the state in holding an open primary did not justify the state court's order:

> The State has a substantial interest in the manner in which its elections are conducted....
> The National Party rules do not forbid Wisconsin to conduct an open primary.  But if
> Wisconsin does open its primary, it cannot require that Wisconsin delegates to the
> National Party Convention vote there in accordance with the primary results, if to do so
> would violate Party rules.[10]

---

[8]   California Democratic Party v. Jones, 530 U.S. 567, 573-78 (2000); Democratic Party of United States v. Wisconsin ex rel. La Follette, 450 U.S. 107 (1981); Cousins v. Wigoda, 419 U.S. 477 (1975)

[9]   Democratic Party of United States v. Wisconsin ex rel. La Follette, 450 U.S. 107 (1981) at 123-24

[10]  Ibid at 126

**Report of the Commission on Presidential Nomination Timing and Scheduling**

It is thus clear that, if a state enacts legislation providing for a presidential preference primary or caucus to be conducted in violation of National Party rules, the DNC can require a State Party to choose its delegates through an alternative process, e.g.,  a caucus process that complies with the rules, and can ultimately enforce that requirement by refusing to seat at the Convention delegates allocated among presidential preferences based on the event conducted in violation of the rules.

# History of Democratic Party Timing Rule and Implementation

The Democratic Party's attempts to control the timing of its presidential nominating process are not new, transitory, or lightly considered. Indeed, since first being addressed at the 1968 Democratic National Convention the issue of timing has become a critical component of the Party's delegate selection process.

## 1972 & 1976 Cycles

As part of the Call for the 1972 Convention, the 1968 Convention adopted a requirement, that the delegate selection process must begin within the calendar year of the Convention. Additionally, the 1968 Convention adopted a resolution establishing the "Commission on Party Structure and Delegate Selection," which became known as the "McGovern-Fraser Commission", after its Chairs, initially Senator George McGovern and later Minnesota U.S. Representative Donald Fraser.

After completing its work in 1969, the McGovern-Fraser Commission adopted "Guidelines for Delegate Selection" for the 1972 Convention. The Commission expressed concern that the elected officials and Party leaders who chose the delegates in many states were themselves selected or elected well before the calendar year of the Convention.  The Commission adopted a requirement that "state parties…prohibit any practices by which officials elected or appointed before the calendar year choose nominating committees or propose or endorse a slate of delegates…."[11]

The Delegate Selection Rules for the 1976 Convention reiterated this requirement by stating that all "steps in the delegate selection process, must take place within the calendar year of the Democratic National Convention."[12]

In the meantime, although the DNC had not yet focused on the timing of specific events, there was pressure on New Hampshire to take part in a regional New England primary as well an effort by Florida and Massachusetts legislators to move their respective states' primaries ahead of New Hampshire.[13] As a result of these developments, in 1975, New Hampshire enacted a statute providing that New

---

[11]  *Mandate for Reform - a Report of the Commission on Party Structure and Delegate Selection to the Democratic National Committee*. April 1970; 47

[12]  *The Delegate Selection Rules for the 1976 Democratic National Convention* as adopted by the DNC March 1, 1975; Rule 3.A.

[13]  Palmer, Niall A. *The New Hampshire Primary and the American electoral process*. Westport, Connecticut: Praeger Publishers, 1997.

## Report of the Commission on Presidential Nomination Timing and Scheduling

Hampshire's primary be held on the second Tuesday in March or on the Tuesday immediately before the date on which any other New England state would hold a similar election.[14]

## 1980 Cycle

In 1975 the DNC created another reform body to study the nominating process. Formally called the Commission on the Role and Future of Presidential Primaries, the group was chaired by then-Michigan State Chair Morley Winograd and became known as the "Winograd Commission."  As part of its work, the Winograd Commission considered various alternatives, including a national primary, regional primaries and limiting the length of the delegate selection process.[15]  The Commission concluded that the existing system had strengths and weaknesses, noting that: "Many have complained that the delegate selection process is too long.  Others have complained that the early primaries and caucuses have undue influence on the process…."[16]  Ultimately, the Commission concluded that "the length of the delegate selection process should be condensed to 13 calendar weeks, with the first determining stage…occurring not prior to the second Tuesday in March….."[17]  Consistent with this recommendation, Rule 10.A. of the 1980 Delegate Selection Rules provided that no event "constituting the first determining stage in the presidential nominating process….may be held prior to the second Tuesday in March….."[18] or March 11, 1980.

In 1978, the Iowa General Assembly enacted a statute mandating that the state's caucuses be held no later than the second Monday in February.

When 1980 came, there were a number of states that held contests before the opening of the window on March 11. These included the Iowa caucuses on January 21; South Dakota caucuses on February 2; Maine caucuses on February 10; New Hampshire primary on February 26, and the Massachusetts primary on March 4, 1980.

## 1984 Cycle

The 1980 Convention authorized creation of another reform panel, the Commission on Presidential Nomination, which was chaired by then-North Carolina Governor James B. Hunt, Jr. Its review of past cycles led the Hunt Commission to express concern about the "front-loading" of delegate selection events within the window period. The Hunt Commission noted that in 1972, 17% of the delegates had been allocated (bound to a presidential candidate) by mid-April, while in 1976 the comparable percentage was 33% and in 1980, 44%.  The Commission found that, "Such trends threaten the pacing and the

---

[14]   Ibid

[15]   *Openness, Participation and Party Building: Reforms for a Stronger Democratic Party - Report of the Commission on Presidential Nomination and Party Structure.* January 1978.; 21-37

[16]   Ibid; 71

[17]   Ibid; 71

[18]   *Delegate Selection Rules for the 1980 Democratic National Convention* as adopted by the DNC June 9, 1978; Rule 10.A.

## Report of the Commission on Presidential Nomination Timing and Scheduling

responsiveness of the process in several respects.  They give even greater influence to a few 'pace-setting' early states.  They threaten to 'lock up' the nomination prematurely….."[19]

With respect to the window itself, the Hunt Commission stated that:

> The Commission heard a great deal of testimony as to the expense and divisiveness of a prolonged campaign and the unfairness of a system which gives disproportionate influence to a few early states.  We regard it essential to shorten the primary/caucus season: the rule we are proposing would delay its beginning by five weeks.  At the same time we see some value in a few early contests where lesser-known candidates can have a greater impact and face-to face-politics still predominates.  We also appreciate the importance of the early caucuses to Democratic party building in Iowa and the 30-year history of New Hampshire's early primary.[20]

Based on these considerations, the Commission recommended that the 1984 rules require that no event be held earlier than the second Tuesday in March (March 11, 1984), with specific exemptions for Iowa, to hold its caucuses no more than 15 days before the opening of the window (February 27), and New Hampshire, to hold its primary no earlier than the first Tuesday in March (March 4). The 1984 Delegate Selection Rules incorporated this recommendation.

As events unfolded, the State of Vermont scheduled a primary for March 6, an event which because of the March 11 window opening date became a non-binding beauty contest on the Democratic side—and therefore not a violation of the window—but was arguably binding on the Republican side.  In response, New Hampshire Secretary of State Bill Gardner invoked his state's statute and interpreted it to require the New Hampshire primary to be first by seven days. Consequently, the 1984 New Hampshire primary was scheduled for February 28.  Since this put the primary one day after the Iowa caucuses, Iowa then enacted a statute requiring that its caucuses be held at least eight days prior to any other state's delegate selection event.[21]  Then, Iowa moved its caucuses up as well to February 20, 1984.

The Democratic presidential candidates agreed to boycott the Vermont primary, but Vermont's State Democratic Party could not move the state-run event back into the window and Secretary Gardner remained intransigent.

In October 1983, the DNC's Compliance Review Commission found New Hampshire's plan in non-compliance. The DNC threatened to hold a national Party-run process to allocate delegates, in place of the state's primary, and intense negotiations ensued.  That same month the New Hampshire State Party obtained a letter from the presidential candidates urging the DNC to back down.  In December 1983, then-DNC Treasurer Paul Kirk, charged by DNC Chairman Chuck Mannatt to resolve the situation, recommended that the DNC not try to unseat the New Hampshire delegation or impose sanctions on the

---

[19]   *Report of the Commission on Presidential Nomination*. February 1982; 11

[20]   Ibid; 19-20

[21]   Iowa Code §43.4 as amended by Acts of 1983 Chapter 138

## Report of the Commission on Presidential Nomination Timing and Scheduling

state because the State Party had made every effort to deal with its state officials but was thwarted by a "Republican power play."  The recommendation was ultimately accepted and neither the New Hampshire nor Iowa delegations were challenged at the 1984 Convention in San Francisco, even though the dates of both events were more in advance than the exceptions provided by the rule.

### 1988 Cycle

The rules for 1988 were developed by the "Fairness Commission," chaired by Don Fowler.  Rule 10.A of the 1988 Rules provided for the window to open the second Tuesday in March (March 8, 1988). The rules also provided exceptions for four states to hold contests before the March 8 opening of the window with Iowa permitted to go 22 days in advance the window on February 15; New Hampshire two weeks before the window on February 23; Maine caucuses nine (9) days in advance on February 28; and Wyoming caucuses four (4) days before the window on March 4.

Again as events unfolded, the National Party faced another issue surrounding the timing of events, this time because of South Dakota, whose Republican-controlled legislature scheduled a primary for February 23.  After the Compliance Assistance Commission threatened to hold the state's plan in non-compliance, and after much negotiation, the South Dakota State Party agreed to treat the primary as a non-binding beauty contest and to hold a separate binding caucus on March 12, within the window.  However, the state-run primary was still binding for the Republicans, leading New Hampshire to move its primary up to February 16 and Iowa to move its caucus back to February 8.  Although these dates violated the window, no effort was made to challenge Iowa or New Hampshire's delegations or impose sanctions.

### 1992 Cycle

The 1992 Delegate Selection Rules moved the opening of the window one week to the first Tuesday in March (March 3), and provided for exemptions for Iowa to hold its caucuses on February 17 and for New Hampshire to hold its primary on February 25.  Again, based on the timing of the February 25 South Dakota primary, Iowa's caucuses actually took place on February 10 and the New Hampshire primary was on February 18. As was the case in the prior two cycles, there were no challenges to Iowa and New Hampshire and no effort to impose sanctions upon them.

### 1996 Cycle

The 1996 Delegate Selection Rules provided for a window identical to that of the 1992 Rules, with the window opening March 5, Iowa allowed to go on February 19 and New Hampshire on February 27.

Following the 1992 elections (and in preparation for the 1996 nominating cycle), two states had taken legislative action to challenge the first-in-the-nation New Hampshire primary date. Arizona passed a law establishing a presidential primary on the date of the earliest primary in any other state; and Delaware passed a law establishing a primary to be held on the first Saturday after the New Hampshire primary.

Ultimately, under pressure from the 1996 GOP presidential candidates, then Arizona Republican Governor Fife Symington had the law repealed. As a result, the Arizona State Democratic Party conducted a presidential caucus in March.

## Report of the Commission on Presidential Nomination Timing and Scheduling

In the meantime, Delaware challenged the first-in-the-nation New Hampshire primary date. Because the wording of the New Hampshire statute was unclear about the length of time between the New Hampshire primary and any subsequent primary, the legislature enacted a new law in 1995 explicitly providing that New Hampshire's primary occur seven days before any similar contest.[22] As the result of pressure from New Hampshire, most of the GOP candidates agreed to boycott the Delaware primary. The DNC Rules & Bylaws Committee (RBC) held the Delaware delegate selection plan in non-compliance.  New Hampshire Secretary of State Gardner threatened to move the New Hampshire primary back to January. Like the Republican candidates, the Clinton-Gore campaign decided to boycott the Delaware primary. In response to the candidate non-participation, Delaware passed a law automatically putting the names of all recognized candidates on the ballot ensuring that candidate names would appear on the primary ballot regardless of candidate desire.

In the end, most of the candidates and the media ignored the Delaware primary, which was held on February 24.  Following that event, the Delaware Democratic Party then resubmitted a delegate selection plan and held an alternative caucus process within the window to formally allocate delegates.

## 2000 Cycle

The 2000 Delegate Selection Rules maintained the same window that existed in 1992 and 1996, with the window opening the first Tuesday in March (March 7) and specific exceptions again provided for the Iowa caucuses, which were allowed to go outside the window but no earlier than February 21, and the New Hampshire primary, which was allowed to go outside the window but no earlier than February 29.

This time, however, the Republicans had instituted their own window for the first time (see discussion in next section, below), a window beginning on the first Tuesday of February.  The 2000 Republican rule did not provide exceptions for Iowa and New Hampshire. The Republican rules did not provide a pre-window period, and all states and territories were required under the Republican rules to hold contests after the window opened on February 1.

In response to the new Republican window, Republican Parties in Arizona, Delaware, Michigan, South Carolina and Washington scheduled state-government run primaries or Party-run events in February. This prompted the Democratic State Parties in those five states to petition the DNC for permission to hold their events on the same date as their state Republican counterparts. In reaction to these events, Iowa and New Hampshire moved their respective contests to January 24 and February 1, well in advance of the exemptions provided by the DNC's rules. The Arizona, Delaware and Washington State Democratic Parties argued that since their state governments were financing and administering presidential primaries, they should be able to take advantage of those contests rather than being forced to hold separate Democratic-only events inside the window.  All five State Democratic Parties maintained that in an effort not to confuse voters they should be allowed to go in February on the dates already set by their states. Furthermore, the five State Democratic Parties insisted that since Iowa and New Hampshire were enjoying additional leeway and time from the exemptions provided by the rules, it was only fair for the DNC to allow them to hold events outside of the window too. Ultimately, the DNC RBC maintained the

---

[22]   H.B. 333, amending New Hampshire Rev. Stat. §653:9

**Report of the Commission on Presidential Nomination Timing and Scheduling**

March 7 start date for all contests except Iowa and New Hampshire and the five State Democratic Parties were forced to hold separate Democratic only contests within the window to allocate delegates.

This decision led to several results. For a five week period from the February 1 New Hampshire primary until the March 7 Super Tuesday events, media attention focused solely on the state contests on the GOP side with little or no attention paid to the Democratic race between Vice President Gore and Senator Bradley.  Additionally, the five State Democratic Parties were put at a strategic disadvantage with their state Republican counterparts because Democrats had to expend Party resources on conducting and administering Party-run events while Republicans held taxpayer funded primaries in February.  Lastly voter turnout in the five State Party run events was considerably lower than it should have been because many voters were confused by the separate events held on different dates. In light of these circumstances, it was no surprise when the State Parties involved complained bitterly. In response, before the first vote was even cast in the 2000 nominating process, then DNC Chairman Joe Andrew instructed the DNC RBC to undertake an examination of the scheduling of future primaries and caucuses and develop recommendations for the 2004 nominating calendar.

In November 1999, the RBC began its five month review process with public hearings across the country that culminated in an April 2000 report. It was during this period, as the Republicans were preparing for adoption of their 2004 rules and calendar at their 2000 Convention, that the RBC Co-Chairs and Chairman Andrew entered into discussions with their Republican counterparts, Bill Brock and Jim Nicholson, to try and come to a bipartisan agreement on the calendar. Ultimately, the RBC concluded that the current process "has helped the Party unify behind its nominee and focus its resources on the general election," but recommended that the Democratic Party use the same window as the GOP, and that the Republicans be encouraged to adopt a later window similar to the Democratic Party's.[23]  Further, "[w]hile the RBC reaffirms its commitment to the historical timing of Iowa's first-tier caucuses and New Hampshire's primary, it does not support attempts by other states to move outside the window."[24]  The Report also concluded that "the two parties should also encourage states to schedule primaries and caucuses later in the window."[25] The RBC considered, but did not adopt, a number of other alternatives, including  a rotating regional primary system, allowing other states to go in the pre-window period and adding incentives to encourage states to move later in the calendar.[26]

# 2004 Calendar  and Current Rule

In 2001, Chairman McAuliffe asked the DNC to adopt 2004 Delegate Selection Rules that moved the beginning of the Democratic Party window to Tuesday, February 3, the same date that the Republican window opened. Once again, the DNC's 2004 rules provided specific exceptions for Iowa to hold its caucuses on January 19, 15 days in advance of the opening of the  window, and for New Hampshire to

---

[23]   *Beyond 2000 - The Scheduling of Future Democratic Presidential Primaries and Caucuses - A Report to National Chair Joe Andrew by the DNC Rules and Bylaws Committee.*  April2000; 11

[24]   Ibid; 11

[25]   Ibid; 12

[26]   Ibid; 13-17

**Report of the Commission on Presidential Nomination Timing and Scheduling**

hold its primary on January 27, seven days before the opening of the window. The window opened on February 3 and featured events in seven (7) states - Arizona, Delaware, Missouri, and Oklahoma (state government run primaries), and New Mexico, North Dakota and South Carolina (caucuses or Party-run primaries). With both parties' windows synchronized, 17 states moved contests into February 2004.

If the same DNC rules apply in 2008, the Iowa caucuses would be held on January 21, 2008, the New Hampshire primary would be held on January 29; and the window would open on Tuesday, February 5. The Republican rules for 2008 do not provide an exemption for Iowa and New Hampshire. Their window for all states opens on Tuesday, February 5.

# Creation of the Commission

When the DNC adopted its 2004 Delegate Selection Rules in January 2002, Michigan Democratic leaders voiced their opposition, as they had in the past, to the exceptions provided in the rules for Iowa and New Hampshire. Later in 2003, the Michigan State Party indicated that it was its intention to submit a delegate selection plan that scheduled its contest for the same day as the New Hampshire primary. This proposed action engendered a not unexpected reaction from Iowa and New Hampshire and generated intense media attention. Ultimately, following serious discussions between the DNC and Democratic leaders in Michigan, Michigan agreed to hold its 2004 contest inside the window. For its part, the DNC agreed to form a commission to review the rules and make recommendations with respect to the 2008 calendar. Accordingly, then DNC Chairman McAuliffe, Senator Levin, and Ms.Dingell jointly co-sponsored a resolution adopted by the 2004 Democratic National Convention on July 25, 2004 establishing a "Commission on Presidential Nomination Timing and Scheduling."

As indicated earlier, this Commission is charged with the responsibility of "studying the timing of presidential primaries and caucuses and developing appropriate recommendations to the Democratic National Committee for the nominating process beginning in 2008."[27]  The Commission is to issue its report and recommendations to the DNC by December 31, 2005.

At a DNC Executive Committee meeting held in December 2004 in Orlando, Florida, Chairman McAuliffe announced the members of the Commission and appointed as its co-chairs former U.S. Secretary of Labor Alexis M. Herman and U.S. Representative David E. Price.

# Republican Rules of Timing

At the outset it should be noted that it has long been difficult for the Republican and Democratic Parties to work together to establish a calendar for primaries and caucuses because of the differences in the distribution of authority to establish party rules.  Under the Republican Party charter, only the Republican National Convention has the authority to establish and amend the rules of the Republican Party of the U.S.  As a result, the delegate selection rules for each presidential election cycle are effectively set at the previous Republican convention, four years earlier.  Under the Democratic Party *Charter*, however, the delegate selection rules have the status of bylaws and can be established and amended by a simple

---

[27]   Resolution establishing a Commission on Presidential Nomination Timing and Scheduling as adopted by the Democratic National Convention, July 25, 2004 – text of resolution in Section 4 of Commission report.

## Report of the Commission on Presidential Nomination Timing and Scheduling

majority of members of the DNC.  Thus, the DNC normally adopts its delegate selection rules for a presidential election cycle at one of the two DNC meetings in the midterm year preceding the cycle.

Prior to 1996, the Republican Party had no rules addressing the timing of delegate selection contests.  In February 1996, then-RNC Chairman Haley Barbour appointed an RNC taskforce to make recommendations on how to avoid front-loading the process. That task force recommended that states holding their delegate selection events later in the process be given extra, or "bonus," delegates.  The 1996 Republican National Convention approved rules implementing this new system, under which states received a 5% delegate bonus for holding their primary or caucus between March 15 and April 14; a 7% bonus for holding their event between April 15 and May 14; and a 10% bonus if they held their primary or caucus between May 15 and June 20.  As a subsequent Republican commission later concluded, this effort was a failure—more states moved earlier than ever before and the "result was the most front-loaded delegate selection process in the history of the Republican Party," with 63% of delegates chosen by the second week of March 2000 compared to 59% in 1996.[28]

In 1999, then RNC Chairman Jim Nicholson appointed an advisory commission, chaired by former Governor and United States Trade Representative Bill Brock, to examine the GOP delegate selection process.   The Brock Commission recommended the "Delaware Plan," under which states would be divided into four groups based on population; the first group, with the smallest populations, would hold their primaries at the opening of the window on the first Tuesday of March, and each succeeding group would their events on the first Tuesday of the following month designated for it.[29] No exception was made for Iowa or New Hampshire.

At the direction of the Bush-Cheney campaign, the 2000 Convention Rules Committee did not recommend, and the Convention did not adopt, the Brock Commission recommendations.

Instead, the Republican rules for 2004 simply provided that no contest could be held prior to the first Tuesday of February.[30]  No exception was made for Iowa, New Hampshire or any other state to go before the opening of the window. Under Republican Rule 16, any state violating this timing rule automatically suffers a 50% loss of delegates if delegates are elected before the call to the Convention is issued, and a cut of 90% if delegates are elected after the call is issued.  The penalty is automatic and the chairman of the RNC is to impose it automatically.[31] If the RNC chairman does not act, any three members of the RNC may file a statement against the violating state party; the statement is referred to the RNC standing Rules Committee; and if the state party is determined to be in violation, then the

---

[28]  *Nominating Future Presidents - A Review of the Republican Process - Advisory Commission on the Presidential Nominating Process.* Republican National Committee; May 2000; 16

[29]  Ibid; 34-39

[30]  Rules of the Republican Party, adopted July 31, 2000; Rule 15(b)(11)(i)

[31]  Ibid; Rule 16(b) & (c)

**Report of the Commission on Presidential Nomination Timing and Scheduling**

penalties are imposed.[32]  Additional sanctions may also be imposed, including hotel location, guest privileges and seating location at the Convention.[33]  There is no appeal from the penalty.[34]

DNC staff have been advised by RNC staff that no penalty was imposed on Iowa and New Hampshire in 2004 because the entire nominating process was uncontested—incumbent President George W. Bush faced no opposition for the nomination. RNC staff have further advised, however, that they fully expect pressure to be placed on the RNC chairman in 2008 to impose the automatic sanctions on Iowa and New Hampshire if those states hold their events prior to the first Tuesday in February, regardless of what the Democratic Party rules may provide; and that they expect statements (challenges) to be filed against Iowa and New Hampshire if the RNC chairman fails to impose the required automatic sanctions.

---

[32]   Ibid, Rule 16(d) & (e)

[33]   Ibid; Rule 16(e)(3)

[34]   Ibid; Rule 16(f)

**Report of the Commission on Presidential Nomination Timing and Scheduling**

(This Page Intentionally Blank)

**Report of the Commission on Presidential Nomination Timing and Scheduling**

# 7      Commission Meetings

In the course of fulfilling its mandate to study the timing of Democratic presidential primaries and caucuses and to issue a report and recommendations by the end of 2005, the Commission Co-Chairs announced that the Commission would hold a series of meetings throughout the course of the year.  The first meeting was announced and scheduled for March 12 in Washington, D.C.

## March 12, 2005 Meeting

The Commission began its formal work and review with its March 12 meeting at the Washington Convention Center.  The focus of the initial meeting was on education and information.  The intended goal was to familiarize Commission members with the broad issues associated with developing a presidential primary and caucus schedule, in order to provide the necessary framework for the Commission to conduct its work at subsequent meetings.

The Commission heard three presentations from four individuals, each with a different expertise and perspective on the Party's nominating process generally, and the issue of timing, specifically.

**Elaine C. Kamarck,** an individual with more than three decades experience and involvement with the presidential nominating process, including a doctoral dissertation, kicked off the Commission's proceedings. Dr. Kamarck, a Lecturer in Public Policy at the John F. Kennedy of School of Government at Harvard University, has held staff positions on several presidential campaigns and at the Democratic National Committee.  Since 1997, she has served as an At-Large member of the Democratic National Committee and as a member of the RBC. Dr. Kamarck was invited to share a history of the Party's rule on timing of presidential primaries and caucuses and an anecdotal narrative  of the nominating process from 1976 to 2004.

Dr. Kamarck explained how the reforms of the delegate selection system, precipitated principally by the McGovern-Fraser Commission, transformed the Party's nominating system from a closed or semi-closed system dominated by Party bosses and backrooms to a truly public system influenced by voters and the media. The openness of the public system was manifestly seen in the proliferation of binding state government-run and administered presidential primaries. Dr. Kamarck believes that once the system became entirely public, it was simply inevitable that the start of the process would gather a significant amount of attention from presidential candidates and coverage from the media.  The new public delegate selection system, in Dr. Kamarck's opinion, is based on the principle of sequence becomes strategy – reinforced by the momentum awarded to presidential candidates after victories in key contests. According to Dr. Kamarck, both Democratic and Republican presidential candidates over the last two decades have understood this strategy. Ever since the first rule on timing was instituted following the 1976 nominating cycle, timing and sequence have not been just about the "rules" or the Party, but more about the ambitions and perceived advantages or disadvantages of various presidential candidates.

The second presentation of the March 12 meeting featured testimony from **Dr. Thomas Mann** and **Dr. Ronald Walters** on the stakeholders or actors in the nominating process – the Party as a whole, presidential candidates, and voters. Drs. Mann and Walters were invited to discuss the Party's goals and

## Report of the Commission on Presidential Nomination Timing and Scheduling

interests in the nominating process specifically with regard to the calendar and offer their thoughts on what presidential candidates and voters expect from a primary schedule.

Dr. Mann is the W. Averill Harriman Chair and Senior Fellow of Governance Studies at the Brookings Institution. A noted lecturer in the United States and abroad on American politics and public policy, Dr. Mann served as a member of the Winograd Commission and as a technical member of the Hunt Commission.

Dr. Mann asserted the Party's central objective in the presidential nominating process is to nominate a strong candidate who is well positioned to compete effectively in the general election. According to Dr. Mann, the calendar affects this objective in two ways. The calendar can be positioned to allow a presumptive nominee to emerge earlier rather than later in order to allow sufficient time for the Party to unify. However, it must be cautioned that this also rests on the Party's willingness to come together and the ability of the presumptive nominee to appeal to different constituencies in the Party. Additionally, a schedule can be designed to allow a vetting of candidates over a longer period of time. The calendar should engage more diverse Democratic voters, who, because of the importance given to the traditional early states and the front-loading of states at the beginning of the process, currently do not play an active and consequential role in the process. Presidential candidates approach the primary and caucus calendar motivated only by a desire to win the nomination, and the rules in sequencing and timing are used as a means to that end, Dr. Mann stated. Voters expect a full, meaningful, and timely opportunity to participate in the process. Dr. Mann stated that many voters do not have that opportunity for active participation due to the present front-loaded calendar, which leads to an early resolution of the contest due in some part to the media's search for the "frontrunner" and winner and the ever elusive nature of momentum.

Dr. Ronald Walters is Director of the African American Leadership Institute, Distinguished Leadership Scholar at the James MacGregor Burns Academy of Leadership, and a professor in government and politics at the University of Maryland. In 1984, he was deputy campaign manager for issues for the Rev. Jesse Jackson campaign for president, and in 1988, Dr. Walters was an advisor to the Jackson campaign for convention issues.

Dr. Walters articulated a different perspective of the Party's presidential nominating process, believing that certain individuals enter the race as office-seekers as opposed to agenda-setters. Stating that the primary and caucus time period provides an opportunity for a high level of participation of certain constituency groups which can then be strengthened and maximized for the fall general election, Dr. Walters believes the Party has a responsibility to recognize and acknowledge the different agendas and motivations that certain constituencies may have in fielding candidates. Furthermore, he contended the Party has a responsibility to challenge mainstream perceptions, fueled in the large part by the media, as to which candidates are viable and which are merely spoilers. Additionally, he suggested that the demographic makeup of the traditional early states – Iowa and New Hampshire – has put minority candidates, specifically Rev. Jesse Jackson and Rev. Al Sharpton, at a disadvantage from other candidates because their message was deflected. Essentially, those candidates' messages are not geared toward the voters in the early states, but rather towards voters in states in subsequent contests.

The final presentation of the March 12 meeting, by attorney **Lyn Utrecht**, was on the challenges and limitations the Party faces in developing a rule on timing of the nominating process. Ms. Utrecht has served as Counsel to various presidential campaigns since 1984, including the Clinton-Gore and Gore-

**Report of the Commission on Presidential Nomination Timing and Scheduling**

Lieberman campaigns, and was counsel to four of the 2004 presidential candidates – Moseley Braun, Dean, Edwards, and Graham.  Currently a partner in her own firm, she worked for seven years at the Federal Election Commission, concluding her service as Special Assistant General Counsel.

Ms. Utrecht focused her presentation on the two categories of issues that need to be examined from a legal standpoint as the Party reviews the timing of the nominating process.  The first involves issues outside of the control and purview of the Party and in the domain of the state legislatures and state statutes.  While among the most prominent of state law related matters is the date of the binding presidential primary, Ms. Utrecht also stated that the question of candidate access to the primary ballot and continued funding for state government-run presidential primaries must be remembered. Moreover, Ms. Utrecht noted, the Commission must recognize and appreciate that electoral realities, specifically what party controls state legislatures, limits the influence that a party not in control can have over these issues. The second set of issues relates more directly to presidential candidates, and Ms. Utrecht asserted that decisions by presidential candidates about how, where, and when to spend money is directly affected by the sequencing of the calendar.  Candidates face a decision on whether to accept public financing during the primary season, and in 2004 both Gov. Dean and Sen. Kerry opted out of the public financing system.  Candidates who accept primary funding have to adhere to an overall spending limit and to state-specific limit levels. Ms. Utrecht suggested, that had a candidate who accepted public financing and whose campaign spending was thus capped at the spending limit emerged as the Party's presumptive nominee in the spring of 2004, he or she would have been out of money until the general election funds were received directly following the candidate's formal nomination by the Convention. Given the continuing trend for presidential campaigns to start earlier and earlier in advance of a first contest, Ms. Utrecht does not see how the current primary public financing system can continue.

# May 14, 2005 Meeting

The Commission's second meeting was held Saturday, May 14, in Chicago, Illinois. The focus of this second meeting was to begin to introduce and highlight various proposals offered by external organizations and by individuals on the Commission. Additionally, this second meeting featured the start of a formal discussion on the role of the traditional early contests – Iowa and New Hampshire.  Furthermore the meeting featured testimony from State Party leaders.

Prior to the start of testimony, Commission staff offered a briefing on issues surrounding the timing of the presidential nominating process and when primaries and caucuses may be scheduled.  Specifically, staff addressed the DNC's authority over the process; current national Party rules on timing, both DNC and RNC; and pertinent state laws that impact the timing of the process.

In planning for the May 14 meeting, the Commission Co-Chairs and staff organized proposals for the calendar into two categories: those that advocate substantive systematic reform and those that would require minor adjustments to the current system.

Among the most well known of the proposals for substantive reform is a proposal for rotating regional primaries offered by the National Association of Secretaries of States (NASS). Speaking on behalf of NASS was its Executive Director, **Leslie Reynolds**.

## Report of the Commission on Presidential Nomination Timing and Scheduling

The NASS plan for rotating regional primaries splits the country into four regions with each region allowed to hold primaries and caucuses the first Tuesday in March, April, May or June. The rotation of the regions would be the East, the South, the Midwest and the West.  A lottery would determine which region would go first. The first region in 2008 would go last in 2012, with other regions rotating in order, and so on for subsequent election years. The NASS proposal for rotating regional primaries continues the first-in-the-nation contests in Iowa and New Hampshire because NASS believes the high level of voter turnout in both states, tradition, and the fact that moving the contests in Iowa and New Hampshire might be too radical an approach. The organization believes its proposal more clearly defines the presidential primary and caucus season and provides candidates and voters a more focused exchange and discussion of issues relevant to the region.

The second organization to testify at the May 14 meeting was the regional Party committee, Democrats for the West. Democrats for the West was founded in 2004 by a coalition of state parties from nine western states – Alaska, Arizona, Colorado, Idaho, Montana, Nevada, New Mexico, Utah and Wyoming. Appearing on behalf of Democrats for the West were **Brian Kuehl**, **Beage Atwater**, and **Jerry Brady**, the 2002 Democratic nominee for Idaho governor.  Commission member Mike Stratton of Colorado offered a brief introduction of the representatives from Democrats for the West.

Democrats for the West proposed that the western states hold coordinated primaries or caucuses on a single day or a period of days toward the start of the nominating process. Democrats for the West argues that the Party has an opportunity to build long-term governing majorities throughout the western region, one of the nation's fastest growing regions. They point to a partisan realignment in the Democratic direction in the Rockies with victories in a number of Democratic gubernatorial and state legislative races. Consequently, Democrats for the West believes that a regional presidential primary/caucus date will prompt presidential candidates to focus on issues critical to the western area allowing for a long-term, region-wide Party building effort that will consolidate gains already made and position the Party for future successes.

The May 14 meeting featured the start of the formal discussion of the role of Iowa and New Hampshire as the first-in-the-nation caucus and primary states.  In planning for the presentations from Iowa and New Hampshire, Commission leadership indicated to the representatives of both states on the Commission that each state was able to select the individuals it wished to deliver testimony.

Beginning the discussion was a proposal offered by the Michigan Democratic Party. Speaking on behalf of Michigan State Party **Chair Mark Brewer**, who was unable to attend the meeting, was State Party **Vice Chair Tina Abbott**.  Vice Chair Abbott was joined in her presentation by Commission members, **Senator Carl Levin** and Michigan National Committeewoman **Debbie Dingell**.

The comments by the Party leaders from Michigan centered on what they described as the dominating role and privileged position of Iowa and New Hampshire at the start of the nominating process. The leaders asserted that these early contests have a disproportionate impact on the nominating process rendering contests in later states less meaningful or altogether irrelevant. They suggested that the retail politics espoused by Iowa and New Hampshire can be duplicated in other states. It was suggested that both states are able to keep their coveted status based on a strategy of commitments and pledges that the states have exerted on past potential presidential candidates. The actions by other states to move their contests closer to those held in Iowa and New Hampshire suggest that voters in other states are anxious

## Report of the Commission on Presidential Nomination Timing and Scheduling

to also have their issues addressed and their voices heard. The Michigan presenters stated that ending the Iowa and New Hampshire exemptions would allow the Party to fulfill its promise and commitment to treat voters and states equally, and would prevent any state from having and exerting a disproportionate influence over the process.

The presentation from Iowa was introduced and moderated by **Commission member Jerry Crawford**. Joining Commissioner Crawford in remarks were **Senator Tom Harkin** (via telephone conference call), Iowa **State Representative Wayne Ford**, and Des Moines School Board member **Ako Abdul-Samad**.

The Iowa leaders suggested that the Iowa caucuses have done an outstanding job of helping to select the strongest Democratic candidate for the general election. Iowa maintains that its position in the calendar, and the very nature of its caucus system, allows a full display of grassroots politics, providing a necessary role at the beginning of the process for the Party faithful. They went on to state that Iowa's size allows presidential candidates to emphasize face-to-face retail politics in meeting and courting possible caucus goers. Iowa has also played a role in bringing issues of national importance to the forefront through various candidate forums, including the Black and Brown Presidential Forum which, as one of the nation's oldest minority-hosted presidential forums in the country, has proved to be a pivotal venue for candidates. Additionally, Iowa's presenters indicated that the Iowa State Party's experience in conducting the first-in-the-nation caucus is a benefit to presidential candidates who have a certainty about how the system will work. Iowa believes that introducing a new, untested, random, complicated process could potentially lead to candidate and voter confusion and other complications.  Accordingly, Iowa suggests that its and New Hampshire's positions are logical, tried and true and therefore a benefit.

The New Hampshire presentation was made by **Governor John Lynch**, **Secretary of State Bill Gardner**, and **State Party Chair Kathy Sullivan**.

New Hampshire believes its primary makes a valuable and irreplaceable contribution to the presidential nominating process. For 85 years its first-in-the-nation primary has given all candidates the opportunity to make their case before New Hampshire voters. In spite of how the media may be sizing up candidate odds, every candidate has a chance and is able to compete in New Hampshire because of its relatively small size.  The tradition attached to the primary is significant because presidential candidates know they must sit, listen, and respond to questions from the voters. Furthermore, New Hampshire's self-label as a purple state means it is a good venue to test the strength of a candidate's endurance, message and ideas. Additionally, since the state allows independent unaffiliated voters to participate in the primary, a candidate must persuade a base of people who do not automatically vote by Party affiliation which serves to strengthen candidates well for the November general election.  While acknowledging that the state's demographics do not represent the country as a whole, New Hampshire takes its responsibility for diversity outreach seriously, and pointed to the election of African American and Hispanics to local positions and the state legislature and a diverse delegation to the National Convention as proof of its commitment to diversity.

Presentations from Iowa and New Hampshire also argued that it is not the placement of the contests and which states go first that matter, but rather the continuing trend of front-loading by states that the Commission must address.  Iowa and New Hampshire believe that the results of their contests have a disproportionate influence because of the high number of states that come directly after, with as many as five contests on one day. The front-loading of states soon after the first-in-the-nation contests in Iowa and

## Report of the Commission on Presidential Nomination Timing and Scheduling

New Hampshire reduces the amount of time for presidential candidates to continue to make their case and for voters to assess the candidates.

The May 14 meeting also featured one piece of the Commission's outreach to various interested organizations and individuals. Following the initial meeting in March, letters were sent to State Party Chairs inviting them to offer their thoughts and suggestions on the process, given the critical role that State Parties play in the delegate selection process, in writing or in person. In advance of the meeting, the Commission received written correspondence from the Alabama, Colorado, Montana, Pennsylvania, Utah, and Wyoming State Parties.

Appearing in person at the meeting were representatives and leaders from the District of Columbia, Nebraska, New Mexico and South Carolina Parties.

**Commission member Donna Brazile**, a DNC at-large member from the District of Columbia, introduced a panel of representatives from the District of Columbia, including **District Shadow Senator Paul Strauss** and **Sean Tenner**, of the D.C. Democracy Fund. In 2004, the District of Columbia held a non-binding beauty contest presidential primary. The date of the January 2004 primary was before the Iowa caucus and therefore violated the Party's rule on timing. After weeks of debate, the D.C. Democratic State Committee decided to abide by the window and hold a separate Party-run event inside the window for the purposes of establishing candidate support and allocating delegates. Speaking at the May meeting, Shadow Senator Strauss and Mr. Tenner urged the Commission to select the District of Columbia as the first-in-the-nation primary. Arguing that D.C. residents are last among Americans when it comes to a lack of voting rights in Congress, the D.C. supporters suggested that D.C. be first in selecting the Party's nominee.  Letters from **D.C. Congressional Delegate Eleanor Holmes Norton** and **D.C. State Party Chair Wanda Lockridge** supporting this proposal were entered into the record.

Speaking on behalf of the New Mexico State Party was **Chair John Wertheim**. He testified to the benefits the State Party saw in moving from its traditional June state-government administered presidential primary to a Party-run primary on the opening day of the window in 2004. Chair Wertheim indicated that over 125,000 people participated in the Party-run primary, and the State Party identified over 15,000 volunteers. Additionally, as the Association of State Democratic Chairs (ASDC) western region representative to the DNC Executive Committee, Chair Wertheim endorsed the Democrats for the West proposal as a way of emphasizing Western issues and bringing them into the nominating process.

Speaking on behalf of the Nebraska Democratic Party was **Nebraska National Committeeman Vince Powers**. Stating that Nebraska is ignored during the presidential nominating process, and later during the fall general election campaign, Committeeman Powers asserted that it was time to change the status quo of which states go first. He suggested that the states that are selected to go first earn the privilege with Democratic victories, arguing that even red states like Nebraska produce gains at the state and local level, if not at the presidential level.

South Carolina State **Chair Joe Erwin** addressed the Commission about the success of his state's 2004 Party-run presidential primary. In the 2000 cycle, South Carolina was forced to hold its contest on a separate date from its state Republican counterparts because of the differences between the two parties' windows. It was the responsibility of the State Party to identify and recruit between 5,000 and 6,000

**Report of the Commission on Presidential Nomination Timing and Scheduling**

volunteers to operate the polls and spent over $250,000 to conduct the primary. Despite these challenges, Chair Erwin termed the 2004 primary the single best grass roots building operation with which he had ever been associated.

# July 16, 2005 Meeting

The next meeting of the Commission was held Saturday, July 16 at the Mayflower Hotel in Washington, D.C. The Co-Chairs announced the scheduling of this meeting at the May meeting in Chicago in order to hear from additional Party allies and interested groups, including representatives of organized labor, and congressional constituency caucuses.

**Commission member U.S. Representative Hilda Solis** testified on behalf of the Hispanic members of the Democratic Caucus and called for greater influence for Latino voters in the presidential nominating process. She asserted that historically Latino voters have not a played a significant role in the nominating process which was attributable to a smaller Latino eligible voting population in previous cycles, as well as the demographic makeup of the traditional early states, Iowa and New Hampshire. She suggested that consideration must be given to ensure that the sequencing of Iowa and New Hampshire does not erode the significance of those early contests in which Latinos can be vital. She urged the Commission to consider the impact that any proposed changes to the nominating process would have on the opportunity for Latino voters to have an influential role in determining the ultimate Democratic nominee.   Further, Congresswoman Solis stressed the need to increase the investment of Party resources that address and specifically target the Latino vote.

Invited to testify at the request of Congresswoman Solis was **Andre Pineda**, a California- based political strategist and pollster. In his remarks, Mr. Pineda discussed demographic information with regard to population growth in the United States, and the prediction that in the next 30 or 40 years a quarter of the electorate will be Latino. Mr. Pineda further stressed the need for Democratic candidates to be doing much better with Latinos than it is. Mr. Pineda believes the presidential primary schedule provides an opportunity for the Party to capitalize on, and improve, its relationship with Latino voters. He suggested that if a state with a high Latino density goes early in the process, presidential candidates will be able to massage their messages in a way that appeals to Latino voters and improves the electoral chances for the general election.

**U.S. Representative William Jefferson** of Louisiana appeared at the July 16 meeting to present the views of the Congressional Black Caucus (CBC). Congressman Jefferson noted that the current primary calendar does not reflect the diversity of the Democratic Party. Specifically the lack of racial, ethnic, and economic diversity within Iowa and New Hampshire is a concern to the CBC. The decisiveness of the early contests in Iowa and New Hampshire has made has made voters, particularly minority voters, feel that their votes don't matter as much as the votes of voters in the early states, according to Congressman Jefferson and the CBC. He urged that the process must be changed by including a broader and more diverse range of states and voters at a point where they can actually make a difference in the decision of the Party's nominee.

Invited to testify at the request of the Congressional Asian Pacific American Caucus was **Ginger Ehn Lew**, a long-time Party activist and official in the Clinton Administration. Ms. Lew began her remarks by

## Report of the Commission on Presidential Nomination Timing and Scheduling

pointing out that in 2004 John Kerry and John Edwards received 61% of the Asian American Pacific Islander (AAPI) vote, up from the 31% that Bill Clinton won in 1992 and the 54% Al Gore and Joe Lieberman garnered in 2000. In order to capitalize on that increasingly strong Democratic performance in the Asian Pacific American Pacific Island communities, Ms. Lew set forth a series of principles, including: inclusion, outreach, resources, delegates, and grassroots organizers. According to Ms. Lew, it is essential that states rich in AAPI populations hold early primaries. Democratic candidates must reach out to the AAPI community early, often and intelligently. The primary schedule should be designed so that presidential candidates will put resources into the AAPI community. The Party needs to increase the participation of AAPI delegates in the nomination process. It is important that the Party continue to empower grassroots activists to participate in the primary process.

Commission member and **AFL-CIO President John Sweeney** offered four principles that should guide the Party's nominating process. Believing that front-loading is a detriment to the process, the calendar should be designed to give time, opportunity and exposure to all candidates so that the strongest and best candidate emerges as the eventual nominee. The calendar should be designed to expose candidates to a variety of voters and issues. Furthermore this diversity of voters must occur before any candidate acquires the momentum to make his or her nomination a foregone conclusion. Asserting that union members are currently underrepresented early in the nominating process, giving presidential candidates less incentive to talk about the issues that matter to workers, no state should be allowed to hold its primary or caucus outside the official opening of the calendar unless it, or another state afforded the same privilege, has representative diversity and high union density. Lastly, the calendar should be designed with an eye toward financial constraints facing candidates and the Party during the presidential election cycle.

**Curtis Gans**, Director of the Center for the Study of the American Electorate, and one of the preeminent experts on voter turnout and participation, also offered his perspective on the primary schedule at the July meeting. According to Mr. Gans there are four criteria that should guide the Party in developing a nominating calendar. The calendar should be long so that candidates will be tested in a variety of situations over time. The calendar should be created to put a maximum of emphasis on retail campaigning. The Party should seek flexibility in allowing late entering presidential candidates and should change filing deadlines appropriately to allow for this possibility. Finally, the primary calendar should be durable and not have to be reinvented every four years.

**Diane Feldman**, President of the Feldman Group, a D.C.-based research and polling firm also testified before the Commission at the invitation of Congresswoman Solis. Ms. Feldman discussed the importance of women initially as swing voters and then as voters who look at values first and foremost. However, she cautioned that female Democratic primary voters are completely different. The very small percentages of women who choose to vote in Democratic primaries are not so much value voters as issue voters. Further, Ms. Feldman urged the Commission to focus its efforts on these voters, who do not really engage in the political process until January and are more interested in the qualities of leadership that they want to see in the next president.

Testifying on behalf of the Americans for Democratic Action (ADA) was **Dr. Bruce Caswell** an Associate Professor at Rowan University. Stressing the importance of fairness in the primary calendar, ADA feels it is unjust that Iowa and New Hampshire have a disproportionate influence on the process cycle after cycle. Additionally, ADA asserted that Iowa and New Hampshire voters are not demographically representative of the country and it is politically unwise for the Party to continue this

**Report of the Commission on Presidential Nomination Timing and Scheduling**

since they are not representative of the Party's base.  Dr. Caswell stated that ADA would prefer for the window to start later and would like to see steps taken to avoid front-loading and to spread the selection of delegates over the entire window.  ADA is also committed to retail politics and feels this is best realized through caucuses, which allow candidates without a lot of financing to make an impact.

**Michael Malbin**, Executive Director of the Campaign Finance Institute testified on the need for reform of the presidential primary financing system. According to Mr. Malbin whatever recommendations the Commission issues in terms of timing and the calendar must also be paired with some recommendations in the general direction of campaign finance or else the money matters will overwhelm the calendar issue. Mr. Malbin pointed out that front-loading gives candidates a huge incentive to opt out of the public funding system if they can raise more money than the spending limit and break through the early primaries.  Once one candidate breaks out, any candidate who stays within the current system gets trapped.  Additionally, he feels that the spending limit should be raised somewhat and further believes that candidates need an escape hatch so that if a candidate takes public money and then has to run against a candidate who has opted out of the system, he/she should be able to keep the public money, but should be allowed to raise enough private money to match the person who opted out. According to Malbin, without a revised public funding system, many worthy candidates will not be able to present themselves to the country.

# October 1, 2005 Meeting

At its October 1 meeting the Commission began to formulate its position relative to the pre-window period. The Commission took three votes at this meeting. The Commission voted to expand the pre-window period to include states in addition to Iowa and New Hampshire.  The Commission voted that Iowa and New Hampshire would be among those states placed in the pre-window period and would be specifically named in the Rules for 2008. Lastly, the Commission voted that there be a range of two to four new states in addition to Iowa and New Hampshire in the pre-window period.

**Report of the Commission on Presidential Nomination Timing and Scheduling**

(This Page Intentionally Blank)

**Report of the Commission on Presidential Nomination Timing and Scheduling**

# 8          Findings and Recommendations

## Pre-Window Period

The questions considered by the Commission with respect to the pre-window period, initially, were whether any contests should be permitted within that period; if so, whether the Iowa caucuses and New Hampshire primary should be designated in the rules; whether other state contests should be allowed to take place within that period; and, if so, how many and when.  The Commission examined and discussed a number of different scenarios and alternatives relative to these questions.

With respect to these issues, the Commission found that:

1.      There was consensus among its members that the goal of the nominating process should be to produce the best and strongest Democratic presidential nominee; and that that goal is best achieved by devising a system that gives Democratic candidates an opportunity to present themselves and their views to a broad range of voters and gives voters an opportunity to see, hear and question the candidates and measure them against one another.

2.      Commission members understand and appreciate the valuable role the Iowa caucuses and New Hampshire primary have played in the Democratic nominating process over many election cycles.  These are key swing states whose caucus participants and primary voters are informed and engaged. The processes in these states subject candidates to "retail politics" involving extensive face to face discussions with voters in addition to the pervasive influence of money and media.  The presentations made on behalf of Iowa and New Hampshire state parties were thoughtful, detailed and persuasive in this regard.

3.      At the same time, a majority of Commission members expressed serious concerns that Iowa and New Hampshire are not fully reflective of  the Democratic electorate or the national electorate generally—and therefore do not place Democratic candidates before a representative range of voters in the critical early weeks of the process.

First, Iowa and New Hampshire together account for only about 1.4% of the nation's population as of 2004.  New Hampshire ranks 41st out of 50 states in population.  Together they select a total of just 11 of the 540 electors in the Electoral College.

Second, Iowa and New Hampshire do not represent the racial and ethnic diversity of the Party or of the Nation.  It has been often noted that the African American community is the most loyal constituency of the Party, and that the Hispanic/Latino vote—for which the Republicans competed strongly in 2004—is a growing share of the total electorate and a key to the Party's future.  Yet, according to the U.S. Census Bureau 2004 American Community Survey, 2.2% of Iowa's population is African American and 0.8% of New Hampshire's population is African American, compared to 12.2% for the nation as a whole.  In terms of

## Report of the Commission on Presidential Nomination Timing and Scheduling

African American population, Iowa ranks 40th out of 50 states and New Hampshire ranks 43rd.

The 2004 Census data indicate that the Hispanic/Latino population of Iowa was 3.7% and that of New Hampshire was 2.1%, compared to 14.2% for the nation as a whole.

Third, these two states alone cannot and do not represent the geographic diversity that is increasingly critical to the future of the Democratic Party.  As matters stand, no Western or Southern state has any role in the pre-window period.  The Commission heard substantial testimony—from Rep. Solis, from Mr. Pineda, from the Democrats for the West group, from a Nebraska DNC member and others—that the Party has made significant inroads in state and local elections in the Western states, that the Western states are critical to the Party's future, and that it is imperative that Western states be given a greater role in the process. A similar logic applies to the South, where the DNC has given priority to rebuilding State Parties.

4.       Commission members' concerns were reinforced by the testimony of numerous presenters. Dr. Mann believed that the calendar should engage more and different types of Democratic voters who currently, because of the importance given to Iowa and New Hampshire combined with front-loading, do not play an active or consequential role in the process.  Dr. Walters suggested that the demographic makeup of Iowa and New Hampshire has disadvantaged minority candidates and minority voters to the point where the process might conceivably be vulnerable to a legal challenge under section 2 of the Voting Rights Act.  (At least one commentator agrees, suggesting that the first in the nation status of Iowa and New Hampshire has created legally actionable "underenfranchisement" of African American voters.[35]).

Representatives Solis and Jefferson, Andre Pineda, former Department of Commerce General Counsel Ginger Ehn Lew and AFL-CIO President Sweeney all agreed that the lack of ethnic and economic diversity in Iowa and New Hampshire prevent minority voters, union members and other core constituencies from having an appropriate influence in the nominating process.

The League of Women Voters suggested that the "current system …fails to test the candidates in a diversity of states under a variety of circumstances."[36]

State party leaders from Michigan, Nebraska, the District of Columbia and other states strongly suggested that New Hampshire and Iowa have a disproportionate impact on the process and are not representative of the Democratic electorate.   The Nebraska DNC member suggested that different states must be afforded an opportunity to go first in order to help rebuild the Party.  The Democrats for the West group expressed the view that

---

[35]   Driver, Justin. *Underenfranchisement: Black Voters and the Presidential Nomination Process*. 117 Harvard Law Review 2318 (2004)

[36]   League of Women Voters of the United State correspondence addressed to Commission Co-Chairs dated July 6, 2005.

## Report of the Commission on Presidential Nomination Timing and Scheduling

presidential candidates do not have an opportunity to appeal to and win support of voters in this fast-growing region of increasing critical importance to the Party.

5.  From different perspectives, a number of presenters also expressed the view, shared by many Commission members, that the disproportionate influence of Iowa and New Hampshire means that, even apart from considerations of diversity and representation, too few voters, too small a slice of the electorate, truly get to participate in the nominating process in a meaningful way. The League of Women Voters suggested that the front-loaded system with two early important contests "leaves most voters out of the selection process because, simply put, the selection is over before it's really begun. A system and schedule that allows a larger number of voters, as well as party members and officials, to participate would build better support and citizen engagement in the process."[37]   Curtis Gans of the Committee for the Study of the American Electorate suggested that because of the importance of the first two contests followed by a truncated schedule, "only a small fraction of either the party electorate or the electorate as a whole gets to participate in the selection process."[38]  He noted that, in 2004, only 5% of the eligible electorate cast ballots before the process was declared over.

In balancing these considerations, the Commission considered a number of alternatives. One way to redress the disproportionate influence of Iowa and New Hampshire would be simply to include them in the regular window period, which is exactly how these states' contests are treated under the current Republican Party rules. This alternative would address many of the concerns noted above and would have the advantage of matching the Democratic calendar to that of the Republicans.

Another alternative would be to allow one or more states to hold caucuses prior to, or on the same day as, Iowa, and/or to allow one or more states to hold primaries prior to, or on the same day as, New Hampshire.

In the end, a majority of Commission members favored an approach that would preserve the first in the nation status of Iowa and New Hampshire but address the diversity, representation and participation issues in a meaningful way by including other states in the pre-window period, in a schedule in which they would play an important role alongside Iowa and New Hampshire.

At the same time, the Commission did not believe that it had enough information, resources or time to make the determination of which states should be so included, and elected to have this decision made by the DNC, upon recommendations by the Rules and Bylaws Committee, based on certain criteria.

Accordingly, the Commission recommends for the 2008 nominating process:

a.  That the first caucus be held in Iowa and the first primary be held in New Hampshire.

b.  That there be an additional one or two first-tier caucuses between the Iowa caucus and the New Hampshire primary.

[37]  Ibid

[38]  Curtis Gans testimony at July 16, 2005 Commission meeting.

**Report of the Commission on Presidential Nomination Timing and Scheduling**

c.      That following the New Hampshire primary, and prior to the opening of the regular window on February 5, 2008, there be one or two presidential preference primaries.

d.      That the Rules and Bylaws Committee select the appropriate date on which the pre-window period shall begin, which date shall under no circumstances be earlier than January 14, 2008.

e.      That the Rules and Bylaws Committee determine the states (other than Iowa and New Hampshire) whose contests may occur during the pre-window period, applying the following criteria:  racial and ethnic diversity; regional diversity; and economic diversity including union density.

In making these recommendations, the Commission emphasizes the following additional points:

The Commission desires to ensure, to the greatest extent possible, that the inclusion of additional contests in the pre-window period not exacerbate the problem of front-loading (a problem described in more detail in the next section).  The Commission urges the Rules and Bylaws Committee, in selecting the states (in addition to Iowa and New Hampshire), whose contests will be allowed to occur in the pre-window period, to consider an appropriate means to limit the aggregate number of delegates allocated through pre-window contests.

Commission members desire that there be an orderly process of establishing and implementing the Delegate Selection Rules for 2008 and that there be clarity and certainty for the state parties called upon to develop and submit their delegate selection plans.  The Commission urges the Rules and Bylaws Committee to adopt a process for determination of the additional states whose contests will be allowed to occur during the pre-window period, a process in which state parties may apply to the RBC for consideration and in which the RBC will expeditiously consider such applications and make its determination early in 2006.  Prior to completion of that process, and the determination of the RBC, no state party should take or permit any action, and no state's legislature should take any action, to schedule the date of that state's contest for any time prior to the start of the regular window (February 5, 2008).

The Commission desires and expects that, to the extent these recommendations are incorporated into the 2008 Delegate Selection Rules developed by the RBC and adopted by the DNC, the RBC will vigorously enforce those Rules.  In this regard, the Commission notes that under current Rule 19.C(1) of the 2004 Delegate Selection Rules, if a state's delegate selection plan violates the timing rules, the number of pledged delegates from that state is automatically reduced by 50% and none of the states' DNC members or other unpledged delegates shall be credentialed as voting delegates at the Convention.  It should be further noted that, as explained above, under the Republican Party rules, a state whose event is held outside the regular Republican window (beginning February 5, 2008, with no exceptions for any state) automatically suffers a 50% loss of delegates if delegates are elected before the call to the Convention is issued, and a cut of 90% if delegates are elected after the call is issued.  The penalty is automatic and the chairman of the RNC is to impose it automatically. There is no appeal from these penalties.[39]

---

[39]     Rules of the Republican Party, adopted July 31, 2000; Rule 16(b-c, f)

**Report of the Commission on Presidential Nomination Timing and Scheduling**

# Inside the Window Period

The continued front-loading of the nominating process has been steady and inexorable.  Not only has the process started ever earlier; it has also concluded ever earlier; as increasing percentages of delegates are effectively selected earlier in the process.    As noted above, the Hunt Commission found that in 1972, 17% of the delegates had been allocated (bound to a presidential candidate) by mid-April, while in 1976 the comparable percentage was 33% and in 1980, 44%.  In 1984, by the end of the first week after the window opened, 40.3% of the delegates had been allocated and by mid-April, 57.4% had been allocated.

In 1992, by the end of the second Tuesday of the window (March 10), 40% of the delegates had been allocated and almost exactly half had been allocated by the end of March.  In 1996, by the second Tuesday of the window (March 12), 54% of the pledged delegates had been allocated.  In 2000, by the second Tuesday (March 14) 66.67%, two-thirds, of the delegates had been allocated.  In 2004, with the regular window opening earlier, by the second Tuesday in March (March 9), 71.4 % of the delegates had been allocated.

Commission members and presenters from virtually all sides of the calendar issue expressed serious concerns about the front-loading trend.  In this regard, representatives of Michigan and other states were joined by party leaders from Iowa and New Hampshire.  Most of the presenters echoed these concerns.  Dr. Mann and Dr. Walters both emphasized that broader participation in the process was limited by front-loading. Mr. Gans, the League of Women Voters and others made the same point.

Front-loading, as William Mayer and Andrew Busch argue, "greatly accelerates the voters' decision process and thus makes the whole system less deliberative, less rational, less flexible, and more chaotic…. Voters are forced to reach a final decision about their party's next presidential nominee in a remarkably short period of time…. Equally important, front-loading makes it all but impossible for the voters to reconsider their initial judgment if new information becomes available."[40]

To address these concerns, the Commission recommends that the DNC, through its Rules and Bylaws Committee, make every effort to schedule no more than five contests in any one week, and that it consult with state parties and political leaders to further this result.

The Commission also recommends a system that would encourage state parties to schedule their events later in the process, or that at least would discourage them from moving earlier than they were in 2000 or 2004.  The Commission noted that the bonus delegate system attempted by the Republican Party for 2000, with bonuses ranging from 5% to 10%, was not remotely sufficient to induce state parties to schedule their events later in the process.  Accordingly, the Commission recommends a program of considerably stronger incentives.  Specifically , the Commission proposes that:

---

[40]    Mayer, William G. and Andrew E. Busch. *The Front-Loading Problem in Presidential Nominations*. Washington: The Brookings Institution, 2004: 56, 63

**Report of the Commission on Presidential Nomination Timing and Scheduling**

The calendar be divided into the following four time stages:

Stage I:    March 4 through March 17, inclusive
Stage II:   March 18 through April 7, inclusive
Stage III:  April 8 through April 28, inclusive
Stage IV:   April 29 through June 10, inclusive

A state would be awarded additional delegates to the 2008 Democratic National Convention equal to the following percentages, applied to the total number of pledged delegates otherwise allocated by the *Charter* and Call to the Convention, and based on the time period in which the state's first determining step in the delegate selection process is scheduled to occur in 2008:

Stage I:    15 percent
Stage II:   20 percent
Stage III:  30 percent
Stage IV:   40 percent

The Commission believes that only a system of strong and meaningful incentives, such as the proposed system outlined above, can mitigate against continued front-loading of the process. In that regard, the Commission suggests that the Rules and Bylaws Committee consider and discuss the issue of whether any system of disincentives (i.e., loss of delegates for moving contests earlier) should be incorporated into the process.

# Further Recommendations

## Presidential Candidate Obligations

Effective implementation of the fundamental goals of the Democratic Party's nominating process, as established in our rules, requires the active participation and support of our presidential candidates. For example, Rule 6 of the current Delegate Selection Rules requires presidential candidates to create their own plans to help achieve affirmative action goals and to use their best efforts to ensure that their own delegations are representative. By the same token, the Commission urges the RBC to impose appropriate obligations on presidential candidates to support, cooperate with and otherwise participate in making the timing system successful and in achieving its fundamental goals.

## Presidential Election Public Financing System

The Commission heard considerable testimony to the effect that the current presidential public financing system is broken and in need of major overhaul if it is to survive.

At the Commission's first meeting, attorney Lyn Utrecht noted that candidates who accept federal matching funds in the primary must observe a spending limit and that, in 2004, President Bush, Gov. Dean and Sen. Kerry all opted out of the system because they feared hitting the spending cap before the Convention, without the ability of the national party committees to use non-federal or soft money to run

## Report of the Commission on Presidential Nomination Timing and Scheduling

advertising to support them or fend off negative attacks during that period.  She believed this trend would continue.

Dr. Michael Malbin of the Campaign Finance Institute (CFI) agreed that under the current system, serious candidates have an incentive to reject matching funds, "so they can break through the spending limits."[41]   A comprehensive report issued by CFI earlier this year recommends that the primary spending limit be raised to the same level as for the general election; that if a candidate who accepts matching funds runs against someone who opts out, the participating candidate can raise as much as his or her opponent; and that matching funds should provide a 3-1 match for the first $100, to encourage small donations, instead of the current 1-1 match for the first $250.[42]

Federal Election Commission Chairman Scott Thomas, a Democrat, and Commissioner Michael Toner, a Republican, have also joined forces to make a number of constructive recommendations with respect to the presidential public financing system, including significantly increasing the primary spending limit; doubling the maximum match amount from $250 to $500; abolishing state by state spending limits; and greatly increasing the total amount of matching funds that candidates can receive if they participate.[43]

This Commission strongly endorses reform of the presidential public financing system; commends to the consideration of the Congress the reforms set out in the CFI and Thomas/Toner proposals; and urges the DNC to take an active role in promoting such reforms.

## Moving Back the Process in 2012 and Beyond

The Commission is of the view that the entire caucus and primary season occurs far too early, and Commission members expressed considerable frustration that both their pre-window and within-window adjustments were compromised by their inability to adjust the date (February 5) on which the Republican window will open in 2008.  As noted above, Republican practice is to approve its rules at the prior national convention.  Therefore, the date is set for 2008 and there is no feasible way to change it.  But the issue can and must be addressed before 2012.

The Commission believes that early February is far too early to start the caucus/primary season, to say nothing of pre-window contests in January.  Now, the early date, plus the powerful impact of Iowa and New Hampshire, plus front-loading within the window, promises to produce a nominee on a date earlier than the first contest used to occur.  The Commission has addressed some of these factors, but would move the entire season as much as two months later if it were free to do so.

In considering the options for 2012 the Commission encourages the Party to think boldly, including for example, RBC consideration of the proposal known as the American Plan which would spread the

---

[41]   Michael Malbin testimony at July 16, 2005 Commission meeting.

[42]    *So the Voters May Choose…Reviving the Presidential Matching Fund System*.  Report by the Campaign Finance Institute Task Force on Financing Presidential Nomination.. 2005. – See also Overton, Spencer. *The Donor Class: Campaign Finance, Democracy and Participation*. 153 University of Pennsylvania Law Review 73, 107-113 (2004)

[43]   Letter from Commissioners Thomas and Toner to Congressional Leaders, Feb. 9, 2005

## Report of the Commission on Presidential Nomination Timing and Scheduling

calendar of contests across ten intervals of time and randomly select the order of the states from one presidential election cycle to the next.

There is some precedent for bipartisan consultation on this matter. In its review of the 2004 nominating calendar in the fall 1999 / spring 2000 called "Beyond 2000," the DNC Rules and Bylaws Committee (RBC) developed a working relationship with the RNC commission headed by Bill Brock (detailed above). At the time, the Co-Chairs of the RBC had discussions with their Republican counterparts and former DNC Chairman Joe Andrew met with Republican Chairman Jim Nicholson about the matter. The bipartisan approach to the nominating calendar reflected the serious commitment by both parties to address concerns about the schedule.

The Commission urges Chairman Dean and the DNC to begin a series of discussions with the RNC as the RNC begins to draft its 2012 rules in anticipation of the 2008 Convention.  Discussion about the Democratic Party's rules for the next cycle before the current process has even begun will be necessary to attain what the Commission believes is truly necessary, a bipartisan solution for 2012 and succeeding cycles.

## Election Reform

The DNC, in its report on election administration problems in Ohio in 2004 and on other occasions, has endorsed a number of reforms in the election process to ensure that all citizens have the right to vote and to have their vote counted.  The DNC has also opposed efforts by some Republicans to restrict the franchise, such as photo identification requirements that would not exclude even one fraudulent voter for every thousand legitimate voters excluded.

Sadly, even in the United States of America there are unnecessary hurdles that diminish voter participation and contribute to our standing as 139th out of 172 democracies in voter turnout.  Our relatively low voter participation is fueled by a maze of exclusionary practices, including: regulations that make it difficult for eligible citizens to get on the voting rolls; overinclusive purges that remove legitimate voters from the rolls; long lines at the polls; policies that make it difficult for college students to vote; bans on voting by former offenders who have served their time; a refusal to provide language assistance where needed; inequitable allocation of election resources; and rules that reject a legitimate voter's provisional ballot cast outside of the voter's precinct (including those ballots cast in the right polling place but at the wrong table).  There are other obstacles, including:  partisan challengers that cause disorder and confusion in targeted precincts on Election Day; and the distribution of misleading information about when and where to vote.  Not only do these factors suppress voter turnout, but many of them disproportionately exclude disabled Americans, senior citizens, young adults, people of color, and the poor.[44] As established in 2000, even practices that exclude a small percentage of voters can determine the outcome of closely-contested elections.

The Commission urges the Rules and Bylaws Committee and the DNC to take into account the DNC's fundamental principles and positions on voting rights and election administration in approving both state

---

[44]   Chandler Davidson et al. *Republican Ballot Security Programs:  Vote Protection or Minority Vote Suppression – or Both?* A Report to the Center for Voting Rights and Protection (Sept. 2004).

## Report of the Commission on Presidential Nomination Timing and Scheduling

run and party run contests for 2008.  These positions include the DNC's belief that DRE voting systems should not be used until a reliable voter verifiable audit feature can be uniformly incorporated into these systems and that voters who have lawfully registered to vote not be required to show government-issued photo identification at the polls as an absolute requirement for voting.  Additionally, we encourage the DNC to continue to work to eliminate unnecessary obstacles to the franchise, including but not limited to the barriers listed above.

Lastly, the Commission also urges the DNC to continue its vigorous advocacy of extension and strengthening of the Voting Rights Act, the provisions of which continue to be a critically important means of ensuring that all Americans have equal access to the right to vote.

## Party Building Efforts

The DNC should, working through its staff, the RBC, and the candidates for the Democratic nomination for President, undertake a program designed to use the unique opportunities of the presidential nominating process to initiate Party building activities in the states with the cooperation and support of State Parties. These efforts should focus on those states and regions in which there are no early processes (primary or caucus) and in which there indications of growth, vitality, and promise for the future of the Democratic Party.

**Report of the Commission on Presidential Nomination Timing and Scheduling**

(This Page Intentionally Blank)

**Report of the Commission on Presidential Nomination Timing and Scheduling**

# 9 Appendix

## Procedural Rules of the Commission

*The following Rules of Procedure are consistent with the Party's Charter and Bylaws, as well as procedural rules utilized by the National Convention's standing committees, and were adopted by the Commission at its March 12, 2005 meeting in Washington, D.C.*

1. **MEETINGS**

   All meetings of the Commission shall be open to the public.

2. **QUORUM**

   Fifty percent (50%) of the full membership of the Commission shall constitute a quorum.

3. **VOTING**

   a. The Commission shall take action on all matters by a majority vote.

   b. No secret ballot shall be permitted at any stage of the Commission's proceedings.

   c. Voting shall be by voice vote, division of the house or, when prescribed by these Rules, by roll call.

   d. A roll call vote shall be taken if requested by 25% of the members present.

   e. Proxy Voting: As the Commission is a deliberative body, proxy voting by Commission members shall not be permitted.

4. **CO-CHAIRS**

   a. It shall be the responsibility of the Co-Chairs to:

      i. prepare an agenda for the orderly conduct of the Commission's business;

      ii. call to order and preside over Commission meeting.

   b. The Commission may transact business with one Co-Chair present, provided that the other Co-Chair consents to such arrangement.

   c. Should both Co-Chairs be absent from any meeting, the Co-Chairs shall designate a Commission member to preside at said Commission meeting.

**Report of the Commission on Presidential Nomination Timing and Scheduling**

**5.   ROBERT'S RULES**

Except as otherwise provided in these Rules, Robert's Rules of Order, Newly Revised, shall apply.

**6.   SUSPENSION OF RULES**

These Rules may be suspended only upon the affirmative vote of at least two-thirds (2/3) of those members voting.

# Acknowledgments

The Commission staff wishes to express its appreciation to Commission Co-Chairs Secretary Herman and Congressman Price and all Commission members. Also of note are Jocelyn Jolley, Pat Lattimore, and Daniel Nichols of Secretary Herman's staff; and JeanLouise Beard, Elizabeth Gottschalk, and Anna Tilghman of Congressman Price's staff.

Additionally, we would like to thank our following Democratic National Committee staff members for their assistance with the work of the Commission: Tom McMahon, Executive Director; Leah Daughtry; Chief of Staff; Josh Earnest of the Communications Department; Josh McConaha of the Internet Department; Matt Nugen in Governor Dean's office; Erica DeVos and the rest of the Secretary's Office staff; Ellen Thrower, Events Director; and Pam Womack, Political Director.

Special thank also goes to DNC General Counsel Joe Sandler for his continued wisdom and insight throughout the Commission's deliberations.

## 2004 Allocation of Pledged Delegates and Alternates Based on Democratic First Determining Steps



| | Week (2) | Week (1) | Week 01 | Week 02 | Week 03 | Week 04 | Week 05 | Week 06 | Week 07 | Week 08 | Week 09 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 | Week 17 | Week 18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Weekly % | 0.013 | 0.006 | 0.143 | 0.054 | 0.020 | 0.017 | 0.328 | 0.141 | 0.052 | 0.000 | 0.000 | 0.000 | 0.041 | 0.044 | 0.019 | 0.015 | 0.037 | 0.000 | 0.034 | 0.034 |
| Cumulative % | 0.013 | 0.019 | 0.162 | 0.216 | 0.237 | 0.254 | 0.582 | 0.724 | 0.775 | 0.775 | 0.775 | 0.775 | 0.817 | 0.861 | 0.880 | 0.894 | 0.932 | 0.932 | 0.965 | 1.000 |



## 2000 Allocation of Delegates and Alternates
## Based on Democratic First Determining Steps

| | Week (7) | Week (6) | Week (5) | Week (4) | Week (3) | Week (2) | Week (1) | Week 01 | Week 02 | Week 03 | Week 04 | Week 05 | Week 06 | Week 07 | Week 08 | Week 09 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulative % | 0 | 0.013 | 0.02 | 0.02 | 0.02 | 0.02 | 0.02 | 0.501 | 0.667 | 0.716 | 0.735 | 0.813 | 0.835 | 0.835 | 0.835 | 0.885 | 0.901 | 0.914 | 0.939 | 0.939 | 1 | 1 | 1 |
| Weekly % | 0 | 0.013 | 0.006 | 0 | 0 | 0 | 0 | 0.481 | 0.166 | 0.049 | 0.02 | 0.077 | 0.022 | 0 | 0 | 0.05 | 0.016 | 0.013 | 0.024 | 0 | 0.061 | 0 | 0 |

## 1996 Allocation of Delegates and Alternates
## Based on Democratic First Determining Steps

| | Week (7) | Week (6) | Week (5) | Week (4) | Week (3) | Week (2) | Week (1) | Week 01 | Week 02 | Week 03 | Week 04 | Week 05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulative % | 0.00% | 0.00% | 0.00% | 0.00% | 1.36% | 2.33% | 2.33% | 30.70% | 53.96% | 60.75% | 72.22% | 72.22% |
| Weekly % | 0.00% | 0.00% | 0.00% | 0.00% | 1.36% | 0.97% | 0.00% | 28.37% | 23.26% | 6.79% | 11.47% | 0.00% |

| | Week 06 | Week 07 | Week 08 | Week 09 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulative % | 74.84% | 74.84% | 79.58% | 80.69% | 90.32% | 91.88% | 92.90% | 94.35% | 100.00 | 100.00 | 100.00 |
| Weekly % | 2.61% | 0.00% | 4.74% | 1.11% | 9.63% | 1.56% | 1.02% | 1.45% | 5.65% | 0.00% | 0.00% |

## 1992 Allocation of Delegates and Alternates Based on Democratic First Determining Steps

| | Week (7) | Week (6) | Week (5) | Week (4) | Week (3) | Week (2) | Week (1) | Week 01 | Week 02 | Week 03 | Week 04 | Week 05 | Week 06 | Week 07 | Week 08 | Week 09 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulative % | 0.00% | 0.00% | 0.00% | 0.00% | 1.39% | 1.91% | 2.99% | 17.24% | 39.99% | 48.38% | 49.97% | 50.74% | 64.70% | 64.70% | 64.70% | 69.51% | 74.18% | 75.77% | 77.10% | 79.61% | 99.52% | 99.52% | 100.00 |
| Weekly % | 0.00% | 0.00% | 0.00% | 0.00% | 1.39% | 0.51% | 1.08% | 14.25% | 22.75% | 8.39% | 1.59% | 0.77% | 13.96% | 0.00% | 0.00% | 4.81% | 4.66% | 1.59% | 1.34% | 2.50% | 19.91% | 0.00% | 0.48% |

## 1988 Allocation of Delegates and Alternates Based on Democratic First Determining Steps

| | Week (7) | Week (6) | Week (5) | Week (4) | Week (3) | Week (2) | Week (1) | Week 01 | Week 02 | Week 03 | Week 04 | Week 05 | Week 06 | Week 07 | Week 08 | Week 09 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulative % | 0.00% | 0.00% | 0.00% | 0.00% | 1.39% | 1.91% | 2.99% | 17.24% | 39.99% | 48.38% | 49.97% | 50.74% | 64.70% | 64.70% | 64.70% | 69.51% | 74.18% | 75.77% | 77.10% | 79.61% | 99.52% | 99.52% | 100.00 |
| Weekly % | 0.00% | 0.00% | 0.00% | 0.00% | 1.39% | 0.51% | 1.08% | 14.25% | 22.75% | 8.39% | 1.59% | 0.77% | 13.96% | 0.00% | 0.00% | 4.81% | 4.66% | 1.59% | 1.34% | 2.50% | 19.91% | 0.00% | 0.48% |

## 1984 Allocation of Delegates and Alternates
## Based on Democratic First Determining Steps

| | Week (7) | Week (6) | Week (5) | Week (4) | Week (3) | Week (2) | Week (1) | Week 01 | Week 02 | Week 03 | Week 04 | Week 05 | Week 06 | Week 07 | Week 08 | Week 09 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulative % | 0.00% | 0.00% | 0.00% | 0.00% | 1.49% | 2.02% | 3.03% | 28.45% | 40.30% | 42.50% | 52.30% | 57.41% | 60.62% | 61.75% | 70.83% | 83.04% | 85.03% | 85.57% | 85.57% | 100.00 | 100.00 | 100.00 | 100.00 |
| Weekly % | 0.00% | 0.00% | 0.00% | 0.00% | 1.49% | 0.53% | 1.01% | 25.42% | 11.85% | 2.20% | 9.80% | 5.11% | 3.21% | 1.13% | 9.09% | 12.21% | 1.99% | 0.53% | 0.00% | 14.43% | 0.00% | 0.00% | 0.00% |

**1980 Allocation of Delegates and Alternates Based on Democratic First Determining Steps**

| | Week (7) | Week (6) | Week (5) | Week (4) | Week (3) | Week (2) | Week (1) | Week 01 | Week 02 | Week 03 | Week 04 | Week 05 | Week 06 | Week 07 | Week 08 | Week 09 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulative % | 1.50% | 1.50% | 1.50% | 2.16% | 2.16% | 4.98% | 8.32% | 21.40% | 29.93% | 40.02% | 44.91% | 45.78% | 46.20% | 54.43% | 61.51% | 65.81% | 69.50% | 75.62% | 78.99% | 100.00 | 100.00 | 100.00 | 100.00 |
| Weekly % | 1.50% | 0.00% | 0.00% | 0.66% | 0.00% | 2.82% | 3.33% | 13.09% | 8.53% | 10.09% | 4.89% | 0.87% | 0.42% | 8.23% | 7.08% | 4.29% | 3.69% | 6.12% | 3.36% | 21.01% | 0.00% | 0.00% | 0.00% |

Jan. 21
Iowa

Feb. 12
Maine

Feb. 26
Minnesota
New Hampshire

March 11 - Window Opens
Florida
Georgia
Oklahoma
Washington, et al

March 25-28
Connecticut
New York

April 22
Missouri
Pennsylvania
Vermont

May 19-24
Oregon
Michigan, et al

June 1-3
California
New Jersey
Ohio, et al

## 1976 Allocation of Delegates and Alternates
## Based on Democratic First Determining Steps

June 8-12
California
Michigan
New Jersey
Ohio

April 27-May 1
Kansas
Louisiana
Pennsylvania
Texas

March 9 - Window Opens
Florida

March 16-20
Illinois
Oklahoma

April 6
New York

Feb. 24
Minnesota
New Hampshire

Jan. 24
Mississippi

Jan. 19
Iowa

| | Week 16 | Week 15 | Week 14 | Week 13 | Week 12 | Week 11 | Week 10 | Week 09 | Week 08 | Week 07 | Week 06 | Week 05 | Week 04 | Week 03 | Week 02 | Week 01 | Week (1) | Week (2) | Week (3) | Week (4) | Week (5) | Week (6) | Week (7) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulative % | 100.00 | 100.00 | 99.40% | 76.63% | 74.67% | 67.32% | 62.00% | 54.42% | 46.68% | 33.41% | 31.75% | 31.75% | 22.64% | 21.61% | 19.58% | 12.73% | 10.04% | 6.48% | 3.03% | 3.03% | 3.03% | 2.36% | 2.36% |
| Weekly % | 0.00% | 0.60% | 22.77% | 1.96% | 7.35% | 5.32% | 7.58% | 7.75% | 13.26% | 1.66% | 0.00% | 9.11% | 1.03% | 2.03% | 6.85% | 2.69% | 3.56% | 3.46% | 0.00% | 0.00% | 0.66% | 0.00% | 2.36% |

50%
45%
40%
35%
30%
25%
20%
15%
10%
5%
0%