UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| BILL NELSON, et al., | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) Case No. 4:07cv427 – RH/WCS |
| | ) |
| HOWARD DEAN, et al., | ) |
| | ) |
| Defendants | ) |
| | ) |
| | ) |

**DECLARATION OF PHILIP MCNAMARA
IN SUPPORT OF DEFENDANTS HOWARD DEAN'S
AND DEMOCRATIC NATIONAL COMMITTEE'S MOTION FOR
SUMMARY JUDGMENT**

1.      My name is Philip McNamara.  I serve as director of the Office of

Party Affairs and Delegate Selection for defendant Democratic National Committee

("DNC").  I have held this position since April 2002 and have served as a staff member in

said office since June 1998.

2.      I make this Declaration based on first-hand knowledge and in

support of the Motion for Summary Judgment of Defendants Howard Dean and DNC.

3.      The DNC is the governing body of the Democratic Party of the

United States.  The DNC is composed of representatives elected from each state,

including Florida, by that state's Democratic Party, plus representatives of a number of

national Democratic organizations.

4.      The nominee of the Democratic Party for President of the United States is chosen by the delegates to the Democratic National Convention held during each presidential election year.  A vote of the majority of delegates to the Convention is required to nominate the Party's presidential candidate.

5.      The delegates to the Democratic National Convention are chosen through a process developed and implemented by each State Democratic Party.  That process is required to comply with certain rules—the Delegate Selection Rules—adopted by the DNC.

6.      In my capacity as director of the DNC's Office of Party Affairs and Delegate Selection, I am responsible, among other things, for staffing the operation of the DNC's Rules and Bylaws Committee ("DNC RBC").  The DNC RBC is a standing committee composed of thirty (30) DNC members which is, among other things, responsible for overseeing the development, implementation and enforcement of the DNC Delegate Selection Rules.

7.      The DNC's rules for delegate selection developed over the course of the movement that began in the 1960s to reform the way the Democratic Party selects its nominees for President.  The first set of rules resulted from the Mississippi Freedom Party credentials challenge led by Fannie Lou Hamer at the 1964 Democratic National Convention in Atlantic City.  Beginning with the 1968 Democratic National Convention, the selection of delegates to each Convention has been governed by a set of principles or rules issued by the DNC.  For each presidential election cycle since 1976, the DNC has issued "Delegate Selection Rules" to govern the selection, in each state, by each state Democratic Party, of the delegates to the National Convention.

2

8.     A true and correct copy of the Delegate Selection Rules for the 2008 Democratic National Convention ("2008 Delegate Selection Rules") is attached hereto as Exhibit A.  The 2008 Democratic National Convention will be held in Denver, Colorado in August 2008.

9.     Under the Delegate Selection Rules, the DNC requires each State Democratic Party to develop a written plan for the selection of delegates to the national nominating Convention, and to submit that plan to the DNC RBC.  (2008 Delegate Selection Rules, Rule 1).  The Committee reviews each plan for compliance with the Delegate Selection Rules. (*Id.* Rules 1(D) & (E)).

10.    The Delegate Selection Rules address two basic aspects of delegate selection: (i) the allocation of delegate positions among presidential candidates, *i.e.*, how many delegates from each state will be pledged to each presidential candidate; and (ii) the selection of the actual individuals to fill those positions, the delegates and alternates who will attend the Convention.  A state party's written plan details how these two functions will be carried out in that particular state in accordance with the Delegate Selection Rules. One group of delegates is chosen by congressional district or other district level (Rule 8); another group is chosen at-large, *i.e.*, from the entire state (Rule 10).  The Rules also provide for selection of other categories of pledged delegates.  The Rules further provide for DNC members, the state's Democratic Members of Congress and, if any, Democratic Governor and certain other officials to attend the Convention automatically, by virtue of their positions, as "unpledged delegates," meaning delegates officially not pledged to any presidential candidate.  Rules 9(A) & (B).

11.     The allocation of delegate positions to presidential candidates is accomplished, by the State Democratic Party, either through a primary or a caucus/convention system.  In a primary system, the State Party uses the state government-run or a party-run primary to allocate delegate positions, based on proportional representation, subject to a 15% threshold.  That is, each candidate who gets at least 15% of the vote is awarded a proportion of the delegates corresponding to the proportion of the vote that candidate wins. For example, if presidential candidate Smith wins 60% of the statewide primary vote and Jones wins 40%, Smith gets 60% of the state's at-large delegate positions and Jones gets 40%. The same method of allocation is used at the district level.  The actual selection of persons to fill these delegate positions can take place at a party-run meeting before the primary, a party-run meeting after the primary or as part of the primary itself.

12.     In a caucus system, the State Party uses a series of party-run meetings both to allocate delegate positions and to select persons to fill those positions. Typically caucuses begin with a series of meetings at the precinct level, open to all registered Democrats or, in states without party registration, persons declaring themselves Democrats, to meet to vote for President and elect delegates to higher-tier set of meetings, usually county or congressional district level caucuses.  At each set of meetings, the proportion of the vote won by each presidential candidate determines how many delegate positions that candidate gets at the next tier, or set of meetings.  A caucus of supporters of that candidate meets during that same session to determine which persons will fill those positions and attend the next tier as "delegates" to that tier.  For example, precinct caucuses may be held to elect delegates to congressional district

caucuses, which will in turn elect delegates to a state convention.   The proportion of delegate positions allocated to each presidential candidate can be based on the vote of caucus participants at any level of this process.  Caucus/convention systems do not involve use of any electoral machinery of the state government in any way.

13.    Attached hereto as Exhibit B is a list of the states indicating which type of system will be used by each State Party in 2008, and the date of each State Party's first event, primary or first-tier caucus.  "C" or "CC" indicates use of a caucus/convention system; "P," use of a state-run primary; and "PP" use of a State Party-run primary system, that is, a primary-type system that is paid for and run by the state party, and that does not use the state's electoral machinery.  As Exhibit B indicates, of the 56 states and territories that will send delegates to the 2008 Convention, twenty (20) will use caucus or party-run primary systems not involving any use of their states' electoral machinery.

14.    The Delegate Selection Rules govern all aspects of the delegate selection process and reflect the values and ideals of the Democratic Party of the United States in a variety of ways.  For example, the primary or first-tier caucus must be open to all Democrats (Rule 2(A)); all stages of the process must be open and transparent (Rule 2(F)); and discrimination based on race, sex, age, color, creed, national origin, religion, ethnic identity, sexual orientation, economic status or physical disability is strictly prohibited at all stages of the delegate selection process. (Rule 4(B); Rule 5).  State Party plans must include affirmative action programs to ensure full participation in the selection of the actual persons to attend the Convention as delegates, including specific numerical goals for African Americans, Hispanics, Asian Pacific Islander Americans and

Native Americans. (Rule 6(A)). Each state's delegation must be equally divided between men and women. (Rule 6(C)).

15.     One of the key elements of delegate selection addressed by the Delegate Selection Rules is the timing of a state's first determining step, *i.e.*, the date of the primary or the date of the first-tier caucus in which all Democrats may participate to express their individual preferences for president. Over the course of the last 38 years, since 1969, a series of different party commissions and bodies has studied the complex question of when states should first be able to hold such events during the election cycle and which states, if any, should be allowed to hold events before all the other states. The recommendations of these commissions, the views of the respective DNC bodies charged with implementing the delegate selection rules for a particular cycle, and of the DNC membership as a whole, have been reflected in the timing provisions of the Delegate Selection Rules, as adopted by the DNC, for each cycle.

16.     These deliberations have involved delicate balancing, for example, of the value of showcasing smaller less populous states where more personal "grassroots" campaigning is still possible; the competing value of giving a role to larger, more racially, ethnically and economically diverse states reflective of the Party's constituency; the value of giving Democratic voters a longer chance to examine and scrutinize the candidates, by stretching out the process; and the competing value of rallying around a nominee earlier in the process and thereby conserving resources for the general election against the Republican nominee.

17.     In 1992, 1996 and 2000, the Delegate Selection Rules provided that all State Democratic Parties were to hold their primaries or first-tier caucuses on the

first Tuesday in March or later, with an exception in the rules for the Iowa caucuses and New Hampshire primary to be held prior to the first Tuesday of March.

18.     Prior to 1996, the national Republican Party had no rules addressing the timing of presidential primaries and caucuses. At their 1996 Convention in San Diego, the Republican National Convention adopted the Republican Party's first rule governing when state Republican State Parties could hold their binding primaries and first-tier caucuses. Under that rule, in the 2000 cycle, State Republican Parties could hold such events any time on or after the first Tuesday in February. In response to this February date, Republican parties in Arizona, Delaware, Michigan, South Carolina and Washington State scheduled state government-run primaries or Republican-run events in February. The DNC maintained the first Tuesday in March as the first date on which state Democratic Parties could hold such events.  As a result, in five (5) states Republican events were held during February with no corresponding Democratic event. The five (5) state Democratic parties were forced to hold separate Democratic only contests, on or after the first Tuesday in March, to allocate delegates.

19.     In adopting the 2004 Delegate Selection Rules, the DNC moved the beginning of the Democratic Party "window" to the same date as the Republicans: the first Tuesday in February—with exceptions for Iowa (15 days earlier) and New Hampshire (7 days earlier) .  In 2004, the Iowa caucuses were held on January 19; the New Hampshire primary was held on January 27; and the regular "window" during which all other states could hold their events opened on February 3.  States holding events on that date (February 3, 2004) included Arizona, Arkansas, Delaware, Missouri,

and Oklahoma (state government-run primaries), and South Carolina, New Mexico and North Dakota (caucuses or party-run primaries).

       20.     During the 2004 nominating cycle, the Michigan Democratic Party threatened to submit a delegate selection plan placing Michigan's party-run primary on the same day as New Hampshire's. As a compromise, it was agreed that in 2004, Michigan's event would be held within the window (after February 3, 2004), but that a commission would be formed to study and make recommendations with respect to the calendar for 2008. Accordingly, then-DNC Chairman Terence R. McAuliffe proposed, and the 2004 Democratic National Convention adopted, on July 25, 2004, a resolution creating a "Commission on Presidential Nomination Timing and Scheduling," charged with the responsibility of "studying the timing of presidential primaries and caucuses and developing appropriate recommendations to the Democratic National Committee for the nominating process beginning in 2008."

       21.     The Commission was co-chaired by U.S. Representative David Price (D-NC) and former U.S. Secretary of Labor Alexis M. Herman. Members of the 40-person Commission, which became known as the "Price-Herman Commission" included U.S. Representative Kendrick Meek (D-FL). The Commission held five meetings over the course of ten months and heard testimony from a number of experts and from a variety of state party officials, party leaders, elected officials, national organizations and academics. Numerous timing scenarios were developed and debated extensively by Commission members.

       22.     The Price-Herman Commission adopted its final report on December 10, 2005. The Commission concluded that, while its members "understand

and appreciate the valuable role the Iowa caucuses and New Hampshire primary have played in the Democratic nominating process," a "majority of Commission members expressed serious concerns that Iowa and New Hampshire are not fully reflective of the Democratic electorate or the national electorate generally—and therefore do not place Democratic candidates before a representative range of voters in the critical early weeks of the process." *Report of the Commission on Presidential Nomination Timing and Scheduling*, p. 39.

23.     In the end, the report explains, the Commission "favored an approach that would preserve the first in the nation status of Iowa and New Hampshire but address the diversity, representation and participation issues in a meaningful way by including other states in the pre-window period in a schedule in which they would play an important role alongside Iowa and New Hampshire." *Id.* at p. 41.  Specifically, the Commission recommended that there be one or two first-tier caucuses between the Iowa caucus and the New Hampshire primary; and that following the New Hampshire primary, and prior to the opening of the regular window on February 5, 2008, there be one or two presidential preference primaries.

24.     The Commission also recognized that effective implementation of the Party's rule on timing required the support of the party's presidential candidates. The Commission urged "the RBC to impose appropriate obligations on presidential candidates to support, cooperate with and otherwise participate in making the timing system successful in achieving its fundamental goals." *Id.* at 44.

25.     There followed a lengthy and deliberative process by the DNC RBC to implement the Price-Herman Commission recommendations and determine

which states should hold such events.  Beginning in March 2006, state Democratic parties were invited to apply to be the ones to hold their events "pre-window," *i.e.*, to hold primaries or caucuses before February 5, 2008, the first date on which all other states would be permitted to hold such events.

26.     In total, eleven state Democratic parties submitted extensive written presentations and testified at length before the RBC at a series of meetings. In evaluating the states that applied, the RBC was guided by the Commission's recommendation that racial and ethnic diversity; geographic diversity; and economic diversity, including union density, be highlighted in the selection of the new pre-window states.

27.     The state of Florida did not apply at any time to be one of the states that would be allowed to hold its first determining step – its primary – prior to February 5, 2008.

28.     At the end of that process of considering states for early events, the DNC RBC recommended to the full DNC that the Iowa caucuses take place no earlier than January 14, 2008; that one caucus be held between the Iowa caucus and the New Hampshire primary, and that the caucus be held in Nevada, a state with a significant and growing Latino population, a sizeable Asian American and Pacific Islander community, a strong organized labor presence, and in the western region of the country where the Democratic Party was making electoral gains.  The RBC further recommended that one primary be held between the New Hampshire primary and the opening of the window on February 5, and that that primary be held in South Carolina, a southern state in which African-Americans represent a significant share of the Democratic electorate.

29.    The proposed Delegate Selection Rules for 2008, including the calendar described in paragraph 29, were adopted by the full DNC at a meeting of the DNC held on August 19, 2006 in Chicago, Illinois.  At no time prior to or during the meeting were any objections to the proposed Rules communicated, privately or publicly, by any representative of the Florida Democratic Party.  A vote on the Rules at the full DNC meeting was taken by voice vote.  As best the DNC staff could determine and as the press reported only members of the New Hampshire delegation voted against the proposed Rules.  No member of the Florida delegation spoke against the proposed Rules.

30.    The 2008 Delegate Selection Rules, as adopted in August 2006, also contain provisions for enforcing those Rules.  Rule 20(C) imposes certain automatic sanctions on any State Party which submits a delegate selection plan violating the timing, proportional representation or threshold provisions of the Rules.  These sanctions were first included in the 2004 Delegate Selection Rules approved by the DNC in 2002.

31.    Rules 20(C)(1)-(3)  provide that any state submitting a plan violating any of these three rules (timing, proportional representation or threshold) will automatically lose 50% of the state's pledged delegate positions and that the DNC members, members of the Congressional delegation and other unpledged delegates will not be able to attend the Convention as voting delegates.  In addition, Rules 20(C)(5)&(6) confer on the DNC RBC the authority to impose additional sanctions, including further reduction of the state party's delegation to the Convention.

32.    As part of the 2008 Delegate Selection Rules, the DNC RBC recommended, and the full DNC adopted, a new rule imposing obligations on presidential candidates with respect to the calendar. This new rule, Rule 20(C)(1)(b),  provides that a

presidential candidate who campaigns in a state that violates the window will not be entitled to receive any pledged delegate positions from that state.

33.    Similarly, the Rules of the Republican National Committee (RNC) impose automatic sanctions on state Republican Parties that submit plans violating the RNC Rules. RNC Rule 16(a)(1) provides that if any state or state party violates the Rules of the Republican Party relating to the timing of the delegate selection process, and the state sets that date before the Call to the Republican Convention is issued, the state party's delegation to the Republican National Convention is to be automatically reduced by 50%. If the state sets the date after the Call is issued, the automatic reduction is 90%. (RNC Rule 16(a)(2)). The relevant portions of the RNC rules are attached hereto as Exhibit C.

34.    In the case in which a state government-run primary is scheduled for a date that violates the DNC's rules, the affected State Party may easily avoid any of these sanctions simply by using a Party-run process to allocate delegate positions and by scheduling that process for a date that complies with the Rules. For example, in 1984, the state of Vermont enacted a law scheduling its primary for March 6, earlier than the earliest date permitted by the 1984 rules, which was March 11. The State Party used a Party-run process to allocate and select delegates, thereby turning the primary into a non-binding beauty contest.

35.    In 1988, the Republican-controlled Legislature of South Dakota enacted a law to hold the state's presidential primary on February 23, 1988, earlier than the earliest date then permitted under the 1988 Rules. The South Dakota State Party ultimately agreed to treat the primary as a non-binding beauty contest and to hold a separate

binding caucus on March 12, which was after March 8, the first date on which states other than Iowa and New Hampshire were permitted to hold binding primaries and first-tier caucuses in 1988.

36.     For the 2000 nominating cycle, the state governments of Arizona, Delaware and Washington enacted legislation establishing presidential preference primaries in February 2000. Specifically, the Republican-controlled legislature and Republican governor in Arizona scheduled its primary February 22, 2000; the Republican-controlled Delaware legislature scheduled its primary for February 8, 2000; and Washington State scheduled its primary for February 29, 2000. Again these February primary dates complied with the opening of the Republican window for the 2000 cycle, but not with the DNC Rules.  The Arizona, Delaware and Washington State Democratic Parties all petitioned the DNC RBC for permission to hold their events in February before the March 7, 2000 opening of the Democratic window. The three state Democratic parties argued that since their state governments were financing and administering presidential primaries that they should be able to take advantage of those contests rather than being forced to hold separate Democratic-only events after March 7. In the end, the DNC RBC maintained the March 7, 2000 opening of the window for all states other than Iowa and New Hampshire.  As a result, the Arizona, Delaware and Washington State Democratic Parties all treated their respective state-run presidential primaries as non-binding events and held separate party-run events in March 2000, in compliance with the DNC's rules.

37.     After the adoption of the 2008 Delegate Selection Rules, during the remainder of 2006 and early 2007 a number of Democratic state legislative leaders and Democratic Governors considered sponsoring and/or supporting legislation to move

13

their state's first events to a date prior to February 5, 2008, in violation of the DNC's rules. These leaders were informed of the DNC's rules and the sanctions that would be imposed on their state Democratic Parties. During the first half of 2007, in no state in the country—other than Florida—was any legislation enacted moving the state's primary to a date that would violate the DNC 2008 Delegate Selection Rules.

38.     On January 11, 2007, the Florida House Ethics and Elections Committee held a hearing on the possibility of moving the state's presidential preference primary to a date at the end of January. State Senator Jeremy Ring (D-Broward) testified that he was well aware of the sanctions that would be imposed by the DNC 2008 Delegate Selection Rules, but believed it would be "worth the risk" that such sanctions would be imposed in order to give Florida more prominent role in the nominating process.

39.     On January 23, 2007, House Bill (HB) 537, to move the date of the Florida presidential primary to one week after the New Hampshire primary (one week after January 22, meaning January 29, 2008) or February 5, whichever is earlier, was pre-filed with a number of Democratic co-sponsors including state Representatives Mary Brandenburg (D-Palm Beach); Susan Bucher (D-Palm Beach); Martin David Kiar (D-Broward); Ari A. Porth (D-Broward); Yolly Roberson (D-Miami-Dade); Franklin Sands (D-Broward); and James W. Waldman (D-Broward).

40.     On February 8, 2007, a hearing on HB 537 was held by the House Ethics and Elections Committee. During the hearing, Rep. Loranne Ausley (D-Jefferson, Gadsden Leon) noted that Democratic State Party Chair Karen Thurman had sent a letter to the Democratic Committee Members noting that moving the primary before February

14

5 would result in the imposition of sanctions under the DNC Rules.  Nevertheless, and evidently with full knowledge of those sanctions, at least three Democratic Members of the Committee made statements in support of the bill: Representatives Ausley, Keith Fitzgerald (D-Manatee, Sarasota) and Elaine Schwarz (D-Broward).  The bill was reported favorably by the Committee on a unanimous vote with all Democratic Members voting in favor.

41.    On February 9, 2007, House Democratic Leader Dan Gelber (D-Miami-Dade) acknowledged in a newspaper interview that DNC Chair Governor Howard Dean had called him and asked the Democratic legislative leadership actively to oppose moving the primary date to January in violation of the DNC Rules.  Rep. Gelber stated, "I don't represent Howard Dean.  I represent a lot of people who would like to be in the primary journey as more than just potential contributors."  (S. Bousquet, *Primary move upsets DNC*, St. Petersburg *Times*, Feb. 9, 2007 at 5B).

42.    HB 537 was then referred to the House Economic Expansion and Infrastructure Committee which reported it favorably on a unanimous vote, with all Democratic Members voting in favor.

43.    On March 6, 2007, the bill was formally placed on the House Calendar.

44.    Around the same time, Florida's junior U.S. Senator Mel Martinez, who also served at that time as General Chairman of the Republican National Committee, acknowledged in a newspaper interview that the Florida Republican Party would suffer a loss of delegates to the Republican National Convention if the state moved its primary to January 29, 2008. Senator Martinez was quoted as stating, "There will be a serious loss of

15

delegates, which I'd hate to see happen. I want the leadership of Florida to know that it's not something I can fix." (B. Reinhard, *Ego battles at heart of debate over primaries*, Miami *Herald*, March 17, 2007 at B1.)

45.     On March 21, 2007, the Florida House passed HB 537 by a vote of 115-1, with all but one Democratic State Representative voting in favor of the bill.

46.     The Senate counterpart to HB 537, S 1010, to move the date of the presidential primary to January 29, 2008, was originally filed on February 1, 2007, by a single sponsor, State Senator Jeremy Ring (D-Broward).  The Republican Chairman of the Senate Elections Committee, Senator Lee Constantine (R-Orange, Seminole) actually announced his intention to introduce a bill to move the date of the primary to February 19, 2008, which would have *complied* both with DNC and RNC rules.  (C. Dolinski, *House, Senate dates for presidential primary differ*, Tampa *Tribune*, March 9, 2007). The Committee merged S 1010 into S 960, a bill which was sponsored by Chairman Constantine and which included changes in Florida's voting systems—transitioning the state from touchscreen to optical scan systems.  Chairman Constantine apparently accepted the January 29 date in order to win House support for the provisions relating to voting systems.  (C. Dolinski, *Senate ties early primary to paper trail for voters*, Tampa *Tribune*, April 18, 2007, Metro p. 4).

47.     In response to the passage of the legislation by the Florida House, on April 5, 2007 the Co-Chairs of the DNC RBC sent a letter to each member of Florida's Democratic congressional delegation, including plaintiffs Senator Bill Nelson, Congressman Alcee Hastings and Congresswoman Corrine Brown.  The letter notified the Members of Congress of the consequences of the pending legislation to move the

primary to January 29, 2008 and urged them to use their "leadership and influence to oppose and help to defeat the state legislation that would put Florida's presidential primary in violation of DNC rules." Subsequent conversations between DNC staff and congressional staff indicated that no Member of the Florida Democratic congressional delegation was willing to raise any concerns or try to intervene with the Democratic state legislative leadership.

48.     On April 26, 2007, S 960 was debated on the floor of the State Senate. The minority (Democratic) Leader offered an amendment to change the primary date back to February 5, 2008, but indicated that he did not really want the amendment to pass, as indicated by a transcript of the floor proceedings:

> Senate Democratic Leader: Alright. Thank you Mr. President.....The, um, the Chair of the Democratic National Committee has of course threatened that if we move our election, uh, if we move the primary to, um to the before the first Tuesday in February that they will, you now sanction us at the Democratic National Convention. So the Democratic Leader and the Democratic Leader Pro Tem are jointly making this motion, which we will duly show to them later, that we tried not have the election, um, before the first Tuesday in [February].
> Senate President: And so Senator,... are you urging a negative vote or would you like us to pass this [amendment]?
> Senate Democratic Leader: Oh no sir. We really really want this, don't we Senator .

(Sarcasm and audible laughter in the Chamber). [Based on video of floor proceedings].

The amendment failed by voice vote with no debate.

49.     On April 27, 2007, the Senate merged S 960 with HB 537 and passed it by a vote of 37-2, with virtually every Democratic Senator voting in favor of the bill. Because the bill as passed by the Senate differed from that passed by the House, the measure was sent back to the House and passed on May 3, 2007 by a vote of 118-0, with every Democratic Representative voting in favor of it. The bill was sent to the Governor and signed into law on May 21, 2007.

50.     Throughout the months of March 2007 and April 2007 officials of the DNC and Florida Democratic Party (FDP) had discussions about the status of the pending legislation and what activities the DNC could engage in to try and influence Democratic state legislators to bring Florida's system into compliance with DNC Rules. Even before the law was signed by Governor Crist on May 21, 2007, DNC and FDP officials began discussions about how to cope with the new law setting the primary date for January 29, 2008, in violation of the DNC's 2008 Delegate Selection Rules. This included an in-person meeting between the parties on Sunday, May 7, 2007 in Annapolis, Maryland.

51.     In May and June 2007, with assistance by the DNC, the FDP developed a plan for an alternative, party run vote by mail process that would be scheduled for a date complying with the rules. On June 10, 2007, however, the Florida Democratic State Executive Committee (FDSEC) voted to make the state-run, January 29 primary binding and submitted to the DNC RBC a delegate selection plan based on that primary.

52.     Throughout July and early August 2007, discussions between the DNC and FDP officials continued, including another in-person meeting on August 11, 2007.  Following that meeting the DNC then developed a proposed State Party-run caucus system, with congressional district caucuses to take place after February 5, 2008. That system would fully comply with the DNC's Rules and afford an opportunity for all Florida Democrats to vote for the Democratic presidential nominee.  The cost to FDP of implementing that caucus system was budgeted at about $870,000. The DNC offered to pay the entire cost of the caucus system. This was unprecedented: no similar offer had

been extended to any of the five state Democratic parties forced to run party events in the 2000 cycle, or any previous cycle, in order to comply with the DNC Rules.

53.     After considerable further discussions between FDP and the DNC, and among the leaders and elected officials of FDP, including plaintiff Senator Bill Nelson, FDP rejected this offer.

54.     On August 4, 2007, the FDSEC approved submission of a delegate selection plan based on use of the January 29, 2008 primary and that plan was submitted to the DNC RBC on August 7, 2007.

55.     On information and belief, on August 11, 2007, the FDP Chair, FDP Executive Director and several Florida DNC members met privately with DNC senior staff and James Roosevelt, the co-chair of the DNC RBC, in the course of a DNC Executive Committee meeting held in Burlington, Vermont. During that private meeting, the DNC officials informed the FDP representatives that, if the FDP persisted in its refusal to adopt an alternate plan complying with DNC Rules, it was likely that the DNC RBC would not only allow the automatic sanctions to go into place (50% reduction in delegates), but would use its authority to further reduce Florida's delegation to zero delegates.

56.     On August 25, 2007, the DNC RBC met in Washington, D.C. to consider 32 state delegate selection plans, including the plan submitted by Florida.  The Committee heard extensive presentations by FDP State Chair Thurman, Florida Democratic National Committeeman Jon Ausman, and Florida Democratic National Committeewoman Terrie Brady.   Members of the Committee then discussed the issue at length, carefully weighing the impact of sanctions against the need for the DNC to be

able to enforce its rules on timing to vindicate the goals and values identified by the Price-Herman Commission, and lest the nominating process descend into chaos, with each state free to leapfrog other states in a never-ending cycle.

57.     Members of the Committee were also cognizant of the fact that every other Democratic State Party in the country had, despite considerable political counter-pressures, submitted a plan complying with the DNC's timing rule. To this day, that remains the case. Although Michigan has enacted a law setting a state-run primary for January 15, 2008, a date which would violate DNC Rules, the Michigan Democratic Party had already submitted a plan to use a party-run process beginning on February 9, 2008, which complies with DNC Rules. At this time that plan remains in effect and it is assumed that the Michigan Democratic Party will simply ignore the results of the state-run-primary, turning it into a non-binding event.

58.     DNC Delegate Selection Rule 20(C)(7) allows the DNC RBC to determine that no sanctions are to be imposed on a state party by reason of violation of the timing rule, if the RBC determines based on "clear and convincing evidence" that "the state party and other relevant Democratic party leaders and elected officials took all provable, positive steps and acted in good faith to achieve legislative changes to bring the state law into compliance" with the Party rules. In this case, however, in the course of its discussion at the August 25 meeting, the RBC members concluded that Democratic party leaders and elected officials had *not* acted in good faith to oppose the legislation moving the primary date, given that Democratic legislators were original co-sponsors of the legislation in both chambers and that virtually all Democratic state legislative leaders and lawmakers actively supported the legislation at every stage of the process.

59.     After that discussion, by a voice vote with only one (1) "no" vote cast, the DNC RBC found the Florida 2008 Delegate Selection Plan in non-compliance with the Delegate Selection Rules because of the violation of the DNC's rule on timing. Under DNC Rule 20(C)(1)(a), that finding triggered the automatic reduction of the State Party's delegation by 50% and the disentitlement of the state's DNC members and Democratic Members of Congress to attend the Convention as delegates. As part of the same motion, under Rule 20(C)(5) and 20(C)(6), the DNC RBC voted to further reduce the state's total number of pledged and unpledged delegates to zero.

60.     Under provisions of the RBC's internal regulations, however, the FDP was given an additional 30-day period of time, following that meeting, in which to submit a revised Plan that complied with the timing requirements of DNC Rules. The official finding of Non-Compliance was received by the FDP via certified mail on August 30, 2007. The 30-day time period expired on September 29, 2007.

61.     Again during September 2007 DNC officials had conversations with a number of Florida party leaders, elected officials and FDP officials. Through all of those conversations the DNC reiterated that the FDP had the option to use a party-run caucus process to allocate delegates and that the DNC was willing to pay for it.

62.     On September 29, 2007 FDP Chair Karen Thurman notified the DNC RBC Co-Chairs that the FDP was reaffirming the delegate selection plan previously submitted, which is based on the January 29, 2008 primary. Chair Thurman's letter acknowledges that the FDP spent months considering potential Party-run alternatives that would have complied with the DNC Rules but that the FDP did not consider any of those alternatives to be acceptable.

21

63.     On October 5, 2007 the DNC RBC Co-Chairs formally notified the FDP that the State Party's decision not to submit a complying plan based on an alternative State Party-run process means the FDP is now subject to the 100% delegate reductions imposed by the RBC at its August 25, 2007 meeting.  The official notification noted the disappointment "in view of those consequences" that the FDP did not choose to implement a Party-run alternative plan that could have complied with the rules and provided Florida Democrats with a full opportunity to participate in the presidential nominating process and to send a full delegation to the Convention."

64.     Since the state party is not currently entitled to send delegates to the Convention, the provision of the Rules that presidential candidates campaigning in a state that violates the timing rule are not entitled to delegates, is inapplicable.  Certain presidential candidates signed a letter pledging not to campaign in Florida but that pledge did not result from any action or request of the DNC.

65.     On October 22, 2007, the national chair of the Republican National Committee announced that the five states which had scheduled primaries or caucuses prior to February 5, 2008 in violation of the RNC Rules, including Florida, would lose half of their delegates to the Republican National Convention.  (Associated Press, *5 states may lose half of GOP delegates*, Oct. 23, 2007).

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed on October 29, 2007.

Philip McNamara

22