UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Victor DiMaio, an individual                    CASE NO: 8:08-CV-672-T-26EAJ

    Plaintiff,
v.

Democratic National Committee

    Defendant,
_____/

### MOTION FOR SUMMARY JUDGEMENT AND MEMORANDUM OF LAW IN SUPPORT THEREOF

COMES NOW the Plaintiff, by and through his undersigned attorney, and files this his Motion for Summary Judgment and Memorandum of Law in support thereof, and says:

Victor DiMaio, through undersigned counsel, hereby moves the court pursuant to Federal Rule of Civil Procedure 56(b) to enter judgment for him on all claims in Plaintiff's complaint. As fully demonstrated below, and in the accompanying memorandum and exhibits, Plaintiff is entitled to a judgment as a matter of law.

### Preliminary Statement:

This case pertains to the legality of the actions of a national political party to disallow participation of duly elected delegates from the State of Florida, to its national nominating convention, in selecting its nominee to be a candidate for President of the United States.

Florida Statute 103.101 explicitly provides that on the last Tuesday in January in each year, the number of which is a multiple of four, each party shall elect one person to be the candidate for nomination of such party for President of the United States or select delegates to the national nominating convention, as provided by party rule. The statute does not provide for an alternate method for the state party branch of the national political party to select delegates.

The aforesaid statute further provides that the state executive committee of each party, by rule adopted at least 120 days prior to the presidential preference primary election, shall determine the number, and establish procedures to be followed in the selection of delegates and delegate alternates from each candidate's supporters. A copy of any rule adopted by the executive committee shall be filed with the Department of State within seven days after its adoption and shall become a public record. The Department of State shall review the procedures and shall notify the state executive committee of each political party of any ballot limitation. The Department of State may promulgate rules for the orderly conduct of the presidential preference primary ballot.

Rules of the National Party provide that no state presidential preference primary election may be held prior to the 1st Tuesday in February or after the 2nd Tuesday in June, in the calendar year of the national convention, except for the States of New Hampshire, Iowa, Nevada, and South Carolina. These rules further provide that the National Party may impose sanctions for violations by a state of these rules, including the reduction or elimination of the number of delegates to the national convention. In addition, the rules of the National Party provide that a state party may be required by a vote of the DNC Executive Committee, upon recommendation of the DNC rules and bylaws committee, to

adopt and implement an alternate party-run delegate selection, which does not conflict with their rules. The Plaintiff seeks a declaration that the rules of the Defendant and their decision to not allow delegates from the state of Florida to be seated at its national nominating convention, based on Florida's January 29, 2008 presidential preference primary, violates Plaintiff's rights under the 14th Amendment to the United States Constitution, and his rights under the Civil Rights Act of 1964.

## **Standing**

The Plaintiff contends that this court has standing to enter a declaratory judgment pursuant to 28 U.S.C. 2201, which provides in part, that "in a case of actual controversy within its jurisdiction... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other relations of any interested party seeking such declaration, whether or not, further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." Article III section 2 of the United States Constitution grants jurisdiction to this court of cases arising under the United States Constitution.

Article III standing requires a party to show actual injury, a causal relation between that injury and the challenged conduct, and the likelihood that a favorable decision by the court will redress the alleged injury Lugan v. Defenders of Wildlife 504 U.S. 555, 560-61 (1992.)

When government action or inaction is challenged by a party who is a target or object of that action, as in this case, "there is ordinarily little question that the action or inaction has caused him injury and that a judgment preventing or requiring the action will redress it" Lugan, 504 U.S. at 561.

3

In the case of <u>Cousins v. Wigoda</u> 419 U.S. 477 (1975), following a primary, Cousins brought a declaratory judgment action seeking a ruling that he was duly elected to the Democratic Nominating Convention in accordance with Illinois law and sought an injunction against Respondent to prohibit them from interfering or impeding the functioning of the Petitioner a duly elected delegate. In that case, the District Court assumed jurisdiction.

In the case of <u>Terry v. Adams</u> 345 U.S. 461 (1953), Plaintiffs were Blacks who instituted an action against a political party in district court for declaratory and injunctive relief. The district court assumed jurisdiction and entered an order declaring Plaintiffs were legally entitled to vote in the party's primary election.

The Plaintiff herein has instituted an action against a political party asking the court to find that Plaintiff is a registered Democratic voter in Hillsborough County, Florida who voted on January 29, 2008 in the party's statewide presidential preference primary, and that Defendant's rules and decision to not seat delegates from the state of Florida, based on the results of that election, violated Plaintiff's rights under the 14th Amendment to the United States Constitution and Section 601 of the Civil Rights Act of 1964. He is also seeking injunctive relief asking the court to order the Defendant to seat Florida's delegates, elected consequent to the January 29, 2008 election.

The Plaintiff has a sufficient stake in the outcome and an injury in fact which can be redressed by action of this court.

## **The rules and decisions of the Defendant constitute "governmental action" for purposes of deciding whether Defendant violated Plaintiff's rights under Amendment 14 of the United States Constitution**

The Fourteenth Amendment's equal protection and due process clauses, only apply to "state action". Section 601 of the Civil Rights Act, which will be discussed below, does not require "state action", but merely that the actor received federal financial assistance.

In the case of Smith v. Allwright 321 U.S. 649 (1944), the Supreme Court of the United Stated declared that the right to vote in a primary election for the nomination of candidates, without discrimination by the state, like the right to vote in the general election, is a right secured by the constitution.

The Supreme Court held that a state is free to conduct her elections as she may deem wise, unless her actions are prohibited by the United States Constitution or in conflict with powers delegated to and exercised by the federal government.

The Respondents in that case contended that the Democratic Party of Texas was a voluntary organization with members banded together for the purpose of selecting individuals of the group representing the common political beliefs as candidates in the general election. They further contended that as such a voluntary organization, the Democratic Party was free to select its own membership and limit to whites participation in the party primary. They finally argued that elections are political party affairs, handled by the party and not government officers.

The court examined whether the action of the party was state action or private action. It was determined that since primaries were conducted by the party under statutory authority, the party was an agency of the state insofar as it determined the participants in a primary election. The party took its character as a state agency from the

5

duties imposed upon it by state statutes, and the duties did not become matters of private law, because they were performed by a political party.

In the case of O'Brien v. Brown, 409 U.S. 1 (1972), the Supreme Court stayed the decisions of the Courts of Appeals, that had ruled that action of the Party in these cases was governmental action, and therefore subject to the requirements of due process. The court refused to address the question, however, in dissent of the decision to stay the decisions, Justice Brennan opined,

> "First, I agree with the Court of Appeals that the action of the Party in these cases was governmental action, and therefore subject to the requirements of due process. The primary election was, by state law, the first step in a process designed to select a Democratic candidate for President; the State will include electors pledged to that candidate on the ballot in the general election. The State is intertwined in the process at every step, not only authorizing the primary, but conducting it and adopting its result for use in the general election. In these circumstances, the primary must be regarded as an integral part of the general election, *see* United States v. Classic, 313 U. S. 299 (1941), quoted *infra* at 409 U. S. 15-16, and the rules that regulate the primary must be held to the standards of elementary due process."

Therefore, the Plaintiff posits that the National Party is an agent of the state insofar as they determine the participants in a primary election (as well as the general election), and must not violate the constitutional rights of the Plaintiff in performing their duties.

6

**The rules and the decision of the Defendant not to seat delegates elected as the result of Florida's January 29, 2008 presidential preference primary violate the Plaintiff's 14th Amendment rights. An order directing that the National party seat delegates to its National Nominating Convention based on the results of Florida's January 29, 2008 Presidential Preference Primary, do not violate the National party's constitutional rights**

In Democratic Party of U.S. v. Wisconsin 450 U.S. 107 (1991), the court stated that "The question in this case is not whether Wisconsin may conduct an open primary election if it chooses to do so or whether the National Party may require Wisconsin to limit its primary election to publicly declared Democrats. Rather, the question is whether, once Wisconsin has opened its democratic presidential preference primary to voters who do not publicly declare their party affiliation, it may then bind the National Party to honor the binding primary results, even though those results were reached in a manner contrary to the National Party rules." In that case the court cited the case of Cousins v. Wigoda 419 U.S. 477 (1974), which stated that "the National Democratic Party and its adherents enjoy a constitutionally protected right of political association. The First Amendment freedom to gather and associate for the purpose of advancing shared beliefs is protected by the Fourteenth Amendment from infringement by any state. The freedom to associate for the common advancement of political beliefs necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only."

The Supreme Court in Democratic Party of U.S. v. Wisconsin went on to state "Here, the members of the National Party, speaking through their rules, choose to define

7

their associational rights by limiting those who could participate in the process leading to the selection of delegates to their national convention. On several occasions this court has recognized that the inclusion of persons unaffiliated with the political party may seriously distort its collective decisions, thus imparting the party's essential functions, and that political party may accordingly protect themselves from intrusion by those with adverse political principals."

The case herein is different from both the Cousins and the Wisconsin cases. In this case, the discrimination, unlike Wisconsin, is not due to the ideology of the voter, but due to racial and national origin demographics, as well as nonsensical stereotypes about how voters in Iowa and New Hampshire are "more informed and engaged" than voters in the rest of the country.

The Plaintiff posits that if this court finds that in fact the Defendant did engage in racial, geographical and national origin discrimination, the associational rights of the Defendant are inferior to the 14th Amendment rights of the Plaintiff.

In the report of the Defendant's scheduling committee, which is attached to Plaintiff's amended complaint, it is clear that the primary reason for allowing New Hampshire and Iowa to hold their primary and caucus before the other states was because the voters in those state's are more "informed and engaged" than the voters in the rest of the other 48 states. Such an irrational stereotype doesn't pass the rational basis test of any level of scrutiny under the 14th Amendment.

The aforesaid report also makes it clear that South Carolina and Nevada were selected to have their primary and caucus before the remaining 46 states because Nevada is a state with a significant and growing Latino population, and a sizable Asian American

and Pacific Islander community. South Carolina was chosen because African-Americans represent a significant share of the Democratic electorate.

Attached hereto as exhibit "A" is a copy of a sworn statement from Philip McNamara, a representative of the Defendant. This statement was filed by the Defendant in the case of <u>Bill Nelson, et al., v. Howard Dean, et al.</u>, case number 4:07cv427-RH/WCS, U.S. District Court of the Northern District of Florida, in connection with the Defendant's Motion for Summary Judgment. The Plaintiff adopts and reasserts the statements of Philip McNamara as if specifically set forth herein. Plaintiff would specifically direct the court's attention to paragraph 28 of this statement.

Also attached hereto as exhibit "B" is a copy of the Defendant's Motion For Summary Judgment filed by the Defendant in the case of <u>Bill Nelson, et al., v. Howard Dean, et al.</u>, case number 4:07cv427-RH/WCS, U.S. District Court of the Northern District of Florida. Plaintiff would specifically direct the court's attention to the bottom of page 22 and the top of page 23, wherein the Defendant admits, " Here, the DNC's manifest intent was to promote the empowerment of Latinos and African-Americans in the nominating process by allowing the state parties of Nevada and South Carolina, to hold their events, in the same period as Iowa and New Hampshire, before all the other states."

Assuming arguendo, that the Defendant decided that the Maine and Utah primaries would be scheduled before the other 46 states, because Maine is a northeastern state where white Anglo-Americans represent a significant share of the Democratic electorate and Utah is a western state where white Anglo-Americans represent a significant share of the Democratic electorate. Assume they gave as a reason that by

9

selecting a white Anglo-American nominee, it improved the chances of a Democrat being elected president and they argued that their 1st Amendment rights to freedom of association permitted them to do so without interference from the state or the courts. Further assume that South Carolina scheduled its primary the same day as Utah's and a voter from South Carolina brought an action against the party alleging a violation of his 14th Amendment rights, if they failed to seat delegates from South Carolina based on the results of the South Carolina primary. Surely the courts would rule that the actions of the party violate the 14th Amendment.

A national political party can not do whatever it wishes with respect delegate selection and the scheduling of primaries. While the discretion is broad, it must not be wholly unreasonable and may not be based on the racial and national origin demographics of a state or states.

The Supreme Court has made it clear that "reverse discrimination" will not be tolerated. In <u>Regents of the University of California v. Bakke</u>, 438 U.S. 265 (1978) the court found the university's preferential treatment toward African-American applicants to medical school, an unconstitutional violation of the 14th Amendment. The court further held that when a state's distribution of benefits or imposition of burdens hinges on ancestry or the color of one's skin, that individual is entitled to a demonstration that the challenged classification is necessary to promote a substantial state interest.

In a more recent case of <u>Parents Involved In Community Schools v. Seattle School District</u> 551 U.S.____(2007), school districts adopted student assignment plans that relied upon race to determine which public schools certain children may attend. The Court stated "racial classifications are simply too pernicious to permit any but the most

exact connection between justification and classification" The court held that the district's plan was unconstitutional.

In the case at bar, it clearly was not necessary to give preferential treatment to the citizens of Nevada and South Carolina, due to the racial and national origin demographics of those states. The rules and decisions of the Defendant clearly violated Plaintiff's 14th Amendment rights and said rights of Plaintiff supersede the competing 1st Amendment rights of the Defendant to association and speech.

### The rules and decisions of the Defendant violate Plaintiff's rights under section 601 of the Civil Rights Act of 1964

Section 601 of Title VI of the civil Rights Act of 1964, 42 U.S.C. § 2000d, provides "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

The Defendant receives financial assistance from the federal government in conducting its presidential nominating conventions. The funding is provided pursuant to Title 26, Subtitle H, Chapter 95, § 9008. This section provides in part "Subject to the provisions of this section, the national committee of a major party shall be entitled to payments under paragraph (3), with respect to any presidential nominating convention, in amounts which, in the aggregate, shall not exceed $4,000,000, as adjusted by the consumer price index."

While there are no U.S. Circuit Court of Appeals cases directly on point, a District Court judge from the District of Columbia held in the case of Freedom Republicans, Inc. v. Federal Elections Commission, 788 F. Supp. 600 (DDC 1992) that

11

Title VI of the Civil Rights Act applied to the National Republican and Democratic Parties and that the parties must comply with the Civil Rights Act by not discriminating in selecting delegates to their national convention.

This District Court case was reversed by the Circuit Court for the District of Columbia <u>Freedom Republican, Inc., v. Federal Elections Commissioner</u>, 13 F.3d 412 (D.C. Cir. 1994), however, the reversal was based on lack of standing due to the inability of the Plaintiff's to establish causation and redressibility, rather than the non-applicability of Title VI with respect to national political parties in connection with the delegate selection process.

Private individuals may sue to enforce §601 of Title VI and obtain both injunctive relief and damages. <u>Alexander  v. Sandoval,</u> 532 U.S. 275 (2001).  In <u>Regents of Univ. of Cal. v. Bakke</u>, 438 U.S. 265 (1978), the Court reviewed a decision of the California Supreme Court that had enjoined the University of California Medical School from "according any consideration to race in its admissions process." Id., at 272.

Discrimination on the basis or race or national origin violates Title VI even if the discrimination carries with it no racial stigma.  There is no qualification or limitation of Section 601's categorical prohibition of discrimination.  The word discrimination clearly means a distinction in the treatment given to different individuals because of there different race or national origin.

On Page 41, of the Defendant's scheduling committee's report, concern was expressed that the first in the nation status of New Hampshire and Iowa resulted in under enfranchisement of African American voters.  There was a discussion on Page 42 of the

report that an alternative process would be to include New Hampshire and Iowa in the regular window period, as the Republicans do.

It is clear in the report that the method in which South Carolina and Nevada were chosen was based on a desire to maintain the role of New Hampshire and Iowa as the first in the nation presidential preference primary and caucus and then compensate for the lack of ethnic diversity in those states by selecting two states in the pre-window period with a significantly larger than average demographic share of African Americans and Hispanic/Latinos than the national average.

The Defendant's plan is precisely the type of plan which the Supreme Court has held violates the Fourteenth Amendment to the United States Constitution and the Civil Rights Act.

By insisting that New Hampshire and Iowa maintain its first in the nations status and then requiring other states that wish to vote in the pre-window period to have a significantly larger than average demographic share of African Americans or Hispanic/Latinos than the national average, the Defendant's plan excludes Florida from voting at the same time as South Carolina and Nevada based on race or national origin.

There is no indication or history which suggests that the Iowa and New Hampshire primary and caucus was scheduled in such a way as to discriminate against African Americans and Latinos/Hispanics.  The policy that Iowa and New Hampshire should always go first is discriminatory and illogical, but the Defendant made a wrong decision worse by discriminating against the other forty-six states based on race and national origin.

On Page 31 of the Defendant's Scheduling Committee's Report, it is acknowledged that many voters do not have the opportunity for active participation due to a front loaded calendar, which leads to an early resolution of the contest. The report stated that it was important that the calendar be positioned in such a way to allow the presumptive nominee to appeal to "different constituents" in the party. The report further stated that "the calendar should engage more diverse democratic voters". Implicit in these statements is a reference (at least in part) to race and national origin.

On Page 40 of the report, the committee states that Iowa and New Hampshire do not represent the racial and ethnic diversity of the party or the nation. It is obvious the Defendants felt that excluding states with populations with significant numbers of African Americans and Hispanic/Latinos from the early window period was discriminatory.

The Plaintiff asserts, first and foremost, that race or national origin should not be considered whatsoever in scheduling primary elections. African American voters in Florida do not necessarily have the same political or economic interest as African Americans in California or New York or even in the same town or the same neighborhood. Under the Civil Rights Act, everyone should be treated as an individual, not part of a racial group or "constituency".

The Defendant in scheduling Nevada in the pre-window period sets forth that this state has a significant number of Latinos/Hispanics. These groups too should not be stereotyped. All Mexican-Americans, Cuban-Americans, and Puerto Ricans do not have the same political or economic interest.

14

The Defendant's scheduling plan operates as a quota. The Defendant's plan is based on the idea that it was beneficial to the party to allow New Hampshire and Iowa to continue to be the first presidential preference primary and caucus in the nation, but since these states demographically had a small percentage of African Americans and Latinos/Hispanics, in order to "diversify" the primary schedule, it was desirable for a state with a significant number of African Americans in the Democratic electorate and a state with a significant number of Latinos/Hispanics in the Democratic electorate to hold their primary election and caucus before the remaining forty six states.

If it is allowable for the Defendant to manipulate the primary schedule to insure that there is a racial and national origin balance amongst the voters in the early primary/caucus states, the plan of the Defendant certainly did not do this.

According to U.S. census data, populations of the four pre-window primary states are as follows: Nevada, 1,314,895, Iowa, 2,982,085, New Hampshire, 2,495,529, South Carolina, 4,321,249. African Americans make up 29 percent of the population in South Carolina, 7.9 percent in Nevada, 2.2 percent in Iowa and .8 percent in New Hampshire. Therefore, African Americans make up 13.73 percent of the combined population of the early primary states while African Americans only make up 12.4 percent of the national population.

In terms of delegates, the impact of the scheduling plan is even more significant. South Carolina has been allocated 54 delegates, Nevada 33, Iowa 57, and New Hampshire 30. Of the total delegates allocated to the four early primary states, 31 percent of the delegates are allocated to South Carolina. This gives South Carolina significant influence in the presidential preference primary process. Therefore, even if it

was permissible for the Defendant to manipulate its presidential preference primary process based on race and national origin to make the process "fair", the Defendant went overboard to the extent that the process was unfair to citizens of states with an average percentage of African Americans and Hispanics/Latinos.

The Defendant's plan allowed other states to apply to hold their primary in the "pre-window" period, however, the Defendant made it clear that it would only choose a state or states with certain desired demographic qualifications based on race and national origin. Since Florida only has an average number of African Americans and Latinos/Hispanics in its population, it would have been futile to apply to be part of the earlier tier of the primary schedule.

The Defendant's scheduling plan could have been race neutral in developing a racially and ethnically diverse primary schedule. The Democratic National Committee's plan was not narrowly tailored. Alternative primary scheduling plans were even suggested in the scheduling committee's report including selecting states based on size, geographical location, etc.

While the Defendant's primary schedule does not deny Florida voters the right to delegates if they comply with the primary schedule, it does give the voters of Florida less perceived influence than the voters of New Hampshire, Iowa, South Carolina and Nevada. Clearly the pre-window period in the primary schedule was a sought-after position and considered desirable.

The decision of the Defendant not to seat all of the delegates elected pursuant to the Florida presidential preference primary is not inconsequential. Currently no Democratic candidate for president has enough pledged delegates to secure the

Democratic nomination and it is highly unlikely that this will be the case at the end of the presidential primary elections. Whether or not all of the delegates from Florida are seated at the Democratic National Nominating Convention could determine which presidential candidate will be the Democratic nominee for president. If the decision of the Defendant stands, the voters of Florida will have no say-so in the selection of the Democratic presidential nominee.

Thus, it is clear that regardless of whether the rules or decisions of the Defendant constitute "state action", as required, in order to be subject to the 14th Amendment, Defendant is subject to section 601 of Title VI of the civil Rights Act of 1964, 42 U.S.C. § 2000d.

As set forth above the Defendant chose to schedule primary elections and caucuses in South Carolina and Nevada, before the remaining states could hold their elections and/or caucuses for the specific purpose of giving preference to those states. The Defendant has clearly admitted that a major reason for giving preference to those states, was due to the racial and national origin demographics of those states. There was a clear intent on the part of the Defendant to discriminate in favor of the voters in South Carolina and Nevada on the basis of race and national origin. This is precisely the type of activity the Act sought to preclude.

The appropriate remedy for Defendant's violation of Plaintiff's rights under section 601 of the Civil Rights Act of 1964, is to enjoin the Defendant from penalizing Florida, the state where Plaintiff resides and voted, by not allowing delegates to be seated at its national nominating convention as a result of Florida's presidential preference

primary held on January 29, 2008. The Defendant should be directed to seat Florida's delegates as elected under state party rule.

## CONCLUSION

Plaintiff posits that there are no material facts in dispute and that a ruling in this case can be made as a matter of law. The Plaintiff requests that this court find that it has jurisdiction and authority to enter a declaratory judgment and injunctive relief.. The Plaintiff further requests that this court enter a declaratory judgment determining (1) that the rules and the decision of the Defendant not to seat delegates elected as the result of Florida's January 29, 2008 presidential preference primary violate the Plaintiff's 14th Amendment rights; (2) that the rules and decisions of the Defendant violate Plaintiff's rights under section 601 of the Civil Rights Act of 1964 (3) that the Plaintiff is entitled to injunctive relief, and that said relief consist of directing the Defendant to seat delegates at its national nominating convention, elected as a result of Florida's presidential preference primary held on January 29, 2008.

          Respectfully Submitted,

          s/ Michael A. Steinberg
          Michael A. Steinberg, Esquire
          4925 Independence Parkway, Suite 195
          Tampa, Florida 33602
          Telephone #: (813) 221-1300
          Facsimile  #: (813) 221-1702
          Frosty28@aol.com
          Attorney for the Plaintiff
          Florida Bar No:  340065

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on April 29, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel for Defendant, Katherine E. Giddlings, Akerman Senterfitt, 106 East College Avenue, Suite 1200, Tallahassee, FL 32301 and counsel, Joseph E. Sandler, Sandler, Reiff & Young, P.C., 50 E. Street, S.E., Suite 300, Washington, DC 20003.

        s/ Michael A. Steinberg
        Michael A. Steinberg, Esquire
        4925 Independence Parkway, Suite 195
        Tampa, Florida 33634
        Telephone #: (813) 221-1300
        Facsimile  #: (813) 221-1702
        Frosty28@aol.com
        Attorney for the Plaintiff
        Florida Bar No:  340065