UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| _____ | |
| BILL NELSON, et al., | ) |
| | ) |
|      Plaintiffs | ) |
| | ) |
| v. | )  Case No. 4:07cv427 – RH/WCS |
| | ) |
| HOWARD DEAN, et al., | ) |
| | ) |
|      Defendants | ) |
| | ) |
| | ) |
| _____ | ) |

## MOTION OF DEFENDANTS HOWARD DEAN AND
## DEMOCRATIC NATIONAL COMMITTEE FOR
## <u>SUMMARY JUDGMENT AND MEMORANDUM  IN SUPPORT THEREOF</u>

COME NOW Defendants Governor Howard Dean ("Gov. Dean") and the

Democratic National Committee ("DNC"), by and through their undersigned attorneys

and, pursuant to Rules 12(b)(6) and 56(b) of the Federal Rules of Civil Procedure,

respectfully move the Court for an order granting summary judgment in their favor on the

grounds that there is no genuine issue as to any material fact and that Defendants Gov.

Dean and the DNC are entitled to judgment as a matter of law.  In support of this motion,

Defendants are submitting herewith (1) a separate Statement of Material Facts As To

Which Defendants Dean and DNC Contend There Is No Genuine Issue to be Tried; and

(2) a supporting Declaration of Philip McNamara, director of the DNC's Office of Party

Affairs and Delegate Selection.

In 2006, the DNC adopted rules setting the sequence and timing of primaries and

caucuses for use by state Democratic Parties for the selection of delegates to the 2008

Democratic National Convention.  Those rules were the culmination of years of studies and deliberations and were based on careful decisions about what type of system would best reflect the Democratic Party's goals and values. Under those rules, in four states— Iowa, Nevada, New Hampshire and South Carolina—the state Democratic parties are permitted to use primaries or caucuses that take place prior to February 5, 2008. All other state parties must use events held on or after that date.  Any state party that violates the rules automatically loses half its delegates to the Convention and the DNC's Rules and Bylaws Committee ("DNC RBC") has authority to further reduce the state party's delegation.

With full knowledge of these rules and sanctions, and with the strong backing of Democratic state legislative leaders and lawmakers, the Florida Legislature earlier this year decided to enact a law to move the date of the state's presidential primary from the second Tuesday in March—which would fully comply with the DNC's rules—to the last Tuesday in January (Jan. 29 in 2008).  The DNC Rules prohibit any state—other than the four noted—from using a primary held before the first Tuesday in February (Feb. 5 in 2008) to award delegate positions to presidential candidates.  The result was simply that the Florida Democratic Party ("FDP") would, for that purpose, be required to use a party-run process—a caucus—rather than the state-run primary.  Use of such a party-run process is an option open to any state party.  And almost half the state parties in the nation will use such party-run processes for the 2008 nominating cycle.  But FDP refused to avail itself of that option, resulting in the imposition of the sanctions which are the basis of plaintiffs' Complaint.

In imposing these sanctions, the DNC, *first*, has not violated the Fourteenth Amendment.  The DNC's sanctions do not represent state action. But even if the DNC were regarded as a state actor, it is well-established that the national political parties have a constitutionally-protected right to determine the method of selection of delegates to their national nominating conventions.  Individual voters do not have a countervailing power to compel the national party to allocate or seat delegates in violation of its rules.

*Second*, the DNC has not caused any deprivation of substantive due process. Again, the DNC is not a state actor and, in any event, its actions did not deprive anyone of the right to vote.  Nor was there any violation of any procedural due process right. The DNC sanctions do not involve state action, but even if they did, the FDP had extensive notice and opportunities to be heard before the DNC's Rules and Bylaws Committee imposed those sanctions.

*Third*, it is clear that, if there is any violation of Section 2 of the Voting Rights Act, it is the State of Florida—*not* the DNC—which has committed that violation.  To the extent that the plaintiffs are contending that the actions of the *State*—represented in this case by defendant Secretary of State Kurt Browning—violate the Voting Rights Act, plaintiffs should be requesting that the Court enjoin the State from holding its primary on January 29, 2008, the date that violates the DNC's rules, thus leaving in place the prior law providing for a primary on the second Tuesday in March (March 11, 2008).  Such a remedy would allow the Florida Democratic Party to treat the primary as binding, immediately restore all of its delegates and allow the presidential candidates to campaign freely in the state.

To the extent, however, that plaintiffs are contending that the DNC itself has violated the Voting Rights Act ("VRA"), that contention must fail.  In forcing the State Party to use a party-run process rather the state's primary to allocate delegates, the DNC is certainly not exercising state-delegated power for purposes of the VRA.  And the DNC's actions manifestly do not result in the denial of the right to vote on account of race.  All Florida Democrats can still vote for their preference for the Democratic nominee for President. And delegates can reflect that choice at the National Convention if the State Democratic Party were willing to run an alternative process, like that in many other states, or the Legislature were willing to set a primary date in compliance with DNC Rules.

## **STATEMENT OF FACTS**

The Democratic National Committee is the governing body of the Democratic Party of the United States. It is composed of representatives from each of the state Democratic Parties, including Florida's, and of various Democratic organizations. (Declaration of Philip McNamara ("McNamara Dec.")  ¶3).   The nominee of the Democratic Party for President of the United States is chosen by the delegates to the Democratic National Convention held in each presidential election year.  The National Convention is organized and run by an arm of the DNC.  The delegates from each state are chosen through a process adopted by the state's Democratic Party.   (*Id*. ¶¶4-5).

Beginning in 1968, each state party's process has been required to comply with principles or rules established by the Democratic National Committee; and for each presidential election starting in 1976, the DNC has established formal Delegate Selection Rules to govern the selection, in each state, of its delegates to the National Convention.

(*Id.* ¶ 7).  These rules require each State Democratic Party to develop a written delegate selection plan and to submit that plan to the DNC's Rules and Bylaws Committee ("DNC RBC") for review and approval (*Id.* ¶ 9).

The delegate selection process in each state involves two basic functions: (i) the allocation of delegate position among presidential candidates, *i.e.*, how many delegates from that state will go to the Convention pledged to each candidate; and (ii) the selection of the actual individuals to fill those position, *i.e.*, the selection of the people who will attend the Convention as delegates and alternates.  (*Id.* ¶ 10).  Generally state parties use either a primary or a caucus/convention system.  In a primary system, the state party uses the state-government run or a party-run primary election to allocate delegate positions, and then a party-run meeting (caucus) to fill those positions.  (*Id.* ¶11).  In a caucus system, the state party uses a series of party-run meetings—caucuses—both to allocate delegate positions and to select the persons to fill those positions. A caucus/convention system does not involve use of the state's electoral machinery.  Of the 56 states and territories that will send delegates to the 2008 Democratic National Convention, 20 will use party-run caucus/convention systems.  (*Id.* ¶¶ 12-13).

The DNC's Delegate Selection Rules (attached to the McNamara Declaration as Exhibit A) govern all aspects of these processes and reflect the values and ideals of the Party in a variety of ways—for example, requiring transparency and openness in the process, ensuring participation by all voters who are registered as or identify themselves as Democrats, prohibiting discrimination and requiring affirmative action programs to achieve diversity in the delegations.  (McNamara Dec. ¶ 14).  One aspect of the rules that also reflects these values and ideals are the provisions governing the timing of primaries

and first-tier caucuses—the state party's event at which voters express their preference for President. (*Id*. ¶15)

For the last 38 years, a series of DNC commissions and bodies has wrestled with the complex question of when states should first be able to hold these events and which states, if any should be allowed to hold events before all other states, and the results of these deliberations have been reflected in the rules for each cycle governing the sequence and timing of primaries and caucuses. (*Id.* ¶ 15). These deliberations have involved delicate balancing of the value of showcasing smaller less populous states where more personal "retail" campaigning is still possible against the competing value of giving a role to larger, more racially, ethnically and economically diverse states. And in setting the timing of caucuses and primaries, the Party has also had to balance the value of giving Democratic voters a longer time period to scrutinize the candidates, by stretching out the process, against the competing value of uniting the Party and rallying around a nominee earlier in the process and thereby conserving resources for the general election. (*Id.* ¶ 16).

For the last several cycles, the DNC Rules set the earliest date on which a binding primary or first-tier caucus could be held, with exceptions allowing Iowa to hold its caucuses and New Hampshire to hold its primary before that date. (*Id.* ¶ 17). Until the 2004 election, that date was the first Tuesday in March. Then, in 2000 the Republican Party for the first time issued rules setting the earliest date for Republican primaries and caucuses as the first Tuesday in February. The DNC then matched the Republican rule and set its earliest date for that same day, but with the usual exceptions for Iowa and New Hampshire. (*Id.* ¶¶ 18-19).

After strenuous objections were voiced by Michigan Democratic Party leaders, the DNC agreed to create a commission to study the issue. In December 2005, after a nearly year-long process involving numerous hearings and meetings, that commission (the "Price-Herman Commission") found that the traditional role of Iowa and New Hampshire should be balanced against the need to place candidates before a range of voters more reflective of the Party's diversity. (*Id.* ¶¶ 20-22). The Commission recommended adding 1-2 additional caucuses between the Iowa caucuses and the New Hampshire primary, and 1-2 additional primaries after the New Hampshire contest but before February 5, 2008, the first date on which all other states could start to hold their events. (*Id.* ¶ 23).

During 2006, the DNC RBC invited state Democratic Parties to apply to be one of the states allowed to hold those pre-February 5 events. Eleven state parties did so. Florida was not among them. After another extensive round of presentations and meetings, the DNC RBC recommended a set of rules providing that the Iowa caucuses would take place no earlier than January 14, 2008; that one caucus would be held between the Iowa caucus and the New Hampshire primary, and that this caucus would be held in Nevada, a state with a significant and growing Latino population, a sizeable Asian American and Pacific Islander community, a strong organized labor presence, and in the western region of the country where the Democratic Party was making electoral gains. The RBC further recommended that one primary be held between the New Hampshire primary and the opening of the window on February 5, and that this primary be held in South Carolina, a southern state in which African-Americans represent a significant share of the Democratic electorate. (*Id.* ¶¶ 25-28).

All other state parties would be required to hold their primaries or first caucuses on or after February 5, 2008.  The full DNC adopted those rules in August 2006 by a near-unanimous vote, with Florida's DNC members voicing no objection. (*Id.*  ¶ 29).

To ensure that the DNC can effectively enforce the Delegate Selection Rules, those rules provide for imposition of sanctions on state parties violating certain fundamental strictures, including the one governing timing of primaries and caucuses. The Rules provide that any state party violating that rule automatically loses 50% of its pledged delegate positions and that the DNC members, Democratic Members of the state's congressional delegation and others normally entitled to attend the Convention as unpledged voting delegates will not be permitted to so attend. (*Id.* ¶¶ 30-31; Exhibit A, Rule 20(C)(1)-(3)).  In addition, the Rules confer on the RBC the authority to impose additional sanctions, including further reductions in the state party's delegation to the Convention.  (*Id.*  ¶ 31; Exhibit A, Rules 20(C)(5) & (6)).

With full knowledge and in open defiance of the DNC's rules and sanctions, the Florida Legislature proceeded to enact a law, HB 537, changing the state's presidential preference primary from the second Tuesday in March (which would fully comply with the DNC's Rules) to the last Tuesday in January.  The record shows that, contrary to Plaintiffs' contention that Florida Democrats were "innocent bystander[s] to decisions controlled by" the state's Republican-majority legislature (Amended Complaint ¶54), the legislation was initially sponsored or co-sponsored in both the state House and Senate by Democratic legislators and was strongly supported by the state's Democratic state legislative leadership and lawmakers at every stage of the process.  (McNamara Dec. ¶¶

38-49).  The bill was signed into law in May 2007, amending section 103.101, Florida
Statutes.

Even in a state in which the state runs a presidential preference primary, the
state's Democratic Party is free to disregard the results of that primary and use a party-
run process instead, to allocate delegate positions among presidential candidates.
(McNamara Dec. ¶34).  Indeed, the very Florida law at issue here, Section 103.101,
Florida Statutes, does not purport to make the primary binding, but rather provides that,
"All delegates shall be allocated as provided by party rule."  Section 103.101(7), F.S.  In
a state in which the state runs a presidential preference primary in violation of the DNC's
timing rules, the state's Democratic Party is free to disregard the results of that primary—
treating it as a non-binding "beauty contest" —and to use a party-run caucus/convention
process instead, to allocate delegate positions among presidential candidates in
compliance with the DNC's timing rules, thereby avoiding any sanctions  Democratic
state parties did exactly that in Vermont in 1984; in South Dakota in 1988; and in
Arizona, Delaware and Washington State in 2000. (McNamara Dec.  ¶¶ 34-36).

 Following enactment of the new law, DNC and Florida Democratic Party
("FDP") officials began extensive discussions about development of an alternative, party-
run caucus/convention plan that would comply with DNC rules and thereby avoid any
sanctions. (*Id.*  ¶ 50). An initial vote-by-mail plan was developed by FDP but in June,
2007, the FDP's Executive Committee voted instead to submit to the DNC a plan making
the January 29 primary binding.  (*Id.*  ¶ 51). Discussions and meetings between the DNC
and FDP continued in June, July and August, during which the DNC developed a plan for
a party-run congressional district caucus system that would comply with DNC rules and

afford an opportunity for all Florida Democrats to vote for President.  The DNC even offered to cover the entire cost of implementing that system.  (*Id.*  ¶ 52).

The FDP rejected this offer, however.  (*Id*. ¶53). Then, at a meeting on August 25, 2007, the DNC RBC considered Florida's plan to use the January 29 primary in violation of the DNC rules.  At that meeting, representatives of the FDP were afforded an extensive opportunity be heard.  (*Id*. ¶ 56).  The RBC then discussed the issue at length, carefully weighing the impact of sanctions against the need for the DNC to be able to enforce its rules on timing to vindicate the goals and values underlying those rules, lest the nominating process descend into chaos, with each state free to leapfrog other states in a never-ending cycle.  Members of the Committee were also cognizant of the fact that every other Democratic State Party in the country had, despite considerable political counter-pressures, submitted a plan complying with the DNC's timing rule.   (*Id.*  ¶ 56-57).

After that discussion, by a voice vote with only one dissenting vote, the DNC RBC found the Florida 2008 Delegate Selection Plan in non-compliance with the timing rule, thereby triggering the automatic reduction of the State Party's delegation by 50% and the disentitlement of the state's DNC members and Democratic Members of Congress to attend the Convention as delegates. As part of the same motion, the DNC RBC voted to further reduce the state's total number of pledged and unpledged delegates to zero, as authorized by the Delegate Selection Rules.  (*Id.*  ¶59).   Under provisions of the RBC's internal regulations, the FDP was given an additional 30-day period of time following that meeting in which to submit a revised Plan that complied with DNC Rules, but the FDP did not do so. (*Id.*  ¶¶ 60-62).

## ARGUMENT

"[S]ummary judgment is appropriate where 'there is no genuine issue as to any material fact and… the moving party is entitled to judgment as a matter of law.'" *Optimum Technologies, Inc. v. Henkel Consumer Adhesives, Inc*., 496 F.3d 1231, 1241 (11th Cir. 2007), *quoting* Fed. R. Civ. P. 56(c).  In this case, based on the undisputed material facts, plaintiffs cannot prevail on any of their four counts.

### I.  The DNC's Actions Do Not Violate the Fourteenth Amendment

#### A.  The DNC's Sanctions Do Not Constitute State Action

To establish a claim under 42 U.S.C. §1983 for deprivation of rights under the Fourteenth Amendment, plaintiffs must show "that the alleged deprivation was committed under color of state law.  . . . Section 1983's state action requirement applies regardless of the nature of the substantive deprivation being alleged."  *Focus on the Family  v. Pinellas Suncoast Transit Authy*., 344 F.3d 1263, 1277 (11th Cir. 2003). Three tests are used to determine whether state action exists:  the "public function" test; (2) the "state compulsion" test; and (3) the "nexus/joint action test."  *Willis v. Univ. Health Serv., Inc.*, 993 F.2d 837, 840 (11th Cir.), *cert. denied*, 510 U.S. 976 (1993).

Here, plaintiffs allege that the DNC is performing a "public function" because the nominee chosen at the National Convention is entitled to a place on the state's general election ballot (Amended Complaint ¶¶ 16, 21).  Plaintiffs further contend that there are "inextricably intertwined functions" of the DNC and the state because of the many functions performed by the state in running its presidential preference primary. (*Id.*  ¶¶ 17-20).  But the DNC is not performing any public functions or in any way using the electoral machinery of the state in imposing sanctions on its state Democratic Party.  The

state's primary does *not* select the presidential nominee who appears on the state's general election ballot; the entire Democratic National Convention does that.  And the sanctions involve the allocation of delegate positions that are not in any way created or assigned by the state.  Indeed, those sanctions would disappear were the FDP to agree—like twenty other state parties—to implement a delegate allocation process—a caucus system—within the DNC's timing rule (on or after Feb. 5, 2008) which would *not* involve the state in any way whatsoever.

As the Supreme Court held in *Cousins v. Wigoda*, 419 U.S. 477 (1975), the "[s]tates themselves have no constitutionally mandated role in the great task of the selection of Presidential and Vice-Presidential candidates."  *Id.* at 489-90. Since *Cousins*, no court has held that a national party's enforcement of delegate selection rules constitutes state action.  In *Williams v. Democratic Party of Georgia*, 409 U.S. 809 (1972), the Court summarily affirmed a district court decision holding that national party delegate selection rules did not have to be pre-cleared under the Voting Rights Act ("VRA").  Later, in *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996) the Court ruled that a political party's imposition of a registration fee for participation in its state convention in effect constituted state action, for purposes of section 5 of the VRA, because Virginia law directly conferred on the state party the power and authority to use that state convention to select its nominee for U.S. Senate.

In *Morse*, the Court took pains to distinguish that situation from the enforcement of delegate selection rules, with respect to the issue of state action:

> *Williams* did not concern the selection of nominees for state elective office, but
> rather a political party's compliance with a rule promulgated by the Democratic
> National Party governing the selection of delegates to its national

convention....[T]he State exercised no control over, and played no part in, the State Party's selection of delegates to the Democratic National Convention.

*Morse,* 517 U.S. at 201-02.

In the two post-*Morse* cases squarely addressing the issue of whether enforcement of national party delegate selection rules constitutes state action, the courts have held that it does not. In *LaRouche v. Fowler*, 77 F. Supp. 2d 80, 89 (D.D.C. 1999) (three judge court), *aff'd w/o opinion,* 529 U.S. 1035 (2000), the court ruled that that such enforcement does not constitute state action for purposes of VRA section 5, because the Act "should not be read to extend coverage that would interfere with core associational rights; specifically here, internal national party rules as followed by state parties in a covered jurisdiction." *Id.* at 89. The court specifically rejected the very argument made by plaintiffs here, that "the DNC has received the delegated authority of covered jurisdictions by the states' allowing major party candidates to appear on the general election ballot. However, we hold that the theory of delegation used in *Morse* does not extend that far." *Id.* at 85.

Only a few weeks ago, in *DiMaio v. Democratic Nat'l Comm.*, No. 8:07-cv-1552-T-26MAP (M.D. Fla., filed Oct. 5, 2007), the court considered a voter's challenge to these same DNC sanctions imposed on the FDP. The court held that the plaintiff did not state a claim for violation of his rights under the Fourteenth Amendment "because the DNC and the FDP do not exercise any power conferred or delegated by the State of Florida; rather they are private actors. . . . The DNC, in enforcing its delegate selection rules, is simply refusing to recognize the results of that primary in the allocation of delegates to the Convention. This does not amount to state action." *Id.*, slip op. at 9.

Because the DNC is not exercising any state-delegated power in refusing to permit FDP to recognize the results of Florida's state-run primary in the allocation of delegates, plaintiffs cannot establish any violation of the Fourteenth Amendment.

**B.  Even if the DNC Were a State Actor, Its Actions Do Not Violate the 14th Amendment**

Even if the DNC were exercising state action, its decision to impose the sanctions at issue would not violate the Fourteenth Amendment.  It is well-established that the national party has a constitutionally-protected interest in determining the process by which it selects its presidential standard-bearer and that this interest confers on the Party the right to refuse to seat delegates allocated in accordance with a state-run primary that violates the party's rules.  And the courts have found that individual voters do not have a sufficiently countervailing right to compel the national party to allocate or seat delegates in violation of its rules.

In the establishment and enforcement of rules for selecting delegates to its national convention, the "national Democratic Party and its adherents enjoy a constitutionally protected right of political association." *Cousins v. Wigoda*, 419 U.S. 477, 487 (1975).  In exercising that right, the national party can refuse to seat delegates allocated through a state-run primary that violates the Party's rules.

In *Democratic Party of the United States v. Wisconsin ex rel. LaFollette*, 450 U.S. 107 (1981),  Wisconsin state law provided for a presidential primary open to Republicans and independents, and required delegates to vote in accordance with the results of the primary.  The state submitted a delegate selection plan providing for such an open primary. The DNC's Compliance Review Commission (now the DNC Rules and Bylaws Committee) disapproved the plan because the plan violated the DNC delegate selection rule banning

open primaries.  The DNC committee indicated that delegates chosen under the plan would not be seated at the 1980 Convention.  The State of Wisconsin sued in the state Supreme Court to force the DNC to seat the delegates.  The state court ordered that delegates be seated based on the results of the state-run open primary.

The U.S. Supreme Court reversed, ruling that the State of Wisconsin could not force the DNC to seat a delegation chosen in contravention of the party's rules because such a requirement would violate the party's associational rights protected by the First Amendment. 450 U.S. at 122.   The Court rejected Wisconsin's argument that its open primary law placed only a minor burden on the national party, holding that a "State . . . may not substitute its own judgment for that of the Party.  *A political party's choice among the various ways of determining the makeup of a State's delegation to the party's national convention is protected by the Constitution*."  *Id.*  at 123-24 (emphasis added).   The Court concluded that Wisconsin was certainly free to conduct its open primary.  "But if Wisconsin does open its primary, it cannot require that Wisconsin delegates to the National Party Convention vote there in accordance with the primary results, if to do so would violate Party rules."  *Id.*  at 126.

Here, too, the state of Florida can run its presidential preference primary on January 29, 2008.  No one seeks to stop the state from doing so.  And plaintiffs and their constituents are perfectly free to vote in that primary, expressing their choices for the Democratic candidate for President.  But Florida "cannot require that [Florida] delegates to the National Party Convention vote there in accordance with the primary results," where the primary violates national party rules.  *Democratic Party of U.S. v. Wisconsin*, 450 U.S. at 126. Clearly, then, the DNC can insist that the FDP choose delegates through a party-run method

that complies with national party rules or else not send any delegates to the Convention at all.

Individuals such as plaintiffs have no more right than the state itself to compel the DNC to seat delegates in violation of its own rules. An individual voter's right to vote does not include the power to require the Party to allocate or select delegates in a certain way; whatever interest individual voters have in that regard is outweighed by the Party's associational right to establish and enforce its delegate selection rules. In *Wymbs v. Republican State Executive Committee of Florida*, 719 F.2d 1071 (11th Cir. 1983), *cert. denied*, 465 U.S. 1103 (1984), a Republican voter challenged the national Republican Party's delegate selection rule (reflected in the state party's rules) providing for apportionment of delegates among congressional districts, on the ground that the rule violated one-person-one-vote and therefore ran afoul of the Fourteenth Amendment. The Court held that the case was non-justiciable for several reasons, including that, "[w]e think it plain that this court is an inappropriate body to decide how the Florida delegation to the Republican National Convention should be selected." 719 F.2d at 1082. The Court further ruled, however, that even if that were not the case, "we would be constrained by the Party's countervailing *first amendment* rights of free speech and association." *Id.* at 1084 (emphasis in original). "[T]he strong first amendment associational freedoms possessed by political parties limited the district court's ability to tell the Republican Party how to conduct its internal affairs and whom it should represent." *Id.* at 1086.

Similarly, in *Bachur v. Democratic National Party*, 836 F.2d 837 (4th Cir. 1987), the court rejected a voter's challenge to the DNC delegate selection rule requiring that a state's delegation be composed of equal numbers of men and women which, in Maryland,

meant that the voter had to vote for such equal numbers on the ballot in the state-run primary. The voter charged that this requirement violated the Equal Protection Clause and his right to vote. The court held that the justiciability of the case was intertwined with the merits, and that the claim lacked merit.

The court reasoned, first, that the equal division rule did little to infringe the plaintiff's right to vote for President because the selection of delegates is "some steps removed from a vote for an actual candidate for public office", since as a result of party rules and procedures "the will of a majority of the electorate expressing a presidential preference and the selection of delegates may be only partially translated into the actual nomination." 836 F.2d at 841-42. Second, the court ruled that this right in any event had to be balanced against the party's associational rights, of which the equal division rule is a legitimate expression:

> When we balance the broad, encompassing First and Fourteenth Amendment protection enjoyed by the National Party and the State Party against the limited restriction on Bachur's right to vote for delegates, we can only conclude that Rule 6C [the equal division rule] does not unconstitutionally infringe on Bachur's right to vote. . . . The Equal Division rule manifestly has a rational purpose. . . Means to stimulate greater female participation were ineffective until the Equal Division rule was formulated and adopted.

836 F.2d at 842.

Again, in *Larouche v. Fowler*, 152 F.3d 974 (D.C. Cir. 1998), the court considered the DNC's enforcement of a rule depriving a candidate of any delegates based on a determination that he was not a bona fide Democrat, even though he won enough votes in primaries to be allocated such delegates. The court concluded that, even if the DNC were treated as a state actor in enforcing that rule, "the presence of First Amendment interests on both sides of the equation makes inapplicable the test applied to electoral restrictions"

imposed by the State.  152 F.3d at 995.  The court held that the Constitution would be "satisfied if" the Party's delegate section rules "'rationally advance some legitimate interest of the party in winning elections or otherwise achieving its political goals.'"  *Id., quoting Ripon Society Inc., v. National Republican Party*, 525 F.2d 567, 586-87 (D.C. Cir. 1975)(en banc), *cert. denied*, 424 U.S. 933 (1976).

In the instant case, too, "the members of the National Party, speaking through their rules, chose to define their associational rights by limiting those who could participate in" the delegate selection process.  *Democratic Party of the U.S.*, 450 U.S. at 122. The full DNC, acting on the recommendations of the Price-Herman Commission and the RBC, established a rule for the sequence and timing of the first binding primaries and caucuses that the DNC believed would best advance its values and political goals—a sequence carefully balancing the traditional role of New Hampshire and Iowa with the desire to showcase events in two states, Nevada and South Carolina, representing important and growing Party constituencies. (McNamara Dec. ¶¶22-23,  28).  As the holdings in *Wymbs*, *Bachur* and *LaRouche* make clear, even if the DNC were regarded as a state actor, plaintiffs' right to vote does not entitle them to dictate the allocation or selection of delegates in a manner contrary to the Party's rules constituting an exercise of its own associational rights protected by the First Amendment.  For this reason, also, the DNC sanctions challenged by plaintiffs do not violate the Fourteenth Amendment.

## II. The DNC Sanctions Do Not Violate Plaintiffs' Substantive or Procedural Due Process Rights

Plaintiffs allege that they have been deprived of substantive due process because they are being denied "the fundamental right to vote and to have their votes truly count in the Presidential primary election."  (Amended Complaint ¶45).  They further allege that

the DNC's sanctions violate their procedural due process rights because the sanction was imposed without taking into account the Democrats' lack of control of the state legislature and because the DNC RBC imposed a reduction of the state's delegation beyond the automatic 50% reduction without fair notice or opportunity to be heard. (*Id.* ¶¶53-56).

These due process claims must fail, first, because plaintiffs' due process claims are asserted as actions under section 1983 (Amended Complaint ¶¶ 49, 51) and, as noted above, "Section 1983's state action requirement applies regardless of the nature of the substantive deprivation being alleged." *Focus on the Family, supra*, 344 F.3d at 1277. For the reasons set forth in I(A) above, the DNC was not acting under color of state law.

Second, the DNC sanctions are not depriving plaintiffs or any other Florida Democratic voters of the right to vote. The state-run primary will take place and plaintiffs and their constituents are free to vote in it. What plaintiffs are complaining about is that their vote will not matter—"truly count," Amended Complaint ¶50—in the selection of the Democratic nominee unless delegates are allocated based on their vote in the state-run primary. But it is not the DNC that is imposing that result; it is the FDP. If the FDP were to agree to implement a party-run process, on or after Feb. 5, 2008, for allocation of delegates, plaintiffs and all of their constituents could fully participate in that process, all of the state party's delegates would be restored and all the delegate positions would be allocated based on the results of that process.[1]

---

[1] Plaintiffs' suggestion that they are also being deprived of rights of "free speech and association" (Complaint ¶45) is presumably a reference to the fact that certain Democratic Presidential candidates have pledged not to campaign in Florida. (*Id.* ¶32). But that pledge did not result from any action or decision of the DNC. While DNC Rules do provide that no presidential candidate who campaigns in a state that has violated the

Third, with respect to their procedural due process claim, plaintiffs contend that the DNC Rules "fail to distinguish meaningfully between circumstances that are within the control of the state's Democratic Party and those situations beyond the control of Democrats." (Amended Complaint ¶53). That contention is flatly wrong. DNC Delegate Selection Rule 20(C)(7) allows the DNC RBC to determine that no sanctions are to be imposed on a state party by reason of violation of the timing rule, if the State Party proves by "clear and convincing evidence" that "the state party and other relevant Democratic party leaders and elected officials took all provable, positive steps and acted in good faith to achieve legislative changes to bring the state law into compliance" with the Party rules. In this case, however, the RBC reasonably concluded that Democratic party leaders and elected officials had not acted in good faith to oppose the legislation moving the primary date, given that Democratic legislators were original co-sponsors of the legislation in both chambers and that virtually all Democratic state legislative leaders and lawmakers actively supported the legislation at every stage of the process. *See* McNamara Dec. ¶¶ 38-49, 58.

Finally, the allegation in Amended Complaint ¶¶ 55-56, that the authority for further reduction of the delegation (Rules 20(C)(5) &(6)) was exercised without standards, fair notice or opportunity for hearing, is meritless. Prior to the August 25, 2007 RBC meeting at which the sanctions were imposed, FDP's Chair and Executive Director were informed of the probability that a 100% delegate reduction would be imposed. (McNamara Dec. ¶ 55). In addition to extensive ongoing discussions between FDP and DNC officials over a period of months (*id.* ¶¶ 50-54), at that August 25 meeting

---

timing rule can be awarded any delegates (McNamara Dec. ¶ 32), that provision is inapplicable given that the FDP at this point has no delegates to award. (*Id.* ¶64).

itself, three FDP officials were given the opportunity to make extensive presentations to the RBC. (*Id.* ¶ 56).

For these reasons, plaintiffs have not been deprived of substantive or procedural due process by reason of the DNC's imposition of sanctions on the FDP.

### III.    The DNC Sanctions Do Not Violate Section 2 of the Voting Rights Act

Section 2 of the Voting Rights Act, 42 U.S.C. §1973(a), provides that "no…standard, practice, or procedure shall be imposed or applied by *any State or political subdivision* in a manner which results in a denial of abridgement of the right of any citizen… to vote on account of race or color" (emphasis added). Plaintiffs have named Florida's Secretary of State as a defendant in this action. They have alleged that the Secretary "continues with efforts to conduct a Presidential preference primary on January 29, 2008, even knowing that such action will disenfranchise more than four million Democrats…." (Amended Complaint ¶41) and that he "intends to conduct a primary election on January 29, 2008 for which Democratic candidates will not be campaigning and Democratic voting will be an exercise in futility." (*Id.* ¶594). Indeed, it is clear that if there is any violation of VRA section 2 here, it is the *State of Florida* that has committed such violation, by enacting a law setting a primary date in violation of the DNC's rules, with full knowledge of the violation and the consequences.

Plaintiffs have requested that the Court "enter such injunctive relief…as is appropriate to remedy the violations of Plaintiffs' rights" under VRA section 2. (Amended Complaint at p. 31). To the extent that plaintiffs are actually alleging that the *State of Florida* is violating section 2, presumably the "appropriate remedy" plaintiffs are seeking would be for the Court to enjoin the State from holding its primary on January

29, 2008, the date that violates the DNC's rules, thus leaving in place the prior law providing for a primary on the second Tuesday in March (March 11 in 2008).  Such a remedy would allow the Florida Democratic Party to treat the primary as binding, immediately restore all of its delegates and allow the presidential candidates to campaign freely in the state.

To the extent, however, that plaintiffs are contending that the DNC *itself* has violated the VRA, this contention should be rejected.  In requiring the State Party to use a party-run process rather the state's primary to allocate delegates, the DNC is certainly not exercising state-delegated power for purposes of the VRA.  As noted above, in the one post-*Morse* case, squarely addressing the issue, *LaRouche v. Fowler*, 77 F. Supp. 2d 80 (D.D.C. 1999)(3-judge court), the court held that a national party's enforcement of its delegate selection rules does not constitute state action for purposes of section 5 of VRA.  Since section 5 is, if anything, broader than section 2 in coverage, *Morse, supra*, 517 U.S. at 209, the DNC is not acting as a "state or political subdivision" under section 2 in enforcing its delegate selection rules against the FDP.

Moreover, to establish a violation of section 2, plaintiff must prove either (1) racially discriminatory intent on the part of the entity imposing the challenged practice; or (2) "objective factors that, under the totality of the circumstances, show the exclusion of the minority group from meaningful access to the political process due to the interaction of racial bias in the community with the challenged voting scheme."  *Osburn v. Cox*, 369 F.3d 1283, 1289 (11th Cir), *cert. denied sub nom Osburn v. Georgia*, 543 U.S. 943 (2004), *quoting Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994)(*en banc*), *cert. denied*, 514 U.S. 1083 (1995). .  Here, the DNC's manifest intent was to promote the

empowerment of Latinos and African-Americans in the nominating process by allowing the state parties of Nevada and South Carolina to hold their events, in the same period as Iowa and New Hampshire, before all the other states.  (McNamara Dec. ¶¶ 22-23, 28). That some Florida politicians may feel that their state is better suited for these purposes than the states chosen by the DNC certainly does not indicate any kind of racially discriminatory intent.

Nor is there any exclusion of African-Americans here due to the interaction of racial bias with the challenged voting scheme. Plaintiffs are alleging a discriminatory effect because all Florida Democrats have lost the ability to have their vote counted in the allocation of delegates and the vast majority of African-American voters are Democrats. (Amended Complaint ¶60).  But that is not a denial of the right to vote on account of race.  All Democratic voters can still vote, in the January 29 primary, for their choice for President.  It is not the DNC's sanctions which have precluded the FDP from allocating delegates based on the votes of Florida Democratic voters. It is the refusal of the FDP to implement a process that complies with the DNC's rules.  All Florida Democrats would be able to participate in a process that is used to allocate delegates to the Convention, and the FDP would have its full complement of delegates, if the FDP had not refused to run such a process as many other state parties do.

For these reasons, plaintiffs cannot establish a violation of section 2 of the VRA by the DNC.

## CONCLUSION

For the reasons set forth above, there is no genuine issue of material fact and, based on the undisputed facts, plaintiffs cannot establish any violation of their rights under the Fourteenth Amendment or under section 2 of the Voting Rights Act. Accordingly, Defendants Gov. Dean and the DNC are entitled to judgment as a matter of law and the motion of these Defendants for summary judgment should be granted.

Respectfully submitted on October 30, 2007,

s/ Thomas A. Range

Joseph E. Sandler
General Counsel, Democratic National Committee
SANDLER, REIFF & YOUNG, P.C.
50 E Street, S.E. # 300
Washington, D.C. 20003
Tel: (202) 479-1111
Fax: (202) 479-1115
E-Mail: sandler@sandlerreiff.com
Co-Counsel for Defendants Howard Dean and the Democratic National Committee

J. Riley Davis (Fla. Bar No. 118121)
Thomas A. Range (Fla. Bar No. 568651)
AKERMAN SENTERFITT
106 East College Avenue, Suite 1200
Tallahassee, FL 32301
Tel: 850.224.9634
Fax: 850.222.0103
E-Mail: riley.davis@akerman.com
          tom.range@akerman.com
Co-Counsel for Defendants Howard Dean and the Democratic National Committee

Amanda S. LaForge
Chief Counsel
DEMOCRATIC NATIONAL COMMITTEE
430 S. Capitol Street, S.E.
Washington, D.C. 20003
Tel: (202) 863-8000
E-Mail: LaForgeA@dnc.org
Co-Counsel for Defendants Howard Dean and the Democratic National Committee

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing was served via CM/ECF to Kendall Coffey and

Jeffrey B. Crockett, Coffey Burlington, Office in the Grove, Penthouse, 2699 S. Bayshore

Drive, Miami, Florida 33133 and Ronald G. Meyer, Meyer and Brooks, P.A., 2544

Blairstone Pines Drive, Tallahassee, Florida 32301 on October 30, 2007.


<u>s/ Thomas A. Range</u>