## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**VICTOR DIMAIO**,

              Plaintiff

v.                                                              Case No. 8:08-cv-672-T-26EAJ
                                                                **Dispositive Motion**

**DEMOCRATIC NATIONAL**
**COMMITTEE**

              Defendant.

_____

## CROSS-MOTION FOR SUMMARY JUDGMENT
## AND MEMORANDUM OF LAW IN SUPPORT THEREOF

COMES NOW the Defendant, the Democratic National Committee ("DNC"), by and

through its undersigned attorneys and, pursuant to Rules 12(b)(6) and 56(b) of the Federal

Rules of Civil Procedure, respectfully moves the Court for an order granting summary

judgment in its favor on the grounds that there is no genuine issue as to any material fact and

that Defendant DNC is entitled to judgment as a matter of law.  In support of this motion, the

DNC is submitting a supporting Declaration of Philip McNamara, director of the DNC's

Office of Party Affairs and Delegate Selection.

## INTRODUCTION

This is the second case brought by this same plaintiff challenging the decision of the

DNC to enforce its rules for selection of delegates to its National Convention by refusing to

seat the delegates selected by the Florida Democratic Party ("FDP") through a process that

violated the DNC rule governing the sequencing and scheduling of Democratic presidential

primaries and caucuses ("the Timing Rule").  In the first case, Plaintiff alleged that the

DNC's actions violated his rights under Article II and the Fourteenth Amendment.  This Court dismissed the complaint, with prejudice, for lack of standing and for failure to state a claim.  *DiMaio v. Democratic Nat'l Comm.*, Order (No. 8:07-cv-1552-T26MAP, Oct. 5, 2007). On appeal, the Eleventh Circuit Court of Appeals affirmed the dismissal for lack of standing, but vacated the District Court's holding on the merits and directed the District Court to dismiss the case without prejudice.  *DiMaio v. Democratic Nat'l Comm.*, No. 0714816-B, 2008 U.S. App. LEXIS 5876 (11th Cir., Mar. 21, 2008).

In his new Complaint, Plaintiff claims, first, that the DNC's actions violate the Fourteenth Amendment because the party rule the DNC is enforcing—the rule allowing four state Democratic Parties to use presidential preference primaries or caucuses taking place before those used by all the other state parties—discriminates against the citizens of the latter states, "based on geographical and racial stereotypes."  (Dkt. #1, at ¶23).  Second, Plaintiff claims that, because the DNC receives public funding for the National Convention under the Presidential Election Campaign Fund Act, 26 U.S.C. §9008, the DNC's decision to give "preferential treatment" to the Democratic Parties of Nevada and South Carolina in the scheduling of their presidential primaries and caucuses, "based on the racial and national origin and demographic makeup of those states," violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d.  (Dkt. #1, at ¶¶27-28).

Based on the undisputed facts, the DNC is entitled to judgment on both Counts.  It is well-established that the national political parties have a constitutionally protected right to determine the method of selection of delegates to their national nominating conventions that will best promote their political goals.  The DNC's determination of the scheduling and

sequencing of presidential primaries and caucuses in the various states, taking into account a variety of politically significant factors, represents an exercise of that right.

To the extent Plaintiff, in Count I of the Complaint, challenges the Timing Rule as a violation of the Equal Protection Clause of the Fourteenth Amendment, that challenge is non-justiciable, by reason of the lack of judicially manageable standards and the DNC's own constitutionally protected right to determine how best to ensure the will of the Democratic electorate is reflected at the Convention.  Further, judicial intervention is unwarranted because the Supreme Court has recognized that the Convention itself is the appropriate forum for resolving such disputes, and that the DNC's Rules and Bylaws Committee ("DNC RBC") has already scheduled a meeting for next month to consider this controversy.

Even if Plaintiff's Equal Protection claim in Count I were justiciable, the DNC would be entitled to judgment on that Count.  The DNC clearly has the right to establish a schedule for the sequence and timing of presidential primaries and caucuses.  No constitutional rule requires the DNC to have all such events held on the same day or to allow each state to hold such an event whenever it pleases.  The DNC's Timing Rule does not discriminate against any individual voter and does not discriminate against the voters in any state, collectively.  And, given the DNC's constitutionally protected right to determine the method of selecting delegates that best advances its political goals, the DNC's decisions about when particular state Democratic Parties should be allowed to hold primaries and caucuses should be found to pass constitutional muster if the DNC's decisions rationally advance those goals.  There is no question that test is met here. And if the DNC has the right to establish rules for selection of delegates to the Convention, the DNC must have the right to enforce those rules, and the

courts have so held.

With respect to Count II, Plaintiff lacks standing to challenge the DNC's promulgation or enforcement of the Timing Rule because these actions have no causal connection whatsoever to the funding of the Democratic National Convention under the Presidential Election Campaign Fund Act. And in any event, those DNC actions do not discriminate on the basis of race or national origin.

**STATEMENT OF UNDISPUTED FACTS**

The Democratic National Committee is the governing body of the Democratic Party of the United States. It is composed of representatives from each of the state Democratic Parties, including Florida's, and of various Democratic organizations. (*See* Declaration of Philip McNamara ("McN. Dec.") ¶3). The nominee of the Democratic Party for President of the United States is chosen by the delegates to the Democratic National Convention held in each presidential election year. The National Convention is organized and run by an arm of the DNC. The delegates from each state are chosen through a process adopted by the state's Democratic Party. (*Id*. ¶¶4-5).

Beginning in 1968, each state party's process has been required to comply with principles or rules established by the Democratic National Committee; and for each presidential election starting in 1976, the DNC has established formal Delegate Selection Rules to govern the selection, in each state, of its delegates to the National Convention. (*Id.* ¶ 7). These rules require each State Democratic Party to develop a written delegate selection plan and to submit that plan to the DNC RBC for review and approval. (*Id.* ¶ 9).

The delegate selection process in each state involves two basic functions: (i) the

allocation of delegate position among presidential candidates, *i.e.*, how many delegates from that state will go to the Convention pledged to each candidate; and (ii) the selection of the actual individuals to fill those position, *i.e.*, the selection of the people who will attend the Convention as delegates and alternates.  (*Id.*  ¶ 11).   Generally state parties use either a primary or a caucus/convention system.   In a primary system, the state party uses the state-government run or a party-run primary election to allocate delegate positions, and then a party-run meeting (or caucus) to fill those positions.  (*Id.*).   In a caucus/convention system, the state party uses a series of party-run meetings both to allocate delegate positions and to select the persons to fill those positions.  A caucus/convention system does not involve use of the state's electoral machinery.   Of the 56 states and territories that are sending delegates to the 2008 Democratic National Convention, 20 have used or will use party-run caucus/convention systems.  (*Id.*  ¶¶ 12-13 & Ex. B).

The DNC's Delegate Selection Rules (attached to McN. Dec. as Exhibit A) govern all aspects of these processes and reflect the values and ideals of the Party in a variety of ways— for example, requiring transparency and openness in the process, ensuring participation by all voters who are registered as or identify themselves as Democrats, prohibiting discrimination and requiring affirmative action programs to achieve diversity in the delegations.  (McN. Dec. ¶ 14).   One aspect of the rules that also reflects these values and ideals are the provisions governing the timing of primaries and first-tier caucuses—the state party's event at which voters express their preference for President. (*Id.* ¶ 15).

For the last 39 years, a series of DNC commissions and bodies has wrestled with the complex question of when states should first be able to hold these events and which states, if

any, should be allowed to hold events before all other states, and the results of these deliberations have been reflected in the rules for each election cycle governing the sequence and timing of primaries and caucuses.  (*Id.* ¶ 15).  These deliberations have involved delicate balancing of the value of showcasing smaller less-populous states where more personal "retail" campaigning is still possible against the competing value of giving a role to larger, more racially, ethnically and economically diverse states.  And in setting the timing of caucuses and primaries, the Party has also had to balance the value of giving Democratic voters a longer time period to scrutinize the candidates, by stretching out the process, against the competing value of uniting the Party and rallying around a nominee earlier in the process and thereby conserving resources for the general election.  (*Id.* ¶ 16).

For the last several election cycles, the DNC Rules set the earliest date on which a binding primary or first-tier caucus could be held, with exceptions allowing Iowa to hold its caucuses and New Hampshire to hold its primary before that date.  (*Id.* ¶¶ 17-18).  Until the 2004 election, that date was the first Tuesday in March.  Then, in 2000, the Republican Party for the first time issued rules setting the earliest date for Republican primaries and caucuses as the first Tuesday in February.  The DNC then matched the Republican rule and set its earliest date for that same day, but with the usual exceptions for Iowa and New Hampshire. (*Id.* ¶¶ 18-19).

After strenuous objections were voiced by Michigan Democratic Party leaders, the DNC agreed to create a commission to study the issue.  In December 2005, after a nearly year-long process involving numerous hearings and meetings, that commission (the "Price-Herman Commission") found that the traditional role of Iowa and New Hampshire should be

balanced against the need to place candidates before a range of voters more reflective of the Party's geographic, racial and economic diversity.  (*Id.* ¶¶ 23-24).  The Commission recommended adding one or two additional caucuses between the Iowa caucuses and the New Hampshire primary, and one or two additional primaries after the New Hampshire contest but before February 5, 2008, the first date on which all other states could start to hold their events.  (*Id.*  ¶ 24).

During 2006, the DNC RBC invited state Democratic Parties to apply to be one of the states allowed to hold those pre-February 5 events.  Eleven state parties did so.  Florida was not among them.  (*Id.* ¶¶ 26-28). After another extensive round of presentations and meetings, the DNC RBC recommended a set of rules providing that the Iowa caucuses would take place no earlier than January 14, 2008; that one caucus would be held between the Iowa caucus and the New Hampshire primary, and that this caucus would be held in Nevada, a state with a significant and growing Latino population, a sizeable Asian American and Pacific Islander community, a strong organized labor presence, and in the western region of the country where the Democratic Party was making electoral gains.  The RBC further recommended that one primary be held between the New Hampshire primary and the opening of the window on February 5, and that this primary be held in South Carolina, a southern state in which African-Americans represent a significant share of the Democratic electorate.  (*Id.* ¶¶ 29-30).  All other state parties would be required to hold their primaries or first caucuses on or after February 5, 2008.

The full DNC adopted this rule—the Timing Rule—as Rule 11A of the Delegate Selection Rules for the 2008 Democratic National Convention.  (*See* Ex. A to McN. Dec.)

The Delegate Selection Rules were adopted by the full DNC in August 2006 by a near-unanimous vote, with Florida's DNC members voicing no objection. (McN. Dec. ¶ 30).

To ensure that the DNC could effectively enforce the Delegate Selection Rules, those rules provide for imposition of sanctions on state parties that violate certain fundamental strictures, including the Timing Rule. The Rules provide that any state party violating that rule automatically loses 50% of its pledged delegate positions. (*Id.* ¶¶ 31-32; Ex. A, Rule 20(C)(1)-(3)). In addition, the Democratic Members of the state's congressional delegation and others normally entitled to attend the Convention as unpledged voting delegates will not be permitted to so attend. (*Id.*) The Rules also confer on the RBC the authority to impose additional sanctions, including further reductions in the state party's delegation to the Convention. (*Id.* ¶ 32; Ex. A, Rules 20(C)(5) & (6)).

With full knowledge and in open defiance of the DNC's rules and sanctions, the Florida Legislature proceeded to enact a law, HB 537, changing the state's presidential preference primary from the second Tuesday in March (which would fully comply with the DNC's Rules) to the last Tuesday in January. The bill was signed into law in May 2007, amending section 103.101, Florida Statutes. (McN. Dec. ¶ 39).

Even in a state that runs a presidential preference primary, the state's Democratic Party is free to disregard the results of that primary and use a party-run process instead, to allocate delegate positions among presidential candidates. (*Id.* ¶¶ 35-37). Indeed, the very Florida law at issue here, Section 103.101, Florida Statutes, does not purport to make the primary binding, but rather provides that "[a]ll delegates shall be allocated as provided by party rule." § 103.101(7), Fla. Stat. (2007). In a state in which the state runs a presidential

preference primary in violation of the DNC's Timing Rule, the state's Democratic Party is free to disregard the results of that primary—treating it as a non-binding contest—and to use a party-run caucus/convention process instead, to allocate delegate positions among presidential candidates in compliance with the DNC's timing rules, thereby avoiding any sanctions. Democratic state parties did exactly that in Vermont in 1984; in South Dakota in 1988; and in Arizona, Delaware and Washington State in 2000. (McN. Dec. ¶¶ 36-37). That same option was available to the FDP.

Discussions and meetings between the DNC and FDP continued in June, July and August of 2007, during which period the DNC developed a plan for a party-run congressional district caucus system that would comply with DNC rules and afford an opportunity for all Florida Democrats to vote for President. The DNC even offered to cover the entire cost of implementing that system. (*Id.* ¶¶ 41-42).

The FDP rejected this offer, however. (*Id.* ¶ 43). Then, at a meeting on August 25, 2007, the DNC RBC considered Florida's plan to use the January 29 primary in violation of the DNC rules. At that meeting, representatives of the FDP were afforded an extensive opportunity be heard. (*Id.* ¶ 46). The DNC RBC then discussed the issue at length, carefully weighing the impact of sanctions against the need for the DNC to enforce its rules on timing to vindicate the goals and values underlying those rules, lest the nominating process descend into chaos, with each state free to leapfrog other states in a never-ending cycle. (*Id.* ).

After that discussion, by a voice vote with only one dissenting vote, the DNC RBC found the Florida 2008 Delegate Selection Plan in non-compliance with the Timing Rule, thereby triggering the automatic reduction of the State Party's delegation by 50% and the

disentitlement of the state's DNC members and Democratic Members of Congress to attend the Convention as delegates. As part of the same motion, the DNC RBC voted to further reduce the state's total number of pledged and unpledged delegates to zero, as authorized by the Delegate Selection Rules.  (*Id.*  ¶ 47).

To this day, no other state Democratic Party has held a caucus or primary in violation of the Timing Rule of the DNC Delegate Selection Rules with the exception of the Michigan Democratic Party, which ultimately chose to use a state-run presidential preference primary taking place on January 15, 2008, in violation of the DNC's rules.  The DNC RBC imposed exactly the same sanctions on the Michigan Democratic Party as the Committee had on the FDP.  (*Id.* ¶ 52).

At various times between October 2007 and April 2008, the DNC and the FDP discussed holding an alternative primary process that would comply with the DNC rules. These discussions included, among other things, consideration of a new state-run primary taking place in the spring of 2008 funded by the State; a new state-run primary taking place in the spring of 2008 funded by private contributions raised by the FDP; and a party-run vote-by-mail process, taking place in the spring of 2008.  (*Id.* ¶ 53).  In the course of these discussions, the FDP submitted to the DNC, in March 2008, for informal review and discussion, a written plan for an alternative, party-run vote by mail process.  The FDP ultimately decided, however, that there was not a consensus among its elected officials and Party leaders for pursuing that option and did not ultimately submit the new plan to the DNC RBC for formal consideration.  (*Id.* ¶¶ 54-55).

The DNC's rules provide for resolution, within the Party organization, of disputes relating to the selection of delegates to the Democratic National Convention.  Under the Call to the 2008 Democratic National Convention, there are three standing committees of the National Convention, one of which is the Credentials Committee.  (Call to Convention, Article VII). Under the Call to the Convention, the Credentials Committee has the power to determine and resolve questions concerning the seating of delegates to the Convention.  (*Id*. §VII(J)(1)).   Under the Call,    the Credentials Committee assumes jurisdiction of such questions as to any challenge brought before the DNC RBC on or after the 56th day before the Convention (June 29, 2008) or any challenge brought before the DNC RBC before that date but not resolved as of that date.  (McN. Dec. ¶¶ 56-57).

Thus, prior to June 29, 2008, the DNC RBC has jurisdiction, under the Party's rules, to determine and resolve challenges brought concerning the seating of delegates to the Convention.  (McN. Dec. ¶ 58).  On March 17, 2008, two such challenges were received by the DNC RBC, relating to the seating of delegates from Florida.  Both challenges were filed by fifteen Democrats from Florida as required by the DNC RBC Regulations and were otherwise filed in proper form.   The first challenge seeks the reinstatement of all of the unpledged delegates from Florida.  The second challenge seeks the reinstatement of one-half of the pledged delegates from Florida, as if the automatic sanctions of Rule 20(C)(1), (2) & (3) of the DNC Delegate Selection Rules had been applied to the FDP without the imposition of any further sanctions by the RBC.  (*Id*. ¶ 59).

On April 2, 2008, following a meeting among DNC Chair Governor Howard Dean and members of the Florida Democratic Congressional delegation, the DNC issued a joint

statement from Governor Dean, the Members of the Congressional delegation and FDP Chair Karen Thurman, stating that "We are all committed to doing everything we can to ensure that a Florida delegation is seated in Denver." (Copy of statement attached as Ex. D to McN. Dec.).

On April 25, 2008, the DNC RBC notified its members that the DNC RBC will hold a meeting on Saturday, May 31, 2008, to consider these challenges as well as a challenge relating to the seating of delegates from Michigan. (McN. Dec. ¶ 61).

## ARGUMENT

"[S]ummary judgment is appropriate where 'there is no genuine issue as to any material fact and… the moving party is entitled to judgment as a matter of law.'" *Optimum Technologies, Inc. v. Henkel Consumer Adhesives, Inc*., 496 F.3d 1231, 1241 (11th Cir. 2007), *quoting* Fed. R. Civ. P. 56(c). In this case, based on the undisputed material facts, Plaintiff cannot prevail on either of his two counts.

## I.     THE DNC'S ACTIONS DO NOT VIOLATE THE FOURTEENTH AMENDMENT

In Count I, Plaintiff claims that the DNC's enforcement of its Timing Rule against the FDP violates the Fourteenth Amendment because (a) the rule itself was "based on geographical stereotypes and racial and national origin demographics" (Dkt. #1, at ¶19) and (b) the DNC's enforcement of the Rule violates the Equal Protection Clause because plaintiff's "vote as to his preference for the Democratic nominee will not be counted in an equal manner as the votes of the citizens of other states." (*Id*. ¶16.) This claim is meritless.

A. **The DNC Has A Constitutionally Protected Right to Establish and Enforce Rules for Selection of Delegates to its National Nominating Convention**

In the establishment and enforcement of rules for selecting delegates to its national convention, the "national Democratic Party and its adherents enjoy a constitutionally protected right of political association." *Cousins v. Wigoda*, 419 U.S. 477, 487, 95 S. Ct. 541, 547 (1975).  In *Cousins*, the DNC refused to seat Illinois' delegates to the 1972 Democratic National Convention, because those delegates, although elected in a state-run primary in accordance with state law, had been selected in violation of the national party's delegate selection rules.  A state court ordered the delegates seated in accordance with state law; the state appellate courts upheld that order. The United States Supreme Court reversed, holding that the DNC had a constitutionally protected right to enforce its delegate selection rules, while the "States themselves have no constitutionally mandated role in the great task of the selection of Presidential and Vice-Presidential candidates."  419 U.S. at 489-90, 95 S. Ct. at 549.  "Thus, Illinois' interest in protecting the integrity of its electoral process cannot be deemed compelling in the context of the selection of delegates to the National Party Convention." *Id.* at 491.

Then, in *Democratic Party of the United States v. Wisconsin ex rel. LaFollette*, 450 U.S. 107 (1981), Wisconsin state law provided for a state-run Democratic presidential primary open to Republicans and independents, and required delegates to vote in accordance with the results of the primary.  The state submitted a delegate selection plan providing for such an open primary.  The DNC's Compliance Review Commission (now the DNC Rules and Bylaws Committee) disapproved the plan because the plan violated the DNC delegate selection rule

banning open primaries.  The DNC indicated that delegates chosen under the plan would not be seated at the 1980 Convention.  The State of Wisconsin sued in the state Supreme Court to force the DNC to seat the delegates.  The state court ordered that the delegates be seated based on the results of the state-run open primary.  The United States Supreme Court reversed, ruling that the State of Wisconsin could not force the DNC to seat a delegation chosen in contravention of the DNC's rules because such a requirement would violate the party's associational rights protected by the First Amendment.  *Id.* at 122.

The Court rejected Wisconsin's argument that its open primary law placed only a minor burden on the national party, holding that a "State . . . may not substitute its own judgment for that of the Party.  *A political party's choice among the various ways of determining the makeup of a State's delegation to the party's national convention is protected by the Constitution*."  *Id.* at 123-24 (emphasis added).  The Court concluded that Wisconsin was free to conduct a primary that violated the DNC rules, but if Wisconsin did so, "it cannot require that Wisconsin delegates to the National Party Convention vote there in accordance with the primary results, if to do so would violate Party rules."  *Id.* at 126.

Here, too, the state of Florida was free to run its presidential primary on January 29, 2008, and Plaintiff was free to vote in that primary—and did so.  (Dkt. #1, at ¶10.)   In refusing to seat the delegates from Florida, the DNC was doing no more than it did in *LaFollette*—establishing and enforcing its rules for selection of delegates to the Convention.

## B.  The DNC's Promulgation and Enforcement of its Timing Rule Represents an Exercise of its Constitutionally Protected Rights

"Freedom of association means not only that an individual voter has the right to associate with the political party of her choice,…but also that a political party has a right to. .

. select a 'standard bearer who best represents the party's ideologies and preferences.'" *Eu v. San Francisco County Democratic Central Comm*., 489 U.S. 214, 225 (1989), (quoting *Ripon Society Inc. v. National Republican Party*, 525 F.2d 567, 601 (D.C. Cir. 1975)(en banc)(Tamm, J., concurring in result), *cert. denied*, 424 U.S. 933 (1976)).

Here, a party commission and the DNC RBC, after extensive and lengthy deliberation, recommended rules. The rules reflected a careful determination that a standard bearer best representing the Democratic Party would more likely be chosen through a process that balanced the traditional role of early events in Iowa and New Hampshire with early events in other states. Such a balanced process would better reflect the Party's diversity—not only racial and ethnic diversity, but economic and geographic diversity as well. Further deliberation resulted in the decision that those states, in 2008, should be Nevada and South Carolina. (*See* McN. Dec. ¶¶ 23-29)  The DNC's associational rights are thus squarely implicated by the DNC's decision to adopt the Timing Rule that the FDP violated.

## C.  Plaintiff's  Fourteenth Amendment Claim Is Non-Justiciable

Plaintiff claims that the DNC's Timing Rule violates the Fourteenth Amendment because the decision to allow Iowa and New Hampshire to go earlier than other states was based on characterizations of the voters in those states were "inherently illogically stereotypical" (Dkt. #1, at ¶20) and the decision to allow South Carolina and Nevada to go earlier than other states was impermissibly "based on race and national origin." *Id*. ¶21. The undisputed facts are that the DNC considered a variety of factors—state size, geography, union density, and ethnic and racial diversity, the tradition of retail politics—in determining that the Democratic State Parties in these four states should be allowed to use presidential

preference primaries or caucuses taking place before those in other states. (*See* McN. Dec. ¶¶ 27-29).

In these circumstances, Plaintiff's Fourteenth Amendment claim is clearly non-justiciable.  In *Wymbs v. Republican State Executive Committee of Florida*, 719 F.2d 1072 (11th Cir. 1983), *cert. denied*, 465 U.S. 1103 (1984), a Republican voter challenged the national Republican Party's delegate selection rule (reflected in the state party's rules) providing for apportionment of delegates among congressional districts, on the ground that the rule violated one-person-one-vote and therefore ran afoul of the Fourteenth Amendment. The court held that the case was non-justiciable for several reasons, including first, that, "to provide the relief [plaintiff] has requested would require this court to engage in political party policy making beyond its role in society and beyond our ken as Article III judges." *Id.* at 1082.  "We think it plain that this court is an inappropriate body to decide how the Florida delegation to the Republican National Convention should be selected."  *Id.*  Second, the court  ruled that, even if that were not the case, "we would be constrained by the Party's countervailing *first amendment* rights of free speech and association."  *Id.* at 1084 (emphasis in original).  "[T]he strong first amendment associational freedoms possessed by political parties limited the district court's ability to tell the Republican Party how to conduct its internal affairs and whom it should represent." *Id.*  at 1086.  Finally, the court noted that the case was one in which there is a "'lack of judicially discoverable and manageable standards to resolve the controversy.'"  *Id.* at 1085 (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).  The court noted that the ultimate decision on what delegates would be seated at the Convention would have to be made by the Convention itself, under *LaFollette,* and that the "court would find it difficult, if not impossible," to

determine how to reapportion Florida's delegate districts as requested by the plaintiff.  *Id*. at 1085-86.

Here too, for this Court to overturn the DNC's Timing Rule on Fourteenth Amendment grounds would require the Court "to engage in political party policymaking," *Wymbs*, 719 F.2d at 1082, by deciding what factors the Party should consider in the scheduling and sequencing of presidential primaries and caucuses and then applying those factors.  As in *Wymbs*, such an exercise would be constrained by the DNC's countervailing First Amendment right of association, which is clearly implicated, as explained above, in the DNC's deliberations leading to promulgation of the Timing Rule.  Finally, this case, too, lacks judicially manageable standards for resolving the controversy:  On the basis of what criteria would the Court decide which state Democratic Parties should be allowed to hold primaries or caucuses before others, and when those events should take place?

If Plaintiff's claim that the Timing Rule violates the Fourteenth Amendment is non-justiciable, so too must be his claim that the DNC's enforcement of the rule violates the Constitution.  If the DNC has the right to establish rules for the selection of delegates, it must be allowed to enforce those rules.  As the Court made clear in *LaFollette*, the appropriate way—indeed, the only way—the national party can enforce these rules is to refuse to seat delegates selected through a process that violates those rules.  *LaFollette*, 450 U.S. at 126.

Further, a finding of non-justiciability is especially warranted where, as in this case, the Party itself is about to address this very controversy through its own internal procedures. In *O'Brien v. Brown*, 409 U.S. 1 (1972), the Supreme Court stayed a Court of Appeals decision overturning recommendations of the Credentials Committee of the 1972 Democratic

National Convention.  There, the Court explained: "It has been understood since our national political parties first came into being as voluntary associations of individuals that the convention itself is the proper forum for determining intra-party disputes as to which delegates shall be seated." *Id*. at 4.  The Court ruled that "no holding of this Court up to now gives support for judicial intervention in the circumstances presented here, involving as they do relationships of great delicacy that are essentially political in nature." *Id*.  The Call to the 2008 Democratic National Convention confers this power, to determine intra-party disputes over the seating of delegates, on the DNC RBC, until June 29, at which point the Convention Credentials Committee assumes that authority.  (McN. Dec. ¶¶ 57-58). The DNC RBC has already scheduled a meeting, for May 31, 2008, to consider this dispute.  (*Id*. ¶ 61).  The DNC RBC and the Credential Committee are clearly the "proper fora" for determining this dispute. Judicial intervention is therefore not only inappropriate, for the reasons set forth in *Wymbs*, but also unwarranted.

### D. Even If the Claim Were Justiciable, the DNC's Actions Do Not Violate the Fourteenth Amendment

Even if Count One presented a justiciable claim, judgment should be rendered for the DNC.  The DNC's actions do not constitute discriminatory treatment that violates the Equal Protection Clause.

First, to the extent Plaintiff is claiming that the Timing Rule itself impermissibly discriminates among states based on race or national origin, (Dkt. #1, at ¶¶21-23), that claim is illogical.  At the outset, it is clear that the DNC must have the right to set a schedule for the primaries and caucuses used to award delegates; and that the DNC is not required to force all the states to hold events the same day or to allow each state to hold its event whenever it

pleases. Would the DNC be constitutionally required to allow Florida to hold a binding primary *before* the New Hampshire primary if Florida's legislature decided to enact such a law?  Because voters in any state that enacts a law to hold a primary earlier than that permitted by DNC rules could make the same claims as Plaintiff now makes, is the DNC constitutionally required to allow states to hold binding primaries on any day they wish?  On Thanksgiving Day?  New Year's Eve?

Of course, the answer to all these questions is no.  Another case brought by plaintiffs in the Northern District of Florida similarly challenged the DNC's decision to strip the Florida Democratic Party of its delegates.  *See Nelson v. Dean*, 528 F. Supp. 2d 1271 (N.D. Fla. 2007).   In granting summary judgment to the DNC, the district court explained:

> Plaintiffs have offered not a single argument—and none comes to mind—in support of the notion that there can be no national schedule.  Plaintiffs have offered not a single argument—and none comes to mind—in support of the notion that each state must be free to do as it pleases.  A national party has a compelling interest in setting a schedule and requiring compliance.

*Id*. at 1280.

If the DNC is to be allowed to determine the schedule and sequence of these primaries and caucuses, it must be permitted to take into consideration factors that rationally advance its political interests. The selection of four states to be allowed to hold presidential preference primaries and caucuses before other states obviously does not discriminate against any individual voter.  Nor does it necessarily discriminate against the voters of any particular *state*, on *any* basis.

To be sure, at the outset of the Democratic Party nominating process for this presidential election, some held the view that the votes of Democrats in states holding events

later in the year would be diluted or worth less because the nomination would be effectively decided before those events took place.  That, of course, has not turned out to be the case at all. The nomination is not decided as of this date, and arguably those voters in states holding events at the every end of the process will exert at least as much or more influence than the voters of Iowa, New Hampshire, Nevada and South Carolina.  Indeed, had Florida scheduled its primary in accordance with the DNC rules, for a date on or after February 5, 2008, or used an alternative party-run process taking place on or after that date, arguably its Democratic voters would have had *more* influence over the nominating process than the Democratic voters of the four early states.

Even if that were not the case, however, the DNC's selection of these four states could not be held to violate the Fourteenth Amendment.  It is undisputed that the racial and ethnic diversity of two of these states, South Carolina and Nevada, was but one factor in their selection, and not the decisive one.  (McN. Dec. ¶27).  Even if the DNC were considered a state actor, the promotion of diversity would constitute a compelling state interest that would enable the DNC's actions to pass constitutional muster in the absence of any indication that race was the decisive factor in its selection of these states. *See Grutter v. Bollinger*, 539 U.S. 306,  328-335 (2003)(promotion of diversity is compelling state interest as long as race is not decisive factor).

But, of course, the DNC is <u>not</u> a state.  Even if the DNC's actions were considered "state action" for purposes of constitutional analysis, unlike the state itself, the DNC has its *own* constitutional rights that must be weighed against those of the voter.  For that reason the "compelling state interest" test does not apply.  Instead, the DNC must only show that its

delegate selection rule rationally advances some legitimate interest of the party in achieving its political goals.

Thus, in *Ripon Society*, the court held that the test for compliance of national party delegate selection rules with the Equal Protection Clause would not be "compelling state interest." *Ripon Society,* 525 F.2d at 585. Rather, the "party's choice, as among various ways of governing itself, of the one which seems best calculated to strengthen the party and advance its interests, deserves the *protection* of the Constitution as much if not more than its condemnation." *Id* (emphasis added). The court determined that "the Equal Protection Clause, assuming it is applicable . . . is satisfied if the representational scheme and each of its elements rationally advance some legitimate interest of the party in winning elections or otherwise achieving its political goals." *Id*. at 586-87.

The exact same approach was taken in *Bachur v. Democratic National Party*, 836 F.2d 837 (4th Cir. 1987). In that case, a Democratic voter challenged the DNC delegate selection rule requiring that a state's delegation be composed of equal number of men and women, claiming that this rule violated the Equal Protection Clause and the voter's fundamental right to vote for delegates of his choice. The court rejected that claim, holding that, while the plaintiff voter certainly had a right to vote, the "question we must decide is whether the private associational rights of the party to give shape to its goals through the equal participation of women at the national convention impermissibly limit [the plaintiff voter's]...participation in the primary process." *Id*. at 842. The court ruled that:

> The First Amendment associational rights of a political party have been deemed to outweigh various state interests in protecting the rights of that state's voters....The case before us is limited to Bachur's right to vote. Nonetheless, the efforts of the states to regulate delegate selection have been

> repeatedly rebuffed, and we may therefore derive instruction on the scope and
> sanctity of a political party's associational rights.
>
>> When we balance the broad, encompassing First and Fourteenth
>> Amendment protection enjoyed by the National Party and the State Party
>> against the limited restriction on Bachur's right to vote for delegates, we can
>> only conclude that Rule 6C does not unconstitutionally infringe on Bachur's
>> right to vote. ....The Equal Division Rule manifestly has a rational purpose.
>> *See Ripon Society*, 525 F.2d at 586-87 ("representational scheme and each of
>> its elements [must only] rationally advance some legitimate interest of the
>> party in winning elections or otherwise achieving its political goals.").

*Id.; see also LaRouche v. Fowler*, 152 F.3d 974, 995 (D.C. Cir. 1998)(Constitution is

satisfied if the Party's delegate selection rules "rationally advance some legitimate interest of

the party in winning elections or otherwise achieving its political goals").

Here, as explained in Section I.B. above, the DNC's Timing Rule advances the

legitimate interests of the Party in winning elections and achieving the Party's political goals,

by striking what the Party believes is the proper balance among the competing interests and

values at stake in determining the sequencing and timing of presidential primaries and

caucuses.  Even if the DNC were regarded as a state actor, then, its promulgation of the

Timing Rule is consistent with the Fourteenth Amendment.

Finally, Plaintiff contends that the DNC's enforcement of the Timing Rule by

refusing to seat Florida's delegates is a violation of Equal Protection because Plaintiff's vote

for President "will not be counted in an equal manner as the votes of the citizens of other

states...."  (Dkt. #1, at ¶16.)  Such unequal treatment, however, is an inherent result of the

Party's enforcement of its delegate selection rules.  If the DNC has the right to promulgate its

rules, it must have the right to enforce them.  "A national party has a compelling interest in

setting a schedule and requiring compliance.  And the party has a First Amendment right to

exclude delegates selected in derogation of the schedule." *Nelson v Dean*, 528 F. Supp.2d at 1280.

No Democratic party from any state in the Nation, other than those of Florida and Michigan, has sought to use a binding process for 2008 in violation of the DNC Timing Rule. No Democratic Party in the Nation, other than that of Florida, faced with a state-run primary that violates the DNC's Timing Rule, has refused to adopt any alternative process that complies with them, in 2008 or any earlier presidential year.   In these circumstances, it is not the DNC's imposition of sanction that represents unequal treatment. To the contrary, it is the special *exemption* from these rules for Florida that Plaintiff now demands, that would be discriminatory and unequal.  The DNC owes to the integrity of its process and to the 54 other state and territorial Democratic Parties its best effort to enforce its rules fairly and uniformly. That is exactly what the DNC has done.  That action does not violate the Fourteenth Amendment.

## II.    THE DNC'S ACTIONS DO NOT VIOLATE TITLE VI OF THE CIVIL RIGHTS ACT

Under the Presidential Election Campaign Fund Act, 26 U.S.C. §9008, the DNC receives federal funding, through the Federal Election Commission ("FEC"), to defray certain costs of putting on the Democratic National Convention.  Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d, prohibits discrimination against any person on the ground of race, color or national origin "under any program or activity receiving Federal financial assistance."   In Count II of his Complaint, Plaintiff claims that because the Democratic Parties of South Carolina and Nevada were allowed to hold their primary and caucus, respectively, before the Florida primary, based in part on the Party's desire to include more

racially and ethnically diverse Democratic electorates in the early contests, the Timing Rule violates Title VI.  (Dkt. #1, at ¶¶27-29.)  The DNC is entitled to judgment on this claim, for two reasons.

First, Plaintiff lacks standing to bring this claim because there is no causal connection between the federal funding and the Timing Rule.  In *Freedom Republicans, Inc. v. Federal Election Comm'n*, 13 F.3d 412 (D.C. Cir.), *cert. denied*, 513 U.S. 821 (1994), a group of Republican voters sued the FEC claiming that the Republican Party's delegate selection rules providing "bonus delegates" to states which elected more Republicans discriminated against minority groups; and therefore that the FEC's continued funding of the Republican National Convention violated Title VI.  The court held that the group lacked standing to assert such a claim because the federal funding played no role in the RNC's decision to promulgate the delegate selection rule being challenged.  "[T]he current delegate-allocation scheme of the Republican Party appears to be the product of complex political considerations that emerged and are sustained independently of any concern for funding."  *Id.* at 419-20.  Thus, the court concluded, the Republican plaintiffs "did not meet the causation and redressability requirements necessary for standing under Article III…."  *Id*. at 419.

Exactly the same is true in the case at bar: the availability of public funding for the Convention played no role at all in the promulgation or enforcement of the DNC Timing Rule.  Plaintiff lacks standing to bring this Title VI claim.

Even if Plaintiff did have standing, however, the DNC would be entitled to judgment on this claim.  The undisputed facts establish that no person is being excluded from participation as a delegate in the 2008 Democratic National Convention on the basis of race.

Nor is any voter being excluded or discriminated against on the ground of race or national origin in terms of ability to participate in the delegate selection process. To the contrary, the DNC Delegate Selection Rules strictly prohibit any form of discrimination in the delegate selection process and require that state parties include robust affirmative action programs in their plans for selection delegates.  (McN. Dec. Ex. A, Rules 5, 6 & 7.)

### CONCLUSION

For the reasons set forth above, there is no genuine issue of material fact and, based on the undisputed facts, Plaintiff cannot establish any violation of his rights under the Fourteenth Amendment or under Title VI of the Civil Rights Act of 1964.  Accordingly, defendant DNC is entitled to judgment as a matter of law and the DNC's motion for summary judgment should be granted.

Respectfully submitted this 1st day of May, 2008,

By:____/s/ Katherine E. Giddings_____
Katherine E. Giddings (Fla. Bar. No. 949396)
katherine.giddings@akerman.com
Pamela C. Marsh (Fla. Bar. No.057400)
pamela.marsh@akerman.com
AKERMAN SENTERFITT
106 East College Avenue Suite 1200
Tallahassee, Florida  32301
Telephone: 850-224-9634
Fax: 850-222-0103

Of counsel:
Joseph E. Sandler
General Counsel, DNC
SANDLER, REIFF & YOUNG, P.C.
50 E Street, S.E.  # 300
Washington, D.C. 20003
Telephone (202) 479-1111
Fax: (202) 479-1115
sandler@sandlerreiff.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 1, 2008, I electronically filed the foregoing CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT THEREOF with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to counsel for Plaintiff, Michael A. Steinberg, Esq., Michael A. Steinberg & Associates, 4925 Independence Parkway, Suite 195, Tampa, Florida 33602.

/s/ Katherine E. Giddings_____
Katherine E. Giddings