# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**VICTOR DIMAIO**,

                Plaintiff                           Case No. 8:08-cv-672-T-26EAJ

v.

**DEMOCRATIC NATIONAL COMMITTEE,**

                Defendant.

_____

## RESPONSE OF DEFENDANT DEMOCRATIC NATIONAL COMMITTEE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

In this action, plaintiff Victor DiMaio ("Mr. DiMaio") is again challenging the decision of defendant Democratic National Committee (the "DNC") to establish and enforce rules governing the sequence and timing of primaries and caucuses used by state Democratic Party committees to select delegates to the 2008 Democratic National Convention (the "Timing Rule"). Mr. DiMaio has moved for summary judgment and the DNC has filed a cross-motion for summary judgment.

In his motion for summary judgment, Mr. DiMaio asserts that the DNC violated his rights under the Equal Protection Clause of the Fourteenth Amendment. Specifically, Mr. DiMaio claims that the DNC improperly considered the racial and/or national origin composition of the Democratic electorate in two states—Nevada and South Carolina—when the DNC determined that those states, along with Iowa and New Hampshire, should be allowed to hold a binding presidential preference event (primary or caucus) before those in

other states. Since Mr. DiMaio is white, he is evidently claiming that he is somehow a victim of "reverse discrimination" based on race or national origin.

For four reasons, this claim is meritless. First, the DNC has not discriminated in any way against Mr. DiMaio, against white voters in the state of Florida, against the Democratic voters of Florida generally or in any other way. Second, the case is non-justiciable because it would implicate the courts in political party policy-making, would call on the courts to ignore the constitutionally protected right of the national political parties to set and enforce rules for the selection of delegates to their national nominating Conventions, and is a case in which there is a lack of judicially discoverable and manageable standards. Third, even if the case were justiciable, the DNC's enforcement of the Timing Rule does not constitute state action. Finally, the DNC's actions do not violate the Fourteenth Amendment because the DNC's consideration of race and national origin as one factor in selection of states to hold early contests would pass constitutional muster even under "strict scrutiny." And, in the absence of any invidious discrimination, those DNC actions easily meet the very different standard that actually is applicable in this case: they rationally advance the Party's political goals.

Mr. DiMaio also claims that the DNC's establishment and enforcement of its Timing Rule violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d. Mr. DiMaio lacks standing to bring this claim because the DNC delegate selection rules have nothing to do with the federal funding made available to hold the Democratic National Convention. In any event, Mr. DiMaio has failed to demonstrate that any voter or delegate has been excluded or

discriminated against in any way based on race or national origin in the DNC's delegate selection process.

## COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS

The material facts the DNC contends are not genuinely in dispute are set out in the Statement of Facts in the DNC's cross-motion and will not be fully repeated here. The facts material to Mr. DiMaio's Motion for Summary Judgment are as follows and are not genuinely in dispute.

The question of what sequence and timing would best serve the Party's interests has been intensely debated within the Party for many years. (*See* Declaration of Philip McNamara, previously filed as Attachment #1 to Defendant's Cross Motion for Summary Judgment (Dkt. #15), (hereinafter "McN. Dec.") ¶¶ 15-16). These deliberations have involved the delicate balancing of the value of showcasing smaller less populous states where more personal "retail" campaigning is still possible against the competing value of giving a role to larger, more racially, ethnically and economically diverse states. (*Id.* ¶16).

For the 2004 presidential nominating process, the DNC's Delegate Selection Rules required all state Democratic Parties to use, for the allocation of delegate positions among presidential candidates, a primary or first-tier caucus occurring no earlier than the first Tuesday in February, with exceptions for Iowa and New Hampshire. (*Id.* ¶¶ 18-19). In December 2005, after a nearly year-long process involving numerous hearings and meetings, that a Party commission (the "Price-Herman Commission") found that the traditional role of Iowa and New Hampshire should be balanced against the need to place candidates before a range of voters more reflective of the Party's geographic, racial and economic diversity. (*Id.*

¶¶ 23-24). The Commission recommended adding one or two additional caucuses between the Iowa caucuses and the New Hampshire primary, and one or two additional primaries after the New Hampshire contest but before February 5, 2008, the first date on which all other states could start to hold their events. (*Id.* ¶ 24).

During 2006, the DNC Rules and Bylaws Committee ("DNC RBC"), the body charged with developing and enforcing the Delegate Selection Rules, invited state Democratic Parties to apply to be one of the states allowed to hold those pre-February 5th events. Eleven state parties did so. Florida was not among them. (*Id.* ¶¶ 26-28). After another extensive round of presentations and meetings, the DNC RBC recommended a set of rules providing that the Iowa caucuses would take place no earlier than January 14, 2008; that one caucus would be held between the Iowa caucus and the New Hampshire primary, and that this caucus would be held in Nevada, a state with a significant and growing Latino population, a sizeable Asian-American and Pacific Islander community, a strong organized labor presence, and in the western region of the country where the Democratic Party was making electoral gains. The DNC RBC further recommended that one primary be held between the New Hampshire primary and the opening of the window on February 5, and that this primary be held in South Carolina, a southern state in which African-Americans represent a significant share of the Democratic electorate. (*Id.* ¶¶ 29-30). All other state parties would be required to hold their primaries or first caucuses on or after February 5, 2008. This is the DNC's "Timing Rule" of which Mr. DiMaio complains.

The Florida Democratic Party ("FDP") chose to use, for the allocation of delegates, a presidential preference primary scheduled by the State of Florida to take place on January 29,

2008—a violation of the DNC's rules. The DNC RBC then enforced the DNC Timing Rule by refusing to allow any delegates to be seated from Florida unless and until the FDP used an alternative process that complied with the rules, which the state party never did. (*Id.* ¶¶41-47). However, the DNC RBC has jurisdiction to resolve challenges brought before June 29, 2008, relating to the seating of delegates. A challenge seeking the seating of Florida's unpledged delegates and one-half of its pledged delegates is now pending before the DNC RBC, and the DNC RBC has scheduled a meeting for May 31, 2008, to consider that challenge. (*Id.* ¶¶58-62).

## I.   THE DNC'S ACTIONS HAVE NOT DISCRIMINATED AGAINST ANYONE ON THE BASIS OF RACE OR NATIONAL ORIGIN

It is indisputable that Mr. DiMaio, as an individual voter, has not been discriminated against based on race or national origin. He has been afforded exactly the same right as Florida Democrats of all races and national origins: to vote in the January 29, 2008 primary. That the DNC has refused to recognize the results of that primary in the allocation of delegates to the National Convention from Florida obviously does not discriminate against anyone on the basis of race or national origin.

Nor has the DNC discriminated against the Democratic voters in Florida based on race or national origin, as Mr. DiMaio suggests in his motion. (Dkt. #10 at 9-10). Mr. DiMaio concedes that the DNC in fact permitted the state Democratic Parties in *four* states to treat as binding primaries or caucuses held before February 5: Iowa, Nevada, New Hampshire and South Carolina. Mr. DiMaio ironically suggests that, because the DNC sought to <u>better</u> reflect the Party's ethnic, geographic and economic diversity in adding South Carolina and Nevada to the mix of states permitted to use events prior to those in all other

states, the DNC's decision was impermissibly "based on the racial and national origin demographics of a state or states." (*Id.* at 10). "It is clear," Mr. DiMaio argues, "that the method in which South Carolina and Nevada were chosen was based on a desire to maintain the role of New Hampshire and Iowa as the first in the nation presidential preference primary and caucus and then compensate for the lack of ethnic diversity in those states by selecting two states in the pre-window period with a significantly larger than average demographic share of African Americans and Hispanic/Latinos than the national average." (*Id.* at 13.)

Mr. DiMaio seems to argue that the DNC is "discriminating" against Democratic voters in any state where the state Democratic Party is not allowed to hold an event prior to February 5th. That argument makes no sense. Mr. DiMaio contends that the DNC's scheduling decision gives the voters of Florida "less perceived influence than the voters of New Hampshire, Iowa, South Carolina and Nevada." (*Id.* at 16). That, of course, has not turned out to be the case. Although many assumed that the "early" state contests would have a disproportionate influence on the outcome of the Democratic nominating contest, in fact, they did not. As of this date, two candidates are still actively competing for the Democratic nomination for President, and Democratic voters in virtually all 50 states have had, or will have, a significant and equal influence on the outcome. Indeed, a strong argument can be made that, had Florida's Democratic Party not violated the DNC rules, but instead held a caucus *after* February 5th, or had the state legislature moved the date of the primary to after February 5th, or had the date of the primary never been changed by the legislature and the primary was conducted as previously provided in statute on March 4, 2008 – the same day as the Ohio and Texas contests, the influence of the Democratic voters of Florida on the

nominating process would have been far *greater* than if the January 29 primary were treated as binding.

In addition, it seems clear that Mr. DiMaio would have no case if the DNC had selected Florida itself, a state with significant representation of African Americans and Latinos in its electorate, to be one of the early states. Yet the logic of Mr. DiMaio's argument would apply with equal force. The FDP never bothered to apply to be considered for selection as one of the additional states to be allowed to hold early contests. Had Florida applied and had the DNC chosen Florida as one of the early states based on the same factors as those that actually applied: geographic diversity, economic diversity and ethnic diversity, by Mr. DiMaio's logic, a voter in any of the other 46 states would have the same case as he does now.

Unless the DNC is somehow constitutionally compelled to require all state Democratic Parties to hold presidential preference primaries and caucuses on the same day, or to allow each state Democratic Party to choose to hold an event whenever it wants, there is simply no basis in this case for a claim of "discrimination" of any kind against the Democratic voters of a particular state. Clearly, the DNC is <u>not</u> required to do either. As the Court held in another case challenging the DNC's actions with respect to Florida's delegates, plaintiffs "have offered not a single argument –and none comes to mind—in support of the notion that each state must be free to do as it pleases. A national party has a compelling interest in setting a schedule and requiring compliance." *Nelson v. Dean*, 528 F. Supp. 2d 1271, 1280 (N.D. Fla. 2007).

## II.   THE FOURTEENTH AMENDMENT CLAIM IS NON-JUSTICIABLE

In any event, the DNC's selection of the four states to be allowed to use early contests was not based exclusively, or even principally, on race or national origin. The Price-Herman Commission Report that recommended that the Democratic Parties of states other than Iowa and New Hampshire be allowed to use early events—a Report that Mr. DiMaio has attached to his Complaint—mandates that the selection of specific additional states be made by the DNC RBC "applying the following criteria: racial and ethnic diversity; regional diversity; and economic diversity including union density." (*See* Price-Herman Commission Report, attached to Complaint as Exhibit B, at p. 43).

In these circumstances, it is apparent that Mr. DiMaio's Fourteenth Amendment claim is not justiciable. In *Wymbs v. Republican State Executive Comm. of Fla.*, 719 F.2d 1072 (11th Cir. 1983), *cert. denied*, 465 U.S. 1103 (1984), a Republican voter challenged the national Republican Party's delegate selection rule (reflected in the state party's rules) providing for apportionment of delegates among congressional districts, on the ground that the rule violated one-person-one-vote, and therefore ran afoul of the Fourteenth Amendment. The Court of Appeals held that the case was non-justiciable for several reasons, including that, "to provide the relief [plaintiff] has requested would require this court to engage in political party policy making beyond its role in society and beyond our ken as Article III judges," *id.* at 1082; that even if that were not the case, "we would be constrained by the Party's countervailing *first amendment* rights of free speech and association," *id.* at 1084 (emphasis in original); and that the case was one in which there is a "'lack of judicially discoverable and manageable standards to resolve the controversy,'" *id.* at 1085 (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

Exactly the same is true in this case. For this Court to overturn the DNC's Timing Rule on Fourteenth Amendment grounds would require the Court "to engage in political party policymaking," *Wymbs*, 719 F.2d at 1082, by deciding what factors the Party should consider in the scheduling and sequencing of presidential primaries and caucuses and then applying those factors. How would this Court determine whether some states should be allowed to hold events before others and if so, what factors should be considered in selecting those states? Moreover, as in *Wymbs*, such an exercise would be constrained by the DNC's countervailing First Amendment right of association. *See Democratic Party of United States v. Wisconsin ex rel. LaFollette*, 450 U.S. 107 (1981). The protections of the First Amendment are clearly implicated in the DNC's deliberations leading to promulgation of the Timing Rule, as explained in the DNC's cross-motion. (Dkt. #15 at 13-15.)

## III.    THE DNC'S ACTIONS DO NOT CONSTITUTE STATE ACTION

Mr. DiMaio invokes the jurisdiction of this Court, as to his Fourteenth Amendment claim, under 28 U.S.C. §1331 and §1343. The Fourteenth Amendment "is not a basis for jurisdiction in a claim against a private actor under either § 1331 or § 1343. ... The Fourteenth Amendment is restricted solely to wrongs committed by the State or on behalf of the State by its agents." *Harris v. McDonald's Corp.*, 901 F. Supp. 1552, 1557 (M.D. Fla. 1995). And, action "under color of state law" is a prerequisite for an action seeking jurisdiction under Section 1343(a)(3). *Hagans v. Lavine*, 415 U.S. 528, 538 (1974) (Section 1343(a)(3) gives federal courts jurisdiction "to entertain suits to redress the deprivation, *under color of state law*, of constitutional rights") (emphasis added); *Fountain v. Metro. Atlanta Rapid Transit Auth.*, 678 F.2d 1038, 1042 n.7 (11th Cir. 1982) (Section 1343(a)(3)

"grants to the federal courts jurisdiction to hear claims alleging *official state deprivation* of constitutional rights or rights secured by federal statutes providing for equal rights." (emphasis added)).

There are three tests for determining if acts of a private entity constitute "state action": (1) the "public function" test; (2) the "state compulsion" test; and (3) the "nexus/joint action" test. *See Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1277-79 (11th Cir. 2003). In this case, it is clear that none of these tests have been met. The DNC was not performing any public function in establishing and enforcing its Timing Rule. To the contrary, the purpose of the DNC RBC's action in eliminating Florida's delegation was to persuade the Florida Democratic Party to use an alternative party-run process—not involving the State's electoral machinery at all—for the allocation and selection of delegates. No state compulsion was involved in the decisions by the DNC to establish and enforce its rule. And there was no "joint action" with the state of Florida: the DNC's Timing Rule required the Florida Democratic Party *not* to use the results of the state-run primary in any way in allocating delegates to the Democratic National Convention. (McNamara Dec. ¶35).

Mr. DiMaio's reliance on the White Primary Cases—*Terry v. Adams*, 345 U.S. 461 (1953) and *Smith v. Allwright*, 321 U.S. 649 (1944)—is unavailing. (Dkt. 10 at 4-5). Those cases involved exclusion of African-Americans from a party-run primary for statewide office, the winner of which was automatically put on the state's general election ballot. In *O'Brien v. Brown*, 409 U.S. 1 (1972), the Supreme Court stayed lower court orders denying the Democratic National Convention the right to strip two states, Illinois and California, of

all of their delegates because those delegates were selected in violation of national party rules. The Court held: "It has been understood since our national political parties first came into being as voluntary associations of individuals that the convention itself is the proper forum for determining intra-party disputes as to which delegates shall be seated." *Id.* at 4. In so ruling, the Court specifically found the White Primary Cases to be inapplicable, explaining that, "This is not a case in which claims are made that injury arises from invidious discrimination based on race in a primary contest within a single state." *Id.* at 4 n. 1. The same is true of the instant case.

The courts have generally found it unnecessary to decide whether a national party's enforcement of its delegate selection rules constitutes state action because the courts have consistently held that, even if it does, the national parties have the constitutionally protected right to enforce those rules and that right prevails over any countervailing state interest or the interest of any individual voter. *See generally Cousins v. Wigoda, 419* U.S. 477 (1975); *LaRouche v. Fowler*, 152 F.3d 974 (D.C. Cir. 1998); *Wymbs v. Republican State Executive Comm. of Fla., supra; Nelson v. Dean, supra.* Indeed, since the *Cousins* decision, not a single federal court has held that a national party's enforcement of delegate selection rules constitutes state action. The only courts to have squarely addressed the question since that time have found that such enforcement does not constitute state action. *LaRouche v. Fowler*, 77 F. Supp. 2d 80, 89 (D.D.C. 1999)(3-judge court), *aff'd w/o opinion*, 529 U.S 1035 (2000). For these reasons, Mr. DiMaio does not have a viable claim under the Fourteenth Amendment.

## IV.    THE DNC'S ACTIONS DO NOT VIOLATE THE 14TH AMENDMENT

Even if the Fourteenth Amendment claim was justiciable and the DNC's actions could be regarded as those of a State, the DNC's establishment and enforcement of the Timing Rule would not violate the Fourteenth Amendment. First and foremost, there is no "discrimination" of any kind at issue here, either against Mr. DiMaio individually or against the Democratic voters of Florida collectively, for the reasons stated in Section I., above, and in the DNC's Cross-Motion for Summary Judgment.

Second, Mr. DiMaio appears to contend that the DNC may not consider race or national origin *at all* in determining which Democratic State Parties should be allowed to use early contests. (Dkt. #10 at 16 ("race or national origin should not be considered whatsoever")) That contention is completely without merit. In *Grutter v. Bollinger*, 539 U.S. 306 (2003), the Court considered the use of race as a factor in admissions decisions made by a state University. The Court held that "student body diversity is a compelling state interest than can justify the use of race in university admissions," 539 U.S. at 330, and that the "narrow tailoring" requirement is met as long as race is used only as a "plus factor" and not the sole criterion: "[U]niversities cannot establish quotas for members of certain racial groups or put members of those groups on separate admissions tracks..... Universities can, however, consider race or ethnicity more flexibly as a 'plus' factor in the context of individualized consideration of each and every applicant." *Id.* at 336. Even if the DNC were a state actor, its consideration of the racial and national origin makeup of a state's Democratic electorate as *one factor* in selecting states for early contests would clearly pass constitutional muster.

Finally, as explained in the DNC's Cross-Motion, because of the Party's own constitutionally protected right to establish and enforce its delegate selection rules, those rules are evaluated under the Fourteenth Amendment, not under the "strict scrutiny" standard but under a much different one: whether the delegate selection rule rationally advances some legitimate interest of the party in achieving its political goals. *LaRouche v. Fowler*, 152 F.3d 974, 995 (D.C. Cir. 1998)(Constitution is satisfied if the Party's delegate selection rules "rationally advance some legitimate interest of the party in winning elections or otherwise achieving its political goals"); *Bachur v. Democratic Nat'l Party*, 836 F.2d 837 (4th Cir. 1987)(same). That standard is easily met in this case. The Timing Rule rationally advances the Party's interest in maintaining a balance between preserving the ability of candidates to engage in "retail" campaigning in smaller states with the desire to reflect the economic, geographic and racial diversity of the National Party.

## V.    THE DNC'S ACTIONS DO NOT VIOLATE TITLE VI

Mr. DiMaio contends that the DNC's Timing Rule violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d, because the DNC receives federal funding to put on its National Convention under the Presidential Election Campaign Fund Act, 26 U.S.C. §9008. As noted in the DNC's Cross-Motion, and as Mr. DiMaio concedes, the one court that has directly addressed application of Title VI to national nominating conventions held that plaintiffs lacked standing to challenge Republican National Committee delegate selection rules, even though the RNC also received federal funding for its Convention, because that funding played no role in the RNC's decision to promulgate and enforce its rule. *Freedom Republicans, Inc. v. Fed. Election Comm'n*, 13 F.3d 412 (D.C. Cir.), *cert. denied*,

513 U.S. 821 (1994). Mr. DiMaio acknowledges, but makes no effort to distinguish, this decision. (Dkt. 10 at 12). It is equally true in this case that the receipt of federal funding for the Democratic Convention bears no relationship at all and played no role in the DNC's decision to establish and enforce its Timing Rule.

In any event, for the reasons stated in Section I above, the DNC's establishment and enforcement of the Timing Rule did not discriminate against anyone, any individual voter or group of voters, on the basis of race or national origin. For that reason alone, Title VI is inapplicable.

## CONCLUSION

For the reasons set forth above and in the DNC's Cross-Motion for Summary Judgment, the DNC's Motion for Summary Judgment should be granted and the Plaintiff's Motion for Summary Judgment should be denied, and judgment should be entered for the DNC on both Counts of the Complaint.

Respectfully submitted this 13th day of May, 2008,

By:    /s/ Katherine E. Giddings
Katherine E. Giddings (Fla. Bar. No. 949396)
katherine.giddings@akerman.com
Pamela C. Marsh (Fla. Bar. No.057400)
pamela.marsh@akerman.com
AKERMAN SENTERFITT
106 East College Avenue Suite 1200
Tallahassee, Florida 32301
Telephone: 850-224-9634
Fax: 850-222-0103

And:
Joseph E. Sandler
General Counsel, DNC
SANDLER, REIFF & YOUNG, P.C.
300 M Street, S.E.  Suite 1102
Washington, D.C. 20003
Telephone (202) 479-1111
Fax: (202) 479-1115
sandler@sandlerreiff.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 13, 2008, I electronically filed the foregoing RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to counsel for Plaintiff, Michael A. Steinberg, Esq., Michael A. Steinberg & Associates, 4925 Independence Parkway, Suite 195, Tampa, Florida 33602.

/s/ Katherine E. Giddings
Katherine E. Giddings